# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

UNITED NATURAL FOODS, INC.,

*Plaintiff*,

v.

GOLDMAN SACHS GROUP, INC.;
GOLDMAN SACHS BANK USA;
GOLDMAN SACHS LENDING PARTNERS,
LLC; STEPHAN J. FELDGOISE; BANK OF
AMERICA, N.A.; and MERRILL LYNCH,
PIERCE, FENNER & SMITH
INCORPORATED,

*Defendants*.

Index No. _____

**SUMMONS**

**Plaintiff designates New York**

**County as the place of trial.**

**Venue is proper in this**

**County pursuant to CPLR § 503.**

**SUMMONS**

TO THE ABOVE-NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED and required to serve upon Plaintiff's attorneys an

answer to the Complaint in this action within twenty (20) days after service of this Summons,

exclusive of its day of service, or within thirty (30) days after service is complete if the

Summons is not personally delivered to you within the State of New York. In case of your

failure to appear or answer, judgment will be taken against you on default for the relief

demanded in the Complaint.

Plaintiff has designated New York County as the place of trial. Venue is appropriate in

this County pursuant to CPLR 503(a) because Defendants Goldman Sachs Group, Inc., Goldman

Sachs Bank USA, Goldman Sachs Lending Partners, LLC, Merrill Lynch, Pierce, Fenner &

Smith Incorporated, and, on information and belief, Stephan J. Feldgoise reside in this County.

This Court has subject matter jurisdiction over the dispute pursuant to Judiciary Law § 140-b. Plaintiff has incurred damages in excess of the $500,000 monetary threshold required for jurisdiction in the Commercial Division of New York County. This Court has personal jurisdiction over Defendants under CPLR 302(a)(1) because each of the Defendants transacts business in New York County and the conduct alleged in the Complaint took place in New York County. This dispute arises out of or relates to contracts that were negotiated and drafted in New York County and are governed by the laws of the State of New York. Under those contracts, Defendants have irrevocably submitted to the exclusive jurisdiction of state and federal courts sitting in the Borough of Manhattan in the City of New York.

Dated: New York, NY
       January 30, 2019

By :   /s/ Gabriel F. Soledad
Gabriel F. Soledad
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
gabrielsoledad@quinnemanuel.com

*Counsel for Plaintiff United Natural Foods, Inc.*

TO:      Goldman Sachs Group, Inc.
          C/O CT Corporation System
          111 8th Avenue
          New York, NY 10011

          Goldman Sachs Bank USA
          200 West Street
          New York, NY 10282

2

<u>Goldman Sachs Lending Partners, LLC</u>
C/O CT Corporation System
111 8th Avenue
New York, NY 10011

<u>Stephan J. Feldgoise</u>
200 West Street
New York, NY 10282

<u>Bank of America, N.A.</u>
1 Bryant Park
New York, NY 10036

<u>Merrill Lynch, Pierce, Fenner & Smith Incorporated</u>
C/O CT Corporation System
111 8th Avenue
New York, NY 10011

3

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

UNITED NATURAL FOODS, INC.,

        *Plaintiff,*

v.

GOLDMAN SACHS GROUP, INC.;
GOLDMAN SACHS BANK USA;
GOLDMAN SACHS LENDING
PARTNERS, LLC; STEPHAN J.
FELDGOISE; BANK OF AMERICA, N.A.;
and MERRILL LYNCH, PIERCE, FENNER
& SMITH INCORPORATED,

        *Defendants.*

Civil Action No.

**COMPLAINT**

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION .................................................................................................. 1

JURISDICTION, VENUE AND GOVERNING LAW .................................................... 6

THE PARTIES........................................................................................................................ 6

I.      Plaintiff ...................................................................................................................... 6

II.     Defendants ................................................................................................................. 7

FACTUAL ALLEGATIONS .............................................................................................. 7

I.      The Acquisition......................................................................................................... 7

        A.      The Acquisition was Vital to UNFI's Future........................................... 8

        B.      Goldman Sachs Earned Millions on the Acquisition by Positioning Itself
                as UNFI's Trusted Financial Advisor ....................................................... 8

        C.      Goldman Sachs Made Millions More on the Acquisition by Committing to
                Provide the Financing UNFI Needed....................................................... 10

        D.      Goldman Sachs Ensured Total Control Over the Financing Terms (And
                Millions More in Fees) By Capturing the Role of Lead Arranger........ 12

        E.      Goldman Sachs' Interests in the Acquisition Directly Conflicted with
                UNFI's ........................................................................................................ 15

II.     The Syndication ..................................................................................................... 17

        A.      Goldman Sachs Initiated the Marketing Period on September 24, 2018 .............. 17

        B.      Goldman Sachs Sought to Extract Concessions Detrimental to UNFI
                Ahead of the Marketing Period's October 15 Close ............................. 20

                1.      Goldman Sachs Manipulated the CDS Market in Exchange for
                        Participation in the Term Loan ................................................. 22

                2.      UNFI Refused to Voluntarily Increase the Interest Rate and
                        Goldman Sachs Warned That "Things Would Get Ugly" ......... 27

III.    The Closing............................................................................................................. 28

        A.      Goldman Sachs' Extortive Claim for the Marketing Period Fees .......... 29

i

1.      Goldman Sachs' Purported Interpretation is at Odds with the Plain Language of the Commitment Letter and its Prior Conduct......................30

2.      Goldman Sachs' Purported Interpretation is Nonsensical and Commercially Unreasonable.......................................................................33

B.     Goldman Sachs Misappropriated an Additional $11.4 Million in Fees................36

C.     Goldman Sachs and Bank of America Withheld Funds From the Funds They Promised UNFI Over UNFI's Vigorous Objection ......................................38

IV.    Damages......................................................................................................................39

CAUSES OF ACTION ........................................................................................................40

DEMAND FOR RELIEF .....................................................................................................45

ii

Plaintiff United Natural Foods, Inc. ("UNFI"), the largest publicly-traded distributor of natural, organic, specialty, and conventional grocery and non-food products, and provider of professional support services in the United States and Canada, by and through its undersigned counsel, brings this action against Goldman Sachs Group, Inc. ("Goldman Sachs"), its subsidiaries Goldman Sachs Bank USA and Goldman Sachs Lending Partners, LLC (together, "Goldman Bank"), and Stephan J. Feldgoise ("Feldgoise"), Goldman Sachs' Head of Mergers and Acquisitions for the Americas, as well as Bank of America, N.A. and Merrill Lynch, Pierce, Fenner & Smith Incorporated (together, "Bank of America") (collectively, the "Defendants").

## NATURE OF THE ACTION

1.      This case is about Goldman Sachs exploiting its reputation, market power and influence over its client, UNFI, in an unbridled pursuit of profits.  UNFI entrusted Goldman Sachs to both provide a full range of investment advisory services and arrange a multi-billion-dollar loan for the largest and most significant transaction in UNFI's history:  its acquisition of SUPERVALU INC. ("SUPERVALU").  UNFI's acquisition of SUPERVALU, at the time the largest publicly-traded food distributor in the United States (the "Acquisition"), is expected to expand UNFI's product range, grow its customer base and enhance its scale and efficiency.  In positioning itself as UNFI's trusted financial advisor on the one hand and lead arranger for the financing on the other, Goldman Sachs consolidated its command over all aspects of the transaction, enabling it to ensure its own profits to the detriment of UNFI and its shareholders.

2.      The Acquisition was to be financed in large part through a **$2.15 billion** loan (the "Term Loan") that Goldman Sachs, though Goldman Bank, along with Bank of America and U.S. Bank, N.A. ("U.S. Bank"),[1] had committed to provide UNFI.  Protecting its (and the other Term

---

[1]      This complaint does not assert claims against U.S. Bank, against which UNFI reserves all rights.

Loan lenders') profits in the Acquisition required that Goldman Sachs successfully recruit investors to fund the Term Loan (known as syndicating the loan), a process that Goldman Sachs made certain it controlled. Goldman Sachs and the other Term Loan lenders were obligated to directly fund any portion of the loan Goldman Sachs was unable to syndicate. As such, Goldman Sachs' failure to syndicate the loan would increase its and the other Term Loan lenders' credit risk (due to the concentration of significant funds in one loan), and prevent them from using those funds to make other investments promising higher returns or offering different risk profiles.

3.      Claiming difficulty syndicating the Term Loan due to insufficient interest from potential investors, Goldman Sachs went into what it called "*full risk mitigation mode*" to protect its bottom line. Goldman Sachs used its influence over UNFI and its total control over the Acquisition's financing to make the Term Loan more attractive to investors and more expensive for UNFI—in complete disregard of the substantial harm that doing so would cause UNFI and its shareholders. Among other changes to the loan terms, Goldman Sachs increased the interest rate on the Term Loan by 1.5%, which would amount to more than **$180 million** in additional interest over the life of the loan. It also demanded that UNFI make detrimental concessions for which it had ***not*** bargained, and that UNFI was under no obligation to provide.

4.      To induce UNFI to agree to its demands, Goldman Sachs largely relied on the threat that UNFI's refusal to do so would "*scare off*" potential investors in the loan, leading to an unsuccessful syndication, which would in turn generate "*blowback*" to UNFI from UNFI's shareholders (who, Goldman Sachs contended, would view a failed syndication as likely to create a perception in the market that UNFI would not be able to repay the financing). In the belief that its trusted financial advisor and good-faith loan arranger was acting in its best interest (as Goldman Sachs was obligated to do), UNFI largely accepted Goldman Sachs' changes to the loan terms and

2

acceded to Goldman Sachs' additional demands, with the view that doing so would ultimately protect UNFI's and its shareholders' long-term interests.

5.      Reflecting Goldman Sachs' utter lack of good faith, one of the changes that Goldman Sachs forced on UNFI was adding SUPERVALU as a co-borrower of the Term Loan in order to manipulate the credit default swaps ("CDS") market so as to syndicate the loan. Goldman Sachs falsely claimed that the change would have a "[m]uted impact on [UNFI], but [would be] meaningful to select accounts." Only after the Acquisition's close did UNFI discover the true meaning of this cryptic, and false, explanation. Through the media—not Goldman Sachs—UNFI learned that the "select accounts" were Goldman Sachs' hedge-fund clients that had previously purchased SUPERVALU CDS, i.e., insurance on SUPERVALU's debt. SUPERVALU's debt stood to be extinguished as part of the Acquisition, rendering insurance on it worthless and zeroing out the CDS purchasers' investment. Adding SUPERVALU as a co-borrower preserved SUPERVALU's loan obligations, reviving the value of CDS on its debt for the benefit of SUPERVALU CDS purchasers.

6.      On the first day that the co-borrower provision was publicly announced, the value of **$470 million** in outstanding CDS protection on SUPERVALU spiked by more than **$70 million**, and has continued to rise by millions more in the intervening months. On information and belief, Goldman Sachs' manipulation of the CDS market, in violation of its regulatory obligations, was a *quid pro quo* for its CDS clients' participation in the syndication, which would protect Goldman Sachs, and the other Term Loan lenders, from the risks and costs of funding the Term Loan themselves. Goldman Sachs' intervention was to the (far more than "muted") detriment of UNFI and its shareholders, who will now have to contend with creditors that would profit from UNFI's default on the Term Loan.

3

7.      Further illustrating Goldman Sachs' lack of good faith, it brazenly demanded that UNFI *voluntarily* increase the interest rate that it would pay on the Term Loan by an additional 0.5%—this after Goldman Sachs had already unilaterally increased the interest rate on the Term Loan by 1.5%.  The additional 0.5% increase would have amounted to over **$61 million** more in interest over the life of the loan (on top of the more than **$180 million** from the initial 1.5% interest rate hike), which would make the loan more attractive to investors, again, at the expense of UNFI and its shareholders.  When, consistent with its fiduciary duties to its shareholders, UNFI refused to voluntarily pay more for the financing, Goldman Sachs called UNFI's CEO and threatened that "*things would get ugly*" if UNFI did not concede to the increase.  Refusing to put Goldman Sachs' profits over its own shareholders, however, UNFI stood its ground.

8.      As a result, just as Goldman Sachs had promised, things "*got ugly*" for UNFI. Goldman Sachs refused to deliver, in flagrant disregard of its duties and obligations to UNFI, tens of millions of dollars it had unequivocally committed to provide UNFI at closing—a commitment for which UNFI had already agreed to pay Goldman Sachs, along with Bank of America and U.S. Bank, dearly.  Goldman Sachs did not communicate to UNFI its intention to withhold those funds until one business day before the Acquisition's close, when UNFI had no choice but to proceed with the transaction or potentially risk billions of dollars in lawsuits by SUPERVALU, as well as its own shareholders.  This final gambit to sweeten the deal to UNFI's detriment illustrates the degree to which Goldman Sachs had abandoned any pretense that it was acting as UNFI's trusted financial advisor, or even good-faith Term Loan lead arranger.  By withholding fees from the financing it had committed, Goldman Sachs made good on its threat, and lined its own pockets.

9.      Goldman Sachs withheld **$40.5 million** on the demonstrably false assertion that UNFI did not allow it the contractually-agreed-upon time to market the Term Loan to potential

4

investors in an effort to syndicate it—a claim Goldman Sachs set up by, on information and belief,

failing to use its good-faith efforts to syndicate the Term Loan as soon as practicable. The plain

language of Goldman Sachs' agreements with UNFI, as well as the parties' common understanding

of those agreements reflected by Goldman Sachs' own course of conduct in the months prior to

closing, belie Goldman Sachs' last-minute claim. That Goldman Sachs knew it was not entitled

to the additional $40.5 million is further evidenced by the manner in which it took it: springing its

claim on UNFI with only one business day remaining before closing and in violation of its

contractual obligation to invoice any claimed fees at least three business days before closing.[2]

10.      In yet another abuse of its complete control over the financing, Goldman Sachs

withheld from the Term Loan, and paid to itself, **$11.4 million** in advisory fees that UNFI had

initially agreed to pay it for faithfully guiding UNFI through the Acquisition. Goldman Sachs did

so despite having no right to withhold *a single penny* of advisory fees—which had to be invoiced

pursuant to a separate agreement between Goldman Sachs and UNFI—from the Term Loan

proceeds. Goldman Sachs nevertheless did so because it enabled it to renege on a **$2 million**

discount that it had offered UNFI on its advisory fees, even before UNFI agreed to enter into the

Acquisition, in order to encourage UNFI to pay a higher purchase price for SUPERVALU—which

UNFI did, in part, based on Goldman Sachs' promise.

---

[2]      On information and belief, this is not the first time that Goldman Sachs, acting as a lender, has
engaged in such misconduct. Goldman Sachs has, on information and belief, claimed additional fees to
which it was not entitled, for purposes of syndicating the entirety of a loan and ensuring its own profits, on
at least one other occasion. As here, it did so at the last minute when its client, the borrower, had no option
but to proceed with the transaction or risk lawsuits by the acquisition target and its own shareholders.
Indeed, it is easy to see how Goldman Sachs might leverage its market power to claim additional fees
whenever it has difficulty syndicating a loan. The threat that it may withhold funding at closing effectively
ensures that a borrower will accept even, as here, extortionate terms designed to line Goldman Sachs' own
pockets to the detriment of the borrower.

11.     While every indication is that the Acquisition will yield the benefits that UNFI anticipated, this lawsuit seeks to hold Goldman Sachs to account for using its influence and control, including its willingness to violate its regulatory obligations, to protect and increase its profits to the detriment of UNFI and its shareholders.

## JURISDICTION, VENUE AND GOVERNING LAW

12.     The Court has subject matter jurisdiction over the dispute pursuant to Judiciary Law § 140-b, and venue is appropriate in this County pursuant to CPLR 503(a), because Defendants Goldman Sachs, Goldman Sachs Bank USA, Goldman Sachs Lending Partners, LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, and, on information and belief, Feldgoise reside in this county.  UNFI has incurred damages in excess of the $500,000 monetary threshold required for jurisdiction in the Commercial Division of New York County.

13.     This Court has personal jurisdiction over Defendants under CPLR 302(a)(1) because each of Defendants transacts business in New York County, and the conduct alleged in this Complaint took place in New York County.  The Commitment Letter, Fee Letter, and Structuring Fee Letter (as defined and described below) were negotiated and drafted in New York County, and are governed by the laws of the State of New York.  Under the Commitment Letter, Defendants have irrevocably submitted to the exclusive jurisdiction of state and federal courts sitting in the Borough of Manhattan in the City of New York.

## THE PARTIES

**I.     Plaintiff**

14.     UNFI is the largest publicly-traded distributor of natural, organic, specialty, and conventional grocery and non-food products, and provider of professional support services, in the

United States and Canada. It is incorporated in Delaware with its principal place of business in Providence, Rhode Island.

## II. **Defendants**

15.     Defendant Goldman Sachs is a Delaware corporation with its principal place of business in New York, New York.

16.     Defendant Goldman Sachs Bank USA is a New York State-chartered bank with its principal place of business in New York, New York.

17.     Defendant Goldman Sachs Lending Partners, LLC is a Delaware corporation with its principal place of business in New York, New York.

18.     Defendant Feldgoise is the Head of Mergers and Acquisitions for the Americas for Goldman Sachs, based in New York, New York.

19.     Defendant Bank of America, N.A. is a nationally chartered banking association with its principal place of business in Charlotte, North Carolina.

20.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated is an investment advisor incorporated in Delaware with its principal place of business in New York, New York.

## FACTUAL ALLEGATIONS

## I.     The Acquisition

21.     On July 26, 2018, UNFI and SUPERVALU announced that UNFI would acquire SUPERVALU, then the largest publicly-traded food distributor in the United States, for approximately $2.9 billion. To do so, UNFI would pay approximately $1.3 billion in cash to SUPERVALU's shareholders and the balance to SUPERVALU's creditors to extinguish most of SUPERVALU's debt.

### A.    The Acquisition was Vital to UNFI's Future

22.    UNFI's acquisition of SUPERVALU was strategically critical for five reasons.

First, it is expected to deliver significant synergies, resulting in at least $185 million in cost savings by the end of the fourth year after the Acquisition.  Second, it diversified UNFI's customer base. Third, it expanded UNFI's market reach and scale to increase efficiencies and capture a greater share of industry growth.  Fourth, it enhanced technology, capacity and systems enabling the streamlining of processes to more efficiently meet the needs of customers and significantly reduce future capital expenditures.  Fifth, it enabled cross-selling opportunities to deliver comprehensive and expanded offerings, including in high-growth categories such as meat and produce.

23.    In short, UNFI's acquisition of SUPERVALU is the single most important undertaking in UNFI's history, intended to convert UNFI, over time, into the premier wholesaler of food-related products and services in North America.  In the months since the Acquisition, every indication is that all of the benefits UNFI anticipated, and more, will be fully realized.

### B.    Goldman Sachs Earned Millions on the Acquisition by Positioning Itself as UNFI's Trusted Financial Advisor

24.    On July 20, 2018, UNFI entered into an agreement (the "M&A Agreement") with Goldman Sachs & Co., LLC ("Goldman Advisory"), a U.S. financial advisor (a Goldman Sachs' subsidiary and affiliate of Goldman Bank), entrusting it to advise UNFI in navigating all aspects of this complex, bet-the-company transaction.[3]  Specifically, Goldman Advisory was to advise UNFI on decisions ranging from what to pay for SUPERVALU; how to structure the financing for

---

[3]    UNFI had another financial advisor on the transaction, Foros LLC ("Foros").  Foros did not, however, stand to earn anywhere near what Goldman Advisory was charging, and did not have control over the terms of the financing or insight into the basis for the changes to the financing that Goldman Sachs demanded.  That is also true of UNFI's transactional counsel, Skadden, Arps, Slate, Meagher & Flom LLP.

the Acquisition; the manner in which to communicate the Acquisition to UNFI's shareholders; as well as an array of other "business, strategic, financial and tactical" decisions.

25.    Importantly, Goldman Advisory promised that it would provide advice to no entity other than UNFI in connection with the Acquisition.  In other words, Goldman Sachs, through Goldman Advisory, pledged that it would remain loyal to its client, UNFI.  Indeed, as a result of the M&A Agreement, Goldman Sachs and UNFI were no longer participants in an arms'-length transaction.  Instead, Goldman Sachs was obligated to provide advice that was in UNFI's best interest, and UNFI had every expectation that Goldman Sachs would do so.

26.    In exchange for Goldman Sachs' financial advisory services, and its promise to act as a guardian of UNFI's interest, UNFI initially agreed to compensate it **$11.4 million**.  Goldman Advisory, through Feldgoise, however, later agreed to reduce those fees to **$9.4 million**. Specifically, on July 25, 2018, when SUPERVALU was still evaluating purchase offers from UNFI and one other company, Goldman Advisory offered to reduce its advisory fees by **$2 million** if UNFI followed its advice and raised the purchase price it was offering from $27 per share to $32.50 per share—a substantial increase in its offer.  In part based on Goldman Advisory's promised $2 million contribution, but also because UNFI believed that its trusted financial advisor was acting in UNFI's best interest in providing pricing advice, UNFI followed Goldman Advisory's advice and raised its offer for SUPERVALU.[4]

27.    As reflected by the offer of a substantial discount on its advisory fees, UNFI winning the bid was vital to Goldman Sachs' interests.  If UNFI won the bid, Goldman Advisory

---

[4]    As further described below (*infra* ¶¶ 84-87), Goldman Sachs would ultimately renege on that agreement by having Goldman Bank misappropriate the advisory fees, including the $2 million that Goldman Sachs had agreed to discount, from the funds that Goldman Bank was obligated to provide to UNFI at closing to acquire SUPERVALU.

would earn its full **$9.4 million** (taking into account its discount to UNFI) in advisory fees.  If it

did not, Goldman Advisory would only be entitled to a small portion (**$500,000**) of those fees.  In

addition, because UNFI would need bank financing to close the Acquisition, Goldman Bank was

simultaneously negotiating with UNFI (at the same time UNFI was bidding on and evaluating the

Acquisition with the help of Goldman Advisory) to hold a substantial portion of the committed

financing.  As described below, that would enable Goldman Bank to secure an additional **$14.5

million** in fees—not including the **$5.375 million** it would also ultimately claim for acting as lead

arranger for the syndication.  It was the prospect of not only the advisory fees, but also the

financing and structuring fees, that colored and influenced Goldman Advisory's supposed counsel

to UNFI at this critical time.  Indeed, coupling advisory services with the offer to fund the

transaction, as it ultimately did, would earn Goldman Sachs, via its subsidiaries Goldman Advisory

and Goldman Bank, a handsome profit—and the higher the bid, the more UNFI would need to

fund and the higher the financing fees that would ultimately bring.

> ### C.  Goldman Sachs Made Millions More on the Acquisition by Committing to Provide the Financing UNFI Needed

28.     As contemplated and negotiated leading up to the signing of the Acquisition, on

July 25, 2018, UNFI entered into an agreement (as amended on August 7, 2018 and August 8,

2018, the "Commitment Letter," attached hereto as Exhibit 1) pursuant to which Goldman Bank

made a firm commitment to fund a loan UNFI needed to acquire SUPERVALU.  Specifically,

Goldman Bank agreed to fund 45%, and Bank of America agreed to fund another 45%, of the

Term Loan,[5] a $2.15 billion loan at a LIBOR plus 2.75% interest rate and a seven-year maturity.[6]

---

[5]     U.S. Bank agreed to fund the remaining 10%.

[6]     The parties to the Commitment Letter, including Goldman Bank and Bank of America, among other banks, also agreed to fund a $2.0 billion "revolver," i.e., a revolving credit line guaranteed by the

Importantly, Defendants' commitments were not conditioned on the successful syndication of the Term Loan.

29.    In exchange for promising UNFI the funding it needed to acquire SUPERVALU, on July 25, 2018, UNFI entered into a second agreement with Goldman Bank and the other Term Loan lenders (as amended on August 7, 2018 and August 8, 2018, the "Fee Letter," attached hereto as Exhibit 2) setting forth, among other things, the fees the Term Loan lenders would earn for committing to fund the Term Loan.  The Fee Letter provided that UNFI would pay Goldman Bank, along with Bank of America and U.S. Bank, at minimum, 1.5% of the Term Loan amount, i.e., **$32.25 million** (1.5% of $2.15 billion), for their commitment to fund the loan—of which Goldman Bank and Bank of America were each entitled to **$14.5 million**.[7]

30.    Notwithstanding the millions in fees it earned for committing the funds, Goldman Bank did not necessarily have to loan them to UNFI.  Goldman Bank and the other lenders had the option "to syndicate [i.e., sell] all or a portion of" their commitments to fund the Term Loan "to one or more banks, financial institutions or other institutional lenders and investors reasonably acceptable to [UNFI]."  That is, Goldman Bank and the other lenders remained responsible for funding the Term Loan only if they were unable to successfully syndicate it.  As such, the syndication effort was essential to Goldman Sachs' and the other lenders' ability to profit on the Acquisition.

---

borrower's assets upon which the borrower can partially or totally draw (the "ABL Facility"), as well as a $150 million bridge loan with a one-year term to maturity.  This complaint does not assert any claims relating to the ABL Facility or the banks that participated solely in the ABL Facility and not the Term Loan. UNFI reserves its rights to bring claims relating to the ABL Facility and against the banks involved in that loan by any other means.

[7]      U.S. Bank was entitled to the remaining **$3.25 million**.

11

31.     If the syndication failed and Goldman Bank and the other lenders had to fund the Term Loan themselves, it would (a) increase their credit risk because more of their assets would be allocated to a single loan rather than in diversified investments or remaining unallocated; and (b) preclude them from using those funds to make other investments with potentially higher returns.  Notably, however, if the syndication was not complete by the Acquisition's close, Goldman Sachs could, under certain circumstances, claim additional amounts that would sweeten the investment for potential syndicate participants.  As such, there was an incentive for Goldman Sachs to intentionally delay syndication until shortly after closing.

32.     Notwithstanding Goldman Bank and the other lenders' entitlement to syndicate the Term Loan, UNFI had a right to veto certain investors Goldman Bank identified.  In addition, Goldman Sachs could not solicit UNFI's competitors to invest in the loan.  Those limitations were essential because investors in the syndicate would have a lasting impact on UNFI in their role as its long term creditors.  Indeed, an investor in the Term Loan could look to make repayment more difficult for UNFI, including by manufacturing opportunities to claim an event of default.

**D.      Goldman Sachs Ensured Total Control Over the Financing Terms (And Millions More in Fees) By Capturing the Role of Lead Arranger**

33.     In negotiating the July 25, 2018 Commitment and Fee Letters, Goldman Sachs edged out the other Term Loan lenders and captured for Goldman Bank the lucrative role of lead arranger, that is, the bank responsible for leading the process to syndicate the Term Loan on behalf of the other banks who committed funding.[8]  As lead arranger, Goldman Sachs, through Goldman Bank, was responsible for establishing the terms of the Term Loan in good faith, i.e., ensuring the

---

[8]     The terms of UNFI's and Goldman Bank's arrangement are set forth in a separate agreement dated July 25, 2018 (as amended on August 7, 2018 and August 8, 2018, the "Structuring Fee Letter," attached hereto as Exhibit 3).

12

success of the syndication on the terms most favorable to UNFI.  In exchange, UNFI agreed to pay

Goldman Bank 0.25% on the Term Loan amount to which Defendants committed at signing, i.e.,

**$5.375 million** (0.25% of $2.15 billion) (the "Structuring Fee"), in addition to the amounts

Goldman Sachs stood to earn as UNFI's financial advisor and lender.  Perhaps more important for

Goldman Sachs than the fee, however, is that, as lead arranger, Goldman Sachs gained complete

control over the financing process.

34.    As lead arranger, Goldman Sachs controlled, among other things, the process of

marketing the loan to potential investors, which had direct implications for UNFI.   The

Commitment Letter provided that UNFI would commit to "using commercially reasonable efforts"

to allow Goldman Sachs, on behalf of the Term Loan lenders, "a period … of 15 consecutive

business days," following the delivery of certain financial statements, to market and sell the Term

Loan to other investors (the "Marketing Period").   *If* (*and only if*) Goldman Sachs was

unsuccessful in its marketing efforts, i.e., syndication of 100% of the Term Loan amount, *and* it

did not receive a full Marketing Period, it could claim additional amounts from UNFI.

35.    Under those circumstances, the Fee Letter permitted (a) Goldman Bank, on behalf

of itself, Bank of America and U.S. Bank, to charge UNFI (at closing) an additional fee of 0.25%

of the ultimate Term Loan amount as of the closing date, i.e., **$4.5 million** (0.25% of $1.8

billion)—a fee that would go directly into Goldman Bank's and the other Term Loan lenders'

respective pockets; and (b) Goldman Bank, on behalf of all Term Loan lenders, to deduct from the

amount funded at closing 2% of the ultimate Term Loan amount as of the closing date, i.e., **$36

million** (2% of $1.8 billion)—which would be credited to all Term Loan lenders (together, the

"Marketing Period Fees").[9]  Even if circumstances had entitled Goldman Sachs to those amounts, it *was not* permitted to take the 0.25% as original issue discount ("OID"), meaning that it was not permitted to withhold it from the funding at the Acquisition's close.  Further, Goldman Sachs was required to invoice UNFI for any fees, if it believed it was owed them, ***at least three business days before closing***.

36.     Goldman Sachs' lead arranger role also gave it the authority to invoke certain provisions under the Fee Letter known as the "Flex Provisions," which provide for changes to the Term Loan to make it more attractive to investors.  Because exercising those provisions would necessarily make the Term Loan more costly for UNFI, Goldman Sachs was permitted to do so ***if*** (***and only if***) it believed—in good faith—that those changes were "necessary" to ensure a successful syndication ***or*** if a successful syndication had not or could not be achieved by the time of closing.

37.     Most notable among the Flex Provisions was a clause permitting Goldman Sachs to increase the interest rate on the Term Loan.  As a baseline, Goldman Sachs could increase the interest rate, ***if necessary*** (as described above), by 1.25%, which amounts to approximately **$152.7 million** (1.25% of the amortizing balance of the $1.8 billion loan over seven years) in additional interest over the life of the Term Loan.  Goldman Sachs could increase the interest rate still further if additional conditions were met.  For example, if necessary ***and*** if UNFI's credit rating was below a specific rating set forth in the Fee Letter, Goldman Sachs could raise the interest rate by another 0.25%, i.e., **$30.5 million** (0.25% of the amortizing balance of the $1.8 billion loan over seven

---

[9]     The Marketing Period Fees are percentages of $1.8 billion because that was the amount Defendants (along with U.S. Bank) ultimately committed to fund UNFI at closing, which, as discussed below, was a concession that Goldman Sachs demanded of UNFI.

14

years) in additional interest over the life of the loan. In addition, Goldman Sachs could charge

UNFI an additional upfront fee of 0.5% of the Term Loan, i.e., **$9 million** (0.5% of $1.8 billion),

again to the extent "necessary" to syndicate the Term Loan or if there had not been a successful

syndication by the time of closing. This upfront fee could be taken as OID, which would be

credited to investors in the syndicate such that UNFI would have to repay that amount (principal

and interest) as though the investors had actually funded it.

38.     As described below, Goldman Sachs did not attempt to syndicate the loan in good

faith. Instead it focused on its bottom line as it continually ratcheted up the costliness of the Term

Loan to UNFI, even going so far as to manipulate the CDS market and take the additional fees

related to the Marketing Period right before it was set to fund the Term Loan based on a nonsensical

and self-serving argument.

**E.     Goldman Sachs' Interests in the Acquisition Directly Conflicted with UNFI's**

39.     Through Goldman Advisory's role as trusted financial advisor and Goldman

Bank's capacity as purportedly good-faith lead arranger, Goldman Sachs cemented its influence

and control over every aspect of the Acquisition. UNFI's primary advisor and contact at Goldman

Sachs—be it for financial advice or in connection with the financing terms and without regard for

corporate formalities—was the same person: Feldgoise, Goldman Sachs' Head of Mergers and

Acquisitions for the Americas. As such, Goldman Sachs was able to leverage its influence and

trust as financial advisor (via Goldman Advisory) to manipulate UNFI into proceeding on terms

favorable to Goldman Sachs as lead arranger and lender (via Goldman Bank)—a conflict of interest

that would become all too apparent.

40.     Feldgoise and his team advised UNFI on every major decision in the Acquisition—

despite having conflicting interests regarding each decision. For example, Goldman Sachs was by

15

UNFI's side as it decided the purchase price for SUPERVALU, advising UNFI to raise its bid from $27 per share to $32.50 per share. As described above, this would benefit Goldman Sachs as both advisor and lender, not only by increasing the probability that UNFI would win the bid (amounting to additional advisory fees), but also by putting UNFI in a position to require billions in financing (allowing Goldman Sachs to earn fees for committing to provide the funds). Goldman Sachs was in UNFI's ear advising it on whether to acquiesce to valuable concessions, such as adding SUPERVALU as a co-borrower on the Term Loan. This concession, as discussed below, would help Goldman Sachs, as lender, manipulate the CDS market to successfully syndicate the loan to protect its profits on the financing. And Goldman Sachs was shoulder to shoulder with UNFI in coordinating the dates on which Goldman Sachs should market and sell the Term Loan to other investors, as well as the closing date for the Acquisition—dates that Goldman Sachs would later rely on to extort millions more from UNFI, as discussed below.

41.     At each step of the way, UNFI heeded Goldman Sachs' advice because UNFI trusted Goldman Sachs in light of its obligation to discharge its responsibilities with regard to UNFI in good faith, not to mention the **$9.4 million** in advisory fees and **$5.375 million** in loan structuring fees that UNFI was paying it (all in addition to the **$14.5 million** in financing fees that Goldman Bank would extract). Yet, as described below, Goldman Sachs would ultimately execute on all of the applicable Flex Provisions, including but not limited to all of those described above, which alone amount to more than **$190 million** (including additional interest and upfront fees) in additional loan costs; demand concessions that UNFI was not obligated to provide that would benefit Goldman Sachs while harming UNFI; and improperly withhold over **$50 million** from the funding it promised UNFI at closing. This conduct, described in greater detail below, leaves no

doubt that Goldman Sachs was, at all times, acting in its own best interest, to the detriment of UNFI—and as such must return those amounts to UNFI.

## II.    The Syndication

42.    Consistent with the terms of the Commitment Letter and UNFI's desire to facilitate the syndication and Acquisition for the benefit of its shareholders, Goldman Sachs received every assistance from UNFI in syndicating the Term Loan, including a full 15-consecutive-business-day Marketing Period. Nonetheless, via threats to UNFI, Goldman Sachs sought to increase the attractiveness of the financing terms to potential investors, including by failing to proceed with the syndication in good faith. It did so with the sole objective of protecting and increasing its own profit margin to the severe detriment of UNFI and its shareholders—in breach of its duties to UNFI and its regulatory obligations.

### A.    Goldman Sachs Initiated the Marketing Period on September 24, 2018

43.    Pursuant to the Commitment Letter, the Marketing Period was to start "following the delivery of the financial statements necessary to satisfy the conditions set forth in Sections (c) and (d) of Exhibit D [of the Commitment Letter] to syndicate [Defendants' financing]." Exhibit D, entitled "Conditions Precedent to Funding," provides that, prior to the closing date, UNFI was to deliver to Defendants (along with all of the other lenders) its and SUPERVALU's financial statements for any fiscal year ending at least 60 days, and any fiscal quarter ending at least 40 days, prior to the Acquisition's close.[10]

---

[10]    The 60- and 40-day time periods referenced in the Commitment Letter are drawn from the Securities and Exchange Commission's ("SEC['s]") Large Accelerated Filer Rule, which specifies the time periods in which certain issuers, including UNFI and SUPERVALU at the time, are required to file their annual and quarterly financial statements. That rule is publicly and widely known throughout the industry, including to Goldman Sachs.

44.     By September 1, 2018, the parties understood that October 22 (or later that week) was the likely closing date based on SUPERVALU's determination that October 18 was the earliest date it could get the necessary shareholder approval for the Acquisition.  UNFI was strongly advocating for a later date,[11] but Goldman Sachs ultimately refused to agree to one on terms acceptable to UNFI,[12] thus confirming on September 18 that the Acquisition's close would be on October 22.

45.     Given the expected timing of the Acquisition's close, Goldman Sachs could only initiate the Marketing Period following either UNFI's or SUPERVALU's filing of their financial statements for a fiscal year ending prior to August 23, 2018 (60 days before the likely October 22 closing) or a fiscal quarter ending prior to September 12, 2018 (40 days before the likely October 22 closing).

46.     The only reporting periods that satisfied that timing, and for which financial statements were due to be filed before October 22, 2018, were UNFI's financial statements for its fiscal year ending July 28, 2018 (set to be filed by **September 26, 2018**, 60 days after the fiscal year end, as required by SEC rules), and SUPERVALU's financial statements for its second fiscal quarter ending September 8, 2018 (set to be filed by **October 18, 2018**, 40 days after the quarter end, as required by SEC rules).  Because SUPERVALU's second quarter financial statements, set for filing by October 18, 2018, would not permit a Marketing Period of 15 consecutive business

---

[11]     UNFI sought to close on October 29, 2018 or later, so that the closing would occur after the end of UNFI's first fiscal quarter and at the very beginning of its second fiscal quarter.  This would have allowed UNFI the majority of the quarter to prepare its financial statements for its second fiscal quarter, which would need to be incorporated and consolidated with SUPERVALU's results.

[12]     SUPERVALU was willing to accommodate UNFI's preferred October 29 closing date provided that both UNFI and Goldman Sachs waived the ability to avoid closing the Acquisition due to a material adverse effect during that additional week.  Goldman Sachs—despite initially agreeing—ultimately refused to make the change unless UNFI agreed to unworkable terms.

days before the closing on October 22, 2018, the only option available to Goldman Sachs to start

the Marketing Period, in conformance with the Commitment Letter, was September 24, 2018.

47.     Consistent with that, on the morning of September 24, in what can only be regarded

by all parties to the Acquisition (including Defendants, UNFI and the prospective lenders) as the

indisputable commencement of the Marketing Period, Goldman Sachs held a live, in-person kick-

off meeting at the Four Seasons Hotel in New York.[13]  At the meeting, Goldman Sachs delivered,

alongside UNFI's Chief Executive Officer and Chief Financial Officer, the Marketing Presentation

to numerous banks and other potential investors in order to solicit their investment in the Term

Loan.

48.     Goldman Sachs followed that with a 67-page memorandum analyzing UNFI's and

SUPERVALU's finances and operations, as well as UNFI's projected growth as a result of the

Acquisition (the "Confidential Information Memorandum"), which it distributed to numerous

banks and other potential investors between late September and early October 2018.   In the

Confidential Information Memorandum—the central document in any syndication process,

containing confidential information about the Acquisition and syndication terms—Goldman Sachs

set the ***deadline*** for potential lenders to commit to participate in the syndication as October 15,

2018, thereby marking that date as the end of the Marketing Period and syndication process.

---

[13]     Leading up to September 24, Goldman Sachs began its preparations to start marketing the Term Loan to prospective investors, including (a) having credit rating agencies assess the loan; (b) preparing a 43-slide presentation analyzing in detail UNFI's acquisition of SUPERVALU, including UNFI's expected growth in revenues and profits as a result of the Acquisition (the "Marketing Presentation"); and (c) creating a data room (i.e., an electronic database accessible by designated parties) with documents and information regarding UNFI and SUPERVALU for potential lenders to analyze whether to invest in the Term Loan.   In addition, Goldman Sachs even conducted "pre-marketing" of the Term Loan before September 24, 2018, which entailed sharing non-confidential details about the Acquisition to prospective investors in the loan.

19

49.     On October 2, 2018, Goldman Sachs held a second meeting with potential investors at the Park Hyatt in New York, again attended by UNFI executives, including its CEO, CFO and Assistant Treasurer, to continue soliciting investments in the Term Loan.  Throughout this same period, Goldman Sachs and UNFI executives also held numerous one-on-one meetings with investors.  It is undisputed that UNFI satisfied its obligations under the Commitment Letter to assist Goldman Sachs' marketing efforts, including by providing information necessary to enable Goldman Sachs to prepare the Marketing Presentation and the Confidential Information Memorandum, among other materials, as well as making UNFI executives available for all of the meetings that Goldman Sachs requested they join.

**B.      Goldman Sachs Sought to Extract Concessions Detrimental to UNFI Ahead of the Marketing Period's October 15 Close**

50.     As the October 15 commitment deadline grew closer, Feldgoise claimed that market conditions were making it more difficult than Goldman Sachs had anticipated to syndicate the loan.[14]  Because UNFI was refusing to agree to concessions demanded by Goldman Sachs, which UNFI was not contractually required to provide and would substantially increase costs to UNFI and its shareholders (such as the unwarranted demand for an additional interest rate increase above that contemplated by the Flex Provisions), Feldgoise told UNFI that it had "forced"

---

[14]     Goldman Sachs pointed to certain temporary headwinds in the equity and fixed income markets as responsible for its difficulties in syndicating the loan.  Following the July 25 signing of the Commitment Letter, the S&P 500 dropped nearly 10% over the course of October from peak to trough, coming off record-highs in late September; and yields on ten-year Treasury bonds increased from 2.94% on the signing date to a high of 3.25% in early October.  It also highlighted that UNFI combined with SUPERVALU (rather than UNFI alone) received lower credit ratings than Goldman Sachs had anticipated.  Both factors were reasonably foreseeable risks that Goldman Sachs assumed when it agreed to a firm commitment to finance the Term Loan, regardless of the market conditions or actual credit ratings.  Moreover, the increase in 10-year Treasury rates followed a Federal Reserve rate hike in September and signals that a fourth annual rate hike would be coming in December, suggesting that the Federal Reserve continued to view the economy as strong and growing.  Goldman Sachs was required to provide the funding regardless of any such conditions; indeed that is the reason it was paid $14.5 million in fees.

Goldman Sachs into "*full risk mitigation mode*."  UNFI, however, had entered into a Commitment

Letter with Goldman Sachs to avoid being impacted by changing market dynamics, or facing any

other unexpected changes to the financing.

51.     Yet, on October 12, 2018, the business day before the Marketing Period was set to

close, Goldman Sachs invoked *each and every* applicable Flex Provision *and* demanded that UNFI

make concessions that would make the loan still more attractive to investors, to UNFI's own

detriment—all purportedly under the guise that they were *necessary* to syndicate the Term Loan

by the October 15 deadline.  Notably, on information and belief, Goldman Sachs did not act in

good faith to syndicate the loan in order to bolster its invocation of the Flex Provisions and give

weight to its threats that its demands were necessary to syndicate the loan.

52.     Goldman Sachs succeeded in securing UNFI's compliance with measures

detrimental to UNFI and its shareholders through scare tactics advanced by Feldgoise, the expert

advisor in whom UNFI had placed its trust and whom UNFI had paid handsomely.  Feldgoise

claimed that if UNFI did not comply with Goldman Sachs' demands, it would "*scare off*" potential

investors, leading to an unsuccessful syndication, which would in turn generate "*blowback*" to

UNFI from its shareholders (who, Goldman Sachs contended, would view a failed syndication as

likely to create a perception in the market that UNFI would not be able to repay the financing).

53.     Goldman Sachs used threats (and other tactics) to justify increasing the Term Loan

interest rate by 1.5%, which amounts to approximately an additional **$183.2 million** (1.5% of the

amortizing balance of the $1.8 billion loan over seven years) in interest payments over the life of

the loan, as well as to impose the upfront fee of 0.5%, amounting to **$9 million** (0.5% of $1.8

billion), which it credited to potential investors.

54.     In addition, and even more nefariously, Goldman Sachs used the same scare tactics to attempt to secure from UNFI additional concessions for which Goldman Sachs had ***not*** bargained and that would further increase the loan's appeal to investors.  Trusting that Goldman Sachs was its good faith advisor, UNFI accepted some of Goldman Sachs' demands.  UNFI refused, however, any additional concessions that would result in immediate financial detriment to UNFI, such as the demand, described below, for an additional, unwarranted interest rate increase—above and beyond the Flex Provisions—of 0.5%.

1.     <u>Goldman Sachs Manipulated the CDS Market in Exchange for Participation in the Term Loan</u>

55.     In a scheme that at once demonstrates Goldman Sachs' market sophistication and its brazen disregard for the rules that apply to it, Goldman Sachs demanded that UNFI add SUPERVALU as a co-borrower on the Term Loan, rather than leaving it as a guarantor of the loan as originally agreed.  Goldman Sachs materially mislead UNFI, falsely assuring it that the change would have a "[m]uted impact on [UNFI] but [was] meaningful to some select accounts."  Shortly before the Acquisition's close, based on Goldman Sachs' representation and its role as trusted advisor, UNFI agreed to the change.

56.     On October 24, 2018 (two days after closing), however, UNFI learned Goldman Sachs' true motivation for this demand.  On that date, *Bloomberg*, a financial media outlet, published an article revealing that investors, and in particular hedge fund clients of Goldman Sachs that held a derivative called a credit default swap or CDS referencing SUPERVALU debt, had experienced a benefit due to SUPERVALU being a co-borrower on the Term Loan.  Contrary to its representations to UNFI, Goldman Sachs manipulated the CDS market on behalf of those hedge funds as a *quid pro quo* for their participation in the syndication, i.e., for helping Goldman Sachs

22

transfer a portion of the Term Loan off of its books, which protected it from having to fund those amounts itself to the detriment of its own bottom line. Goldman Sachs did so despite the fact that the harm to UNFI caused by this change is far from "muted."

57.     A CDS is a form of insurance on a particular entity's debt. Under a CDS contract, a protection buyer makes periodic payments to a protection seller (akin to premium payments by an insured). In exchange, the protection seller is required to make a payment to the protection buyer if the entity referenced in the CDS defaults on its debt (akin to an insurance payout). Goldman Sachs is a CDS market maker, meaning that it acts as a middleman between protection sellers and buyers, buying at lower prices from sellers, selling at higher prices to buyers, and capturing the price spread between those purchases and sales.

58.     UNFI's acquisition of SUPERVALU was expected to have a significant impact on the **$470 million** market for SUPERVALU CDS. The price of credit protection on SUPERVALU in the months leading up to the announcement of the Acquisition was high, reflecting the market's view that SUPERVALU was a risky borrower, warranting a significant premium for credit protection. The Acquisition, however, was to render that credit protection effectively worthless because all of SUPERVALU's debt (the underlying obligation protected by the CDS) was to be paid off by UNFI. This would lead to what is colloquially referred to as an "orphan CDS"—a situation where credit protection buyers are paying a monthly premium for credit protection on obligations that no longer exist, and credit protection sellers no longer face the risk of making a protection payout.

59.     As a substantial market maker in SUPERVALU CDS, unbeknownst to UNFI at the time it engaged Goldman Advisory and Goldman Bank, Goldman Sachs had unique information about the CDS positions held by its clients. In particular, Goldman Sachs had numerous clients

23

that had purchased credit protection on SUPERVALU, and thus would be harmed by the Acquisition. Goldman Sachs also had numerous clients that had sold credit protection on SUPERVALU, and thus would benefit from the Acquisition. On information and belief, Goldman Sachs made a deal with buyers of credit protection—breaching the wall between its CDS market-making desk and its lending division—to change the Term Loan structure for which UNFI had bargained to avoid orphaning the buyers' CDS in exchange for their participation in the lending syndicate.[15]

60.    In order to hold up its end of the bargain and avoid orphaning the buyers' CDS, Goldman Sachs would have to persuade UNFI to add SUPERVALU as a co-borrower. Recognizing that UNFI would never agree to do so if it knew Goldman Sachs' true intentions, Goldman Sachs falsely claimed to UNFI that the change would have a "[m]uted impact on [UNFI] but [was] meaningful to select accounts."   When UNFI resisted the change, Goldman Sachs threatened it, claiming that if UNFI did not acquiesce it would "*scare off the lending group*," which would in turn raise concerns among UNFI's shareholders. At no time did Goldman Sachs inform UNFI that the "select accounts" were in fact Goldman Sachs' own clients that had bought CDS on SUPERVALU debt. Believing that Goldman Sachs was acting in good faith, UNFI agreed to the change.

61.    By making SUPERVALU a co-borrower on the Term Loan, Goldman Sachs ensured that SUPERVALU would continue to have outstanding debt, thus causing the price of CDS protection on SUPERVALU to immediately triple. As a result, the value of **$470 million** in outstanding CDS protection on SUPERVALU increased by more than **$70 million** overnight, and

---

[15]    In doing so, Goldman Sachs may have breached its obligations under relevant securities laws and regulations.

has continued to rise in the intervening months.  In exchange for this massive value shift in the

CDS market, on information and belief, the holders of CDS in SUPERVALU—who Goldman

Sachs could identify through its market-making desk—agreed to fund portions of the Term Loan

that Goldman Sachs and the other lenders had committed to UNFI.  Stated differently, Goldman

Sachs asked for payment (in the form of participation in the Term Loan) in order to change the

Term Loan structure with the specific intent of impacting the pricing of SUPERVALU CDS for

the benefit of certain of its clients.[16]  This scheme allowed Goldman Sachs and the other Term

Loan lenders to benefit:  they got to move the amount of the Term Loan sold to the relevant

SUPERVALU CDS investors off their balance sheets and onto the balance sheets of those

investors; while the CDS investors avoided, and in some cases reversed, significant mark-to-

market losses on their positions in SUPERVALU CDS, and created the possibility of a significant

payout in the event of a future default on the Term Loan.

    62.    The only loser in this scheme was Goldman Sachs' client: UNFI. UNFI bargained

for a bank loan from what it believed, at the time, to be reputable Wall Street banks, including

Goldman Sachs, which UNFI believed would syndicate the loan with good-faith investors.  It

ended up with a loan funded by hedge funds that are betting that SUPERVALU, and now UNFI

---

[16]    This conduct may have effected a fraudulent manipulation of the market for SUPERVALU CDS
in violation of the federal securities and commodities laws.  Goldman Sachs' willingness to exploit its CDS
franchise, and openly offer to manufacture outcomes in the CDS market, in exchange for participation in
the Term Loan is particularly shocking in the face of clear statements by the U.S. Commodity Futures
Trading Commission ("CFTC") that this type of conduct in the CDS market constitutes illegal market
manipulation prohibited by the securities laws.  The CFTC stated in April 2018 that manufactured outcomes
in the CDS market "may constitute market manipulation and may severely damage the integrity of the CDS
market, including markets for CDS index products, and the financial industry's use of CDS valuations to
assess the health of CDS reference entities."  CFTC, *Statement on Manufactured Credit Events by CFTC
Divisions of Clearing and Risk, Market Oversight, and Swap Dealer and Intermediary Oversight* (Apr. 24,
2018), https://www.cftc.gov/PressRoom/SpeechesTestimony/divisionsstatement042418.

(having acquired SUPERVALU), will default on its debt.[17]  As loan partners, the CDS purchasers

may engage in predatory practices intended to cause a credit event under the CDS contracts, such

as declaring technical defaults on the Term Loan or otherwise pressuring UNFI to fail.[18]  In the

context of a highly leveraged transaction, the lack of good-faith loan partners substantially reduces

the value of the Term Loan to UNFI.  With SUPERVALU as a co-borrower, UNFI will have much

less flexibility in borrowing arrangements for SUPERVALU going forward, in addition to an

inability to restructure SUPERVALU's debt or to sell SUPERVALU outright.  While this reduced

flexibility might have been a small issue with cooperative lenders whose interests were aligned

with UNFI, it has become a much larger issue now that UNFI is partnered with lenders that have

bet on UNFI to fail.

63.    Goldman Sachs, on information and belief, carefully orchestrated this scheme,

while deliberately concealing the detriment it would cause to UNFI, which as described above

---

[17]    Tellingly, Goldman Sachs failed to provide a final list of investors in the Term Loan syndicate as of the date the syndication closed, which would have reflected its hedge-fund clients with CDS positions adverse to SUPERVALU.  Prior to closing, Goldman Sachs provided only non-final lists of what it described as prospective investors.

[18]    This concern is not theoretical.  Recent events in the CDS market have shown a proliferation of activist strategies undertaken by certain market participants aimed at creating the very outcomes they have bet on in the CDS market.  One particularly prevalent form of activism is dubbed "net-short debt activism," whereby an "investor buys 'long' positions in corporate debt not to make money on those positions, but instead to assert defaults that will enable the investor to profit on a larger 'short' position."  Joshua A. Feltman et al., *The Rise of the Net-Short Debt Activist*, Harv. L. Sch. F. on Corp. Gov. & Fin. Reg. (Aug. 7, 2018), https://corpgov.law.harvard.edu/2018/08/07/the-rise-of-the-net-short-debt-activist/ (noting a "rise" in this "new type of debt investor" in recent years).

     In one recent example of net-short debt activism, a hedge fund declared a technical covenant default on debt issued by Windstream Holdings in an effort to trigger a payout on its CDS short position referencing Windstream.  *See generally* Verified Amended Counterclaims, *U.S. Bank Nat'l Assn. v. Windstream Servs., LLC*, No. 1:17-cv-07857-JMF-GWG, ECF 72, ¶ 7 (S.D.N.Y. Nov. 22, 2017) (alleging the hedge fund "acquired its position in the 6 3/8% Notes for the sole purpose of seeking to manufacture th[e] alleged default, and declare that a credit event has occurred or is occurring, in order to collect a credit default swap payoff").  The hedge fund's default declaration, and subsequent litigation, has cost the company millions, created a permanent drag on its share price, and left the company teetering on the brink of bankruptcy while awaiting judicial resolution of the hedge fund's allegations.

stands to be anything but "muted." A key element of hiding this scheme from UNFI was to avoid

providing it a final list of the investors participating in the Term Loan syndicate. The list would

have necessarily included all of the hedge funds holding SUPERVALU CDS that Goldman Sachs

induced to participate in the Term Loan syndication, which would have caused UNFI to raise

concerns and question their sudden interest in the Term Loan.

64. The fact that Goldman Sachs was willing to manipulate the CDS market to benefit

some of its customers while severely harming others, and all to the severe detriment of its client,

UNFI, is clear evidence that Goldman Sachs had abandoned its duties to UNFI in a brazen effort

to preserve and enhance its profits on the transaction.[19]

2.  UNFI Refused to Voluntarily Increase the Interest Rate and Goldman
Sachs Warned That "Things Would Get Ugly"

65. Goldman Sachs did not, however, stop there. It went on to demand that UNFI

voluntarily raise the interest rate on the Term Loan by 0.5%, which would add about **$61.1 million**

(0.5% of the amortizing balance of the $1.8 billion loan over seven years) in additional interest

over the life of the Term Loan. Goldman Sachs did so despite knowing that, if UNFI were to agree

---

[19]     Further illustrating the depths of legal and ethical impropriety to which Goldman Sachs was prepared to go in furtherance of its profit motive, it also bears noting that its activity to generate additional profit via the securities markets was not limited to CDS. On information and belief, Goldman Sachs also traded UNFI stock during this same period without disclosing that fact to UNFI, which would violate its duties and obligations to UNFI as both financial advisor and lender, not to mention its obligations under U.S. securities laws and regulations.

According to public reports, this is not the first time that Goldman Sachs has engaged in dubious, indeed potentially illegal, market practices. In 2010, Goldman Sachs paid the SEC $550 million for defrauding investors by providing false information in connection with its sale of derivate products tied to residential mortgage-backed securities. In 2016, it paid $3.2 billion to federal and state enforcement agencies and $1.8 billion to consumers for its role in creating the 2008 financial crisis through the sale of those same securities. Most recently, it has become the target of the largest money laundering investigation in history for assisting senior government officials of Malaysia to steal and launder close to $7 billion of the Malaysian government's funds—in exchange, of course, for exorbitant and disproportionate fees—from a sovereign wealth fund known as 1Malaysia Development Berhad ("1MDB").

to pay more on the Term Loan, it would expose itself to a shareholder suit for, among other potential claims, breach of fiduciary duty.  Choosing to protect its shareholders over Goldman Sachs' extortionate demand, UNFI refused.  Little did it know how much that refusal would cost it.  Late on October 18, 2018, Feldgoise called UNFI's CEO and stated that "***things would get ugly***" as a result of UNFI's refusal.  That same night, as described below, Goldman Sachs revealed how it would carry out its threat.[20]

## III.   **The Closing**

66.    Not satisfied with the extra fees and concessions it had wrung from UNFI to this point, at closing Goldman Sachs came up with another round of improper extra fees and charges it would impose on the Term Loan.  Knowing UNFI had a proverbial gun to its head because objecting at that point could have jeopardized the Acquisition's close and exposed UNFI to lawsuits by SUPERVALU and its own shareholders, Goldman Sachs took what it otherwise could not obtain through market manipulation and outright threats.

---

[20]    The above are not the only examples of concessions that Goldman Sachs demanded of UNFI to successfully syndicate by October 15.  They are simply the most telling.  Goldman Sachs also demanded, for example, that UNFI agree to reduce the size of the seven-year Term Loan from $2.15 billion to $1.95 billion, and ultimately to $1.8 billion with an additional one-year $150 million loan.  While that change harmed UNFI by reducing its available liquidity following the acquisition, it benefited Goldman Sachs: although it along with the other lenders ultimately had to syndicate $200 million less, their fees for committing to the loan would stay the same, as they would remain a percentage of the initial loan amount of $2.15 billion.

In addition, Goldman Sachs demanded the addition of a springing maturity tied to the extension of UNFI's contract with Whole Foods Market, UNFI's largest customer; a reduction in permitted purchased-money debt; a reduction in permitted incremental first lien debt; and a strengthening of several operating covenants protecting lenders, including covenants restricting the additional indebtedness that UNFI is permitted to incur, as well as investments UNFI would be able to make, during the life of the Term Loan.  None of these additional changes were contemplated by the agreed upon Flex Provisions in the Term Loan.  Nonetheless, believing it had no other choice, UNFI agreed to most of these demands.

28

### A.  Goldman Sachs' Extortive Claim for the Marketing Period Fees

67.     At 11:53 PM on October 18, 2018, as the second-to-last business day before closing wrapped up, Goldman Sachs sent UNFI a list—known as a "funds flow"—of the amounts it intended to withhold at closing from the Term Loan funds it had promised to UNFI.  The funds flow included—for the first time and in direct contradiction of a funds flow Goldman Sachs had sent UNFI just *one day* earlier—**$40.5 million** in unexplained withholdings.  The timing was overtly strategic:  with barely one business day before closing, UNFI had no time to dispute these newly-minted charges.

68.     It was not until a call UNFI demanded the next day, October 19 (the business day before the Acquisition's scheduled October 22 closing), that Goldman Sachs explained it was claiming the Marketing Period Fees.  During that call, Goldman Sachs asserted—for the first time—that, although the Marketing Period had commenced on September 24 and concluded on October 15, a *second* Marketing Period had commenced on October 15, 2018, upon SUPERVALU's filing of its financial statements for its second fiscal quarter with the SEC (which, notably, SUPERVALU had filed that day at Goldman Sachs' express direction).  Based on this false premise, Goldman Sachs claimed that, because the second Marketing Period would not end until November 5, 2018 (15 consecutive business days from October 15), it would be cut short by the October 22, 2018 closing date—the date on which Goldman Sachs committed to fund despite UNFI's strong preference for a later date.  The terms of the Commitment Letter, the course of conduct between the parties and that the claim was made at the eleventh hour expose it for what it is:  Goldman Sachs' brazen attempt to extort additional funds from UNFI to protect its own profits.

69.     As described above, pursuant to the Commitment Letter, UNFI was required to pay the Marketing Period Fees *if* (*and only if*) Defendants did not have "a period … of 15 consecutive

business days" to market and sell the Term Loan to other investors (the so-called Marketing

Period) *and there was not a successful syndication as of the Acquisition's close*. In order to

claim the Marketing Period Fees, Goldman Sachs thus did not act in good faith to syndicate the

loan prior to the Acquisition's close and concocted a nonsensical interpretation of the Marketing

Period provision that was not only at odds with its agreement but also its prior conduct. [21]

1.  Goldman Sachs' Purported Interpretation is at Odds with the Plain Language of the Commitment Letter and its Prior Conduct

70.    The Commitment Letter clearly and unambiguously provides for a singular

Marketing Period to market the Term Loan—described as "*a* period (*the* 'Marketing Period') of

15 consecutive business days" (emphases added). It is indisputable that Goldman Sachs initiated

the Marketing Period on September 24, 2018, and that the Marketing Period ended 15 business

days later on October 15, 2018. Having completed the Marketing Period provided for in the

Commitment Letter, Goldman Sachs cannot now claim that it was entitled to a second Marketing

Period not contemplated by the clear and plain terms of the Commitment Letter.

71.    Goldman Sachs' course of conduct throughout the three months leading up to the

Acquisition's closing, moreover, belies its new-found, self-serving interpretation of the language

in the Commitment Letter defining the Marketing Period. Indeed, as evidenced by the below,

Goldman Sachs' actions conclusively demonstrate that it knew that the Marketing Period

commenced on September 24 and concluded on October 15 and that this is nothing more than a

last-ditch attempt to profit from the Acquisition at the expense of its client, UNFI.

---

[21]       Notably, delaying or even failing to complete the syndication would also bolster Goldman Sachs'
contention, described above, that exercising the Flex Provisions was necessary, as well as allow time for
Goldman Sachs' above-described CDS scheme to unfold.

72.     First, despite its role as UNFI's trusted financial advisor, Goldman Sachs never so much as mentioned, despite daily conversations with UNFI and UNFI's counsel, that the October 22 closing date would expose UNFI to tens of millions of dollars and potentially other more devastating losses.  Because SUPERVALU's filing deadline for its second quarter financials of October 18 was known well before any Marketing Period started, and was known when Goldman Sachs insisted on October 22 as the closing date, a second Marketing Period ending on November 5 was at all times incompatible with the timeframe to which the parties had agreed in September.  If Goldman Sachs had believed a second Marketing Period was possible, its obligations to UNFI required it to have, at minimum, alerted UNFI to its exposure as a result of the vagaries of timing alone.  At the latest, Goldman Sachs should have done so on September 18, when it confirmed that it would fund the Term Loan on October 22—notwithstanding UNFI's preference that the closing occur on a later date.

73.     Second, far from advising UNFI that Goldman Sachs believed it had the right to continue syndicating the Term Loan until early November, the Confidential Information Memorandum that Goldman Sachs prepared and distributed to potential investors expressly provided that the *deadline* for potential lenders to commit to participate in the syndication, i.e., the end of the process—not its beginning—was October 15, 2018.  Equally telling, despite including other "Key Dates" on a "Transaction Timetable" included therein that Goldman Sachs developed, controlled and contributed to, it *nowhere* included the anticipated filing of SUPERVALU's Form 10-Q by October 18 as even a noteworthy event.  Yet, according to Goldman Sachs' new-found view, a filing on that date would restart the Marketing Period thus necessarily delaying closing or permitting Goldman Sachs to withhold **$40.5 million** from the amount Defendants promised UNFI with the Term Loan.

31

74.     Third, Feldgoise told UNFI's CEO that Goldman Sachs believed SUPERVALU's second quarter financial statements would have "***no impact***" on the syndication of the Term Loan. Consistent with Feldgoise's assertion, Goldman Sachs did not disseminate an "update" presentation summarizing those financial statements (which it had prepared with UNFI and SUPERVALU's assistance). Nor did it convene a call between potential investors and SUPERVALU (and UNFI) executives to discuss those financial statements—despite asking SUPERVALU executives to stand ready for such a call (which they did). Similarly, Goldman Sachs told SUPERVALU not to file its second quarter financial statements on October 12, which SUPERVALU was prepared to do, which would have given investors additional time to digest SUPERVALU's results (had Goldman Sachs believed it necessary) before committing to the Term Loan.

75.     Fourth, Goldman Sachs insisted that SUPERVALU file its second quarter financial statements on October 15, which was by Goldman Sachs' designation the end of the commitment period for the syndication, rather than on October 12, when SUPERVALU indicated that it would be able to file them, or October 18, the SEC filing deadline. Apparently, Goldman Sachs believed it important that SUPERVALU's second quarter results be filed early to ensure that they were public prior to the end of the commitment period, i.e., October 15, but not so early, i.e., October 12, that they might interfere with the syndication of the Term Loan.

76.     Fifth, Goldman Sachs took no action on October 15 to kick off another Marketing Period along the lines of the steps it took to initiate the Marketing Period on September 24, e.g., an investor meeting attended by UNFI and SUPERVALU executives, preparing a revised Marketing Presentation, or otherwise. Moreover, Goldman Sachs took no public action even after October 15, e.g., it did not distribute a revised Confidential Information Memorandum or

32

presentations addressing SUPERVALU's second quarter financial statements, which is also inconsistent with its actions between September 24 and October 15. Instead, it simply continued marketing with the key materials, such as the Confidential Information Memorandum, that it had prepared for the Marketing Period beginning on September 24, 2018. Indeed, UNFI had certain obligations to assist in marketing that required Goldman Sachs to apprise UNFI of its marketing efforts. As such, that Goldman Sachs never did so is further evidence that the purported additional Marketing Period was a sham.

77.     Sixth, in a funds flow that Goldman Sachs sent UNFI on October 17—just one day before its assertion of the disingenuous interpretation of the Marketing Period—Goldman Sachs conspicuously did not include the Marketing Period Fees, nor had it done so in a funds flow it sent to UNFI a few days prior on October 13. It tellingly omitted those fees *despite representing to UNFI that those funds flows contained all of the fees that Goldman Sachs was claiming upon closing*. Either Goldman Sachs was hiding its intention to claim the Marketing Period Fees or it had yet to conjure up its disingenuous interpretation of the Marketing Period requirement. Either way, Goldman Sachs violated its obligation under the Commitment Letter to invoice UNFI for fees three business days before closing and that alone precluded it from withholding them at closing.

78.     Collectively, the foregoing indisputable facts and course of events lay bare the impropriety of Goldman Sachs' claim for the Marketing Period Fees.

2.     Goldman Sachs' Purported Interpretation is Nonsensical and Commercially Unreasonable

79.     Under Goldman Sachs' newly adopted interpretation, the Marketing Period is transformed into an endless loop that restarts anew anytime UNFI or SUPERVALU deliver their

33

financial statements, regardless of whether Defendants have already engaged in a full Marketing

Period, much less whether they started the Marketing Period knowing that additional financial

statements would be forthcoming.  Because, with the march of time, there will always be new

financial statements from either UNFI or SUPERVALU periodically being released, Goldman

Sachs' interpretation would make it next to impossible for UNFI to agree to a closing date without

incurring the risk of owing the Marketing Period Fees, especially given that the closing date is not

within UNFI's control, but rather Goldman Sachs' and SUPERVALU's.

80.     Under Goldman Sachs' approach, the period from September 24, 2018 to October

15, 2018 would qualify as the sole Marketing Period only so long as the closing occurred on or

before October 17, 2018.  That would place SUPERVALU's second fiscal quarter ending on

September 8, 2018 (the financial statements for which were filed on October 15, 2018) less than

40 days from the closing, and thus not necessary for the closing, such that they would be incapable

of triggering a second Marketing Period.  If, instead, the closing occurs on October 18, 2018,

September 8, 2018 would be 40 or more days from the closing such that (under Goldman Sachs'

interpretation) SUPERVALU's October 15, 2018 filing of its second fiscal quarter financial

statements would transform the earlier Marketing Period into something other than "a Marketing

Period" and commence a brand new Marketing Period.  Notably, because a closing date prior to

October 15 would deprive Goldman Sachs of 15 consecutive business days from UNFI's

September 24 filing of its year-end financial statements, under Goldman Sachs' reading, out of 31

days in October 2018, only *three*—October 15, 16, and 17—would allow UNFI to avoid paying

tens of millions of dollars in Marketing Period Fees and any adverse shareholders' reaction to their

payment.

34

81.     Significantly, October is not an anomaly.  Because, pursuant to the definition of Marketing Period, all fiscal quarter-end financial statements need to be delivered six weeks (40 days) before the Acquisition's close, the Marketing Period requires three weeks (15 business days), and roughly every six-and-a-half weeks one of either UNFI or SUPERVALU has a quarter end or files the results of that fiscal quarter (or fiscal year) with the SEC,[22] it is nearly as likely as not that there would be an event—under Goldman Sachs' reading of the Commitment Letter—that could re-trigger a Marketing Period before any previously commenced Marketing Period and closing could be completed.[23]  If ever there were an interpretation that could be disproven by simply explaining its implications, this extravagant and ridiculous construction is it.

82.     As illustrated by the foregoing, Goldman Sachs' interpretation would read out of the Commitment Letter the requirement that UNFI engage in "commercially reasonable efforts" to provide for a complete Marketing Period before closing.  The closing date is the dispositive factor determining whether UNFI has to pay additional fees and UNFI has virtually no control over the closing date.  The closing date was conditioned, among other events, on the date SUPERVALU set its shareholder vote—a decision over which UNFI had no control.  Thus, under Goldman Sachs' interpretation, UNFI would have to pay the Marketing Period Fees based not on

---

[22]     Goldman Sachs has never claimed that Exhibit D requires anything less than the filing of Form 10-Ks and Form 10-Qs with the SEC.  SUPERVALU simply could not have filed a complete and accurate Form 10-Q any earlier than October 10, 2018, because such documents take time to prepare (and are drafted to exacting standards to avoid civil and criminal penalties).

[23]     There are eight quarter-end or year-end filings for UNFI and SUPERVALU in a given year, four for each company.  The average length between each filing is six-and-a-half weeks.  But because, under Goldman Sachs' interpretation of the Commitment Letter, any closing date within the first three weeks following a filing renders the Marketing Period incomplete, a closing on nearly half of the dates of the year would trigger the payment of the Marketing Period Fees.  Thus, to accept Goldman Sachs' illogical interpretation, one must accept that, due to the vagaries of the calendar, half of the year is off-limits for closing—unless UNFI wishes to pay tens of millions of dollars in Marketing Period Fees.

35

its own decisions, but rather on SUPERVALU's and Goldman Sachs' choices. Adopting Goldman

Sachs' reading, then, it would be chance, rather than UNFI's commercially reasonable efforts, that

would determine whether Goldman Sachs could claim the Marketing Period Fees they withheld

from UNFI and paid themselves here.

83.     In light of the above, the only reading of the Marketing Period provision that makes

the Commitment Letter logically consistent, including with the provision's purpose to allow

Goldman Sachs a meaningful amount of time to syndicate the loan, is the one that Goldman Sachs,

itself, consistently applied through its words and actions up until its eleventh-hour claim: there is

***one***, and only ***one***, Marketing Period.

### B.     Goldman Sachs Misappropriated an Additional $11.4 Million in Fees

84.     Goldman Sachs, seemingly unsatisfied with improperly withholding **$40.5 million**,

also instructed Goldman Bank to withhold from the funding promised to UNFI at closing an

additional **$11.4 million** in Goldman Advisory's claimed fees, including **$2 million** in fees it had

previously agreed to forego. This was a baseless misappropriation of loan funds in violation of

the Commitment Letter. As described above, UNFI initially agreed to pay Goldman Sachs **$11.4**

**million** in fees in exchange for its financial advisory services. On July 25, 2018, however,

Goldman Advisory, acting through Goldman Sachs' Feldgoise, offered to reduce those fees by **$2**

**million**. Feldgoise did so in order to encourage UNFI to raise its offer for SUPERVALU from

$27 per share to $32.50 per share, which was necessary to beat out the competing bid for

SUPERVALU. In part on the basis of Goldman Sachs' promised **$2 million** contribution, UNFI

ultimately agreed to increase its bid to $32.50 a share.

85.     Almost immediately after UNFI secured the right to acquire SUPERVALU,

however, Goldman Sachs began taking measures to renege on its agreement to reduce its financial

advisory fees. When, just hours after the promise had been made, UNFI wrote to Feldgoise to memorialize their agreement on the fee reduction, Feldgoise began to express doubts on his ability to abide by his earlier agreement. Behind the scenes, Feldgoise was attempting to convince UNFI's other financial advisor involved in the Acquisition to take a **$1 million** discount on its own fees such that Goldman Sachs would only have to forego **$1 million** of the **$2 million** it had promised UNFI. But the other financial advisor refused, aptly noting the exorbitant fees that Goldman Sachs had already secured for itself both on the advisory and financing sides of the transaction.

86. Knowing that UNFI would dispute paying the **$2 million** in light of Goldman Sachs' prior agreement to forego that amount, Goldman Sachs simply decided to have Goldman Bank withhold the full **$11.4 million** from the financing it and the other Term Loan lenders were required to provide to UNFI at closing. But Goldman Bank had no right to do so, particularly over UNFI's vigorous objection before closing.

87. Even if UNFI had owed the full **$11.4 million** to Goldman Advisory (which it did not), nothing in any agreement between UNFI and Goldman Bank gave it the right to withhold fees owed to Goldman Advisory from the funding that Defendants agreed to provide UNFI at closing *for the financing of the Acquisition*. Goldman Advisory's relationship with UNFI is governed by the M&A Agreement to which Goldman Bank is not a party, and Goldman Bank's relationship with UNFI is governed by the Commitment, Fee and Structuring Fee Letters to which Goldman Advisory is not a party. In other words, for purposes of the financing arrangement, Goldman Advisory was a third party. Goldman Sachs nevertheless took advantage of the fact that it had complete control over the financing owed at closing to ensure that its subsidiary took the

37

**$11.4 million** in advisory fees—including the **$2 million** that Feldgoise had discounted—over UNFI's objection.

> C. **Goldman Sachs and Bank of America Withheld Funds From the Funds They Promised UNFI Over UNFI's Vigorous Objection**

88.     On October 19, 2018, UNFI demanded that Goldman Sachs organize a call with Bank of America and U.S. Bank, the other two Term Loan lenders, to ensure that they were aware of Goldman Sachs' intention to withhold more than **$50 million** in funds to which it was not entitled, and the harm that UNFI would suffer as a consequence. After explaining the factual circumstances (that UNFI understood at the time) and UNFI's legal position regarding these funds, including highlighting the absurdity of Goldman Sachs' position, UNFI's General Counsel and CFO specifically asked representatives of Bank of America if they supported Goldman Sachs' outlandish position. The representatives confirmed verbally on that conference call that Bank of America would support Goldman Sachs. Acting alongside Goldman Sachs, then, Bank of America would also wrongfully extract the additional fees, despite its knowledge of the factual circumstances leading up to, and the specious legal arguments supporting, the withholding.

89.     Notwithstanding Bank of America's sanctioning of Goldman Sachs' intention to withhold more than **$50 million** from the Term Loan funding, over the weekend that followed, as late as the early morning hours of the October 22 close of the Acquisition, UNFI vigorously and repeatedly objected to Goldman Sachs' planned withholding. UNFI even developed and submitted to Goldman Sachs its own version of the funds flow that detailed the proper payments to be made out of the closing proceeds, which did ***not*** include the Marketing Period Fees or the $11.4 million in advisory fees.

90.     UNFI did as much as it could to stop Goldman Sachs from violating its duties and obligations under its agreements with UNFI, including reserving rights, with UNFI representatives (General Counsel, CFO and others) and its external legal counsel pursuing its positions until a few hours before the 7:00 AM closing conference call was to commence on the day of closing. UNFI did not stop objecting until it became futile, ultimately recognizing that it had no choice but to proceed to close the Acquisition because a failure to do so could potentially expose it to billions of dollars in claims by SUPERVALU, and UNFI's own shareholders, that could have led to UNFI's demise.

## IV.     Damages

91.     UNFI's damages from Defendants' conduct have been devastating. As a preliminary matter, these damages include the fees that Goldman Sachs illegally withheld on the day of closing, including the **$40.5 million** in Marketing Period Fees and the **$11.4 million** in advisory fees. While Goldman Sachs should be required to return all of those fees to UNFI, they are not the limit—or even the lion's share—of the harm UNFI has suffered.

92.     The Flex Provisions that Goldman Sachs exercised unnecessarily, including a 1.5% interest rate increase on the loan (amounting to more than **$180 million** over the life of the loan), and the concessions for which Goldman Sachs had ***not*** bargained but nonetheless forced upon UNFI, including adding SUPERVALU as a co-borrower to the loan and inviting creditors with an interest in UNFI's failure to fund the loan, amounted to significant and unexpected additional costs to UNFI and its shareholders. Defendants should be required to compensate UNFI for the additional and unnecessary costs it now faces in repaying the Term Loan. The foregoing losses, the value of which will be proven at trial, are a direct and foreseeable result of Defendants' misconduct.

## CAUSES OF ACTION

### COUNT ONE: BREACH OF CONTRACT (THE COMMITMENT LETTER, THE FEE LETTER AND THE STRUCTURING FEE LETTER) IN TAKING THE $40.5 MILLION IN MARKETING PERIOD FEES
### (Against All Defendants)

93.     UNFI repeats and re-alleges paragraphs 1 through 92 as if fully set forth here.

94.     UNFI, Goldman Bank and Bank of America are all parties to the Commitment Letter and Fee Letter.  UNFI and Goldman Bank are parties to the Structuring Fee Letter.

95.     Goldman Sachs is Goldman Bank's parent and, through Feldgoise and others, directed the execution of its obligations pursuant to the Commitment, Fee and Structuring Fee Letters.

96.     The Fee Letter allowed Goldman Bank to charge $40.5 million in Marketing Period Fees on behalf of itself and the other Term Loan lenders, if and only if the syndication was unsuccessful *and* the Acquisition closed before the conclusion of the Marketing Period.

97.     Further, the Fee Letter only allowed Goldman Bank to charge amounts that it and Bank of America were claiming as fees, if Goldman Bank invoiced UNFI for them at least three business days prior to the Acquisition's close.

98.     There is no doubt that the Marketing Period began on September 24 and concluded on October 15, well before the October 22 close.

99.     The Structuring Fee Letter allowed Goldman Bank singular control over the marketing and syndication process.

100.    Goldman Sachs failed to use good faith efforts to close the syndication prior to the Acquisition's close.

40

101.    Goldman Sachs directed Goldman Bank to withhold the $40.5 million (sanctioned by Bank of America) despite that documentation listing all of the fees and costs that Goldman Sachs intended to withhold, sent to UNFI on October 17, did not include the $40.5 million.

102.    Defendants breached the Commitment, Fee and Structuring Fee Letters by misappropriating that amount from UNFI.

103.    Defendants must return to UNFI the $40.5 million they misappropriated and must pay to UNFI all other damages, including interest on that amount, which UNFI proves at trial.

## COUNT TWO: BREACH OF CONTRACT (THE COMMITMENT LETTER, THE FEE LETTER AND THE STRUCTURING FEE LETTER) IN WITHHOLDING THE $11.4 MILLION ADVISORY FEE
### (Against All Defendants)

104.    UNFI repeats and re-alleges paragraphs 1 through 92 as if fully set forth here.

105.    UNFI, Goldman Bank and Bank of America are all parties to the Commitment Letter and Fee Letter.  UNFI and Goldman Bank are parties to the Structuring Fee Letter.

106.    Goldman Sachs is Goldman Bank's parent and, through Feldgoise and others, directed the execution of its obligations pursuant to the Commitment, Fee and Structuring Fee Letters.

107.    The Commitment Letter and Fee Letter allow Goldman Bank to withhold from the Term Loan certain fees for its benefit and for the benefit of other banks involved in the transaction.

108.    No provision in the Commitment, Fee or Structuring Fee Letters allows Goldman Bank to withhold fees for the benefit of third parties.

109.    Even if such a provision existed, Goldman Bank could not withhold fees to which UNFI objects.

41

110.    Further, any such fees would have to be invoiced at least three business days prior to the Acquisition's close.

111.    For the benefit of Goldman Advisory, Goldman Sachs, through Feldgoise, directed Goldman Bank to withhold $11.4 million in fees from the Term Loan—over UNFI's objection— which it was not entitled to do.  Of that amount, $2 million was a pure windfall because Goldman Advisory had previously discounted its fees by that amount, as Goldman Sachs, Feldgoise and Goldman Bank were well aware.

112.    Goldman Bank and Bank of America withheld that amount without invoicing it at least three business days prior to closing, which would have been October 17, the day before Goldman Sachs first claimed the fees, October 18.  In fact, documentation listing all of the fees and costs that Goldman Sachs intended to withhold, sent to UNFI on October 17, did not include the $11.4 million.

113.    By withholding $11.4 million in fees, let alone over UNFI's objection and without invoicing them at least three business days in advance of the Acquisition's close, Defendants breached the Commitment, Fee and Structuring Fee Letters.  Defendants further breached the Commitment, Fee and Structuring Fee Letters by including in the amount withheld $2 million that UNFI did not owe.

114.    Defendants must return to UNFI the $11.4 million, and must pay to UNFI all other damages, including interest on that amount, that UNFI proves at trial.

### COUNT THREE: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (THE COMMITMENT LETTER, THE FEE LETTER AND THE STRUCTURING FEE LETTER)
#### (Against All Defendants)

115.    UNFI repeats and re-alleges paragraphs 1 through 92 as if fully set forth here.

42

116.    UNFI, Goldman Bank and Bank of America are parties to the Commitment and Fee Letters.

117.    UNFI and Goldman Bank are parties to the Structuring Fee Letter.  Bank of America was named a lead arranger of the Term Loan in the Commitment Letter.

118.    Goldman Sachs is Goldman Bank's parent and, through Feldgoise and others, directed the execution of its obligations pursuant to the Commitment, Fee and Structuring Fee Letters.

119.    Under New York law, there is an implied covenant of good faith and fair dealing in the Commitment, Fee and Structuring Fee Letters.  Accordingly, Defendants must act in good faith in syndicating the Term Loan.

120.    Defendants breached their duty to act in good faith when they unnecessarily exercised the Flex Provisions thereby increasing the cost of the financing to UNFI by more than **$180 million**; demanded that UNFI make detrimental concessions it was not obligated to make, including inducing UNFI to add SUPERVALU as a co-borrower on the Term Loan in order to manipulate the CDS market; failed to use good faith efforts to close the syndication prior to the Acquisition's close; and baselessly withheld $11.4 million for Goldman Advisory over UNFI's objection and without invoicing it at least three business days in advance of the Acquisition's close.

121.    UNFI would have never entered into the Commitment, Fee or Structuring Fee Letters had it known that Defendants would use them to artificially increase the costs of the financing terms and manipulate the CDS market to invite investors with interests at odds with UNFI to become UNFI's creditors.

122.    Defendants' conduct damaged UNFI in an amount to be proven at trial.

43

## COUNT FOUR: FRAUD
### (Against Goldman Sachs, Goldman Bank and Feldgoise)

123.　　UNFI repeats and re-alleges paragraphs 1 through 92 as if fully set forth herein.

124.　　Goldman Sachs, Goldman Bank and Feldgoise (collectively, the "Goldman Defendants") made material misrepresentations and omissions of fact to induce UNFI to accept the Goldman Defendants' demand that SUPERVALU be added as a co-borrower on the Term Loan.

125.　　First, the Goldman Defendants told UNFI that the impact of adding SUPERVALU as a co-borrower would be "muted." In fact, the impact of adding SUPERVALU as a co-borrower was a significant harm to UNFI because, unbeknownst to UNFI but well known to the Goldman Defendants, the change was part of an unlawful *quid pro quo* between the Goldman Defendants and CDS short sellers to induce their participation in the Term Loan. As a result of the change, UNFI was subjected to Term Loan lenders with a significant incentive to force UNFI and SUPERVALU to default on the Term Loan, in order to manufacture a payoff on their short CDS bet. These perverse incentives give rise to a significant risk of net-short debt activism, which materially reduces the value of the Term Loan to UNFI.

126.　　Second, in response to a request from UNFI regarding the purpose behind adding SUPERVALU as a co-borrower, the Goldman Defendants made a partial disclosure that the co-borrower provision was important to "select accounts," without disclosing that those select accounts were CDS short sellers looking to preserve their bet that SUPERVALU would default on its borrowing. The Goldman Defendants' partial disclosure was misleading because it omitted the material fact that the "select accounts" were CDS purchasers who were motivated by their CDS positions to ensure SUPERVALU maintained a reference obligation for their short positions.

44

Disclosure that the "select accounts" were CDS short sellers was necessary to make the Goldman Defendants' response to UNFI's request for an explanation truthful, and the omission of this fact rendered the Goldman Defendants' response false and misleading.

127.    The Goldman Defendants knew that the addition of SUPERVALU as a co-borrower would not have a "muted" impact on UNFI, and further knew that disclosure of the CDS position held by the "select accounts" that wanted this change was necessary to make their explanation truthful, but nonetheless failed to correct their false and misleading statements and omissions.  The Goldman Defendants' conduct was willful, malicious and made with an intent to defraud UNFI.

128.    UNFI reasonably relied on the Goldman Defendants' assurances that the impact of making SUPERVALU a co-borrower would be muted.  UNFI is further presumed to have reasonably relied on the Goldman Defendants' omission as to the CDS position of the "select accounts" that desired the addition of SUPERVALU as a co-borrower.  Absent the Goldman Defendants' misrepresentations and omissions, UNFI would not have agreed to add SUPERVALU as a co-borrower.

129.    As a direct, proximate and foreseeable result of the Goldman Defendants' misrepresentations and omissions, UNFI agreed to add SUPERVALU as a co-borrower and was damaged by the reduction of the value in the Term Loan caused by the inclusion of net-short debt activist hedge funds in the lender syndicate, which harm is compensable in damages in an amount to be determined at trial.  UNFI is further entitled to punitive damages.

## **DEMAND FOR RELIEF**

**WHEREFORE**, UNFI demands judgment against Defendants as follows:

a.    Damages for all injuries suffered as a result of Defendants' unlawful and improper conduct, including compensatory and punitive damages where appropriate in an

amount to be determined at trial, disgorgement of profits, and pre-judgment and post-judgment

interest;

    b.    Costs of this action, including UNFI's attorneys' fees; and

    c.    Such other and further relief as the Court deems just and proper.

Respectfully submitted,


/s/ Gabriel F. Soledad
Gabriel F. Soledad
Juan P. Morillo
Michael E. Liftik
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
gabrielsoledad@quinnemanuel.com
juanmorillo@quinnemanuel.com
michaelliftik@quinnemanuel.com

Daniel P. Cunningham
Blair A. Adams
Samantha Gillespie
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
danielcunningham@quinnemanuel.com
blairadams@quinnemanuel.com
samanthagillespie@quinnemanuel.com

Dated: January 30, 2019

*Counsel for Plaintiff United Natural Foods, Inc.*

46

# EXHIBIT 1

Execution Version

GOLDMAN SACHS BANK USA
GOLDMAN SACHS LENDING PARTNERS LLC
200 West Street
New York, New York 10282-2198

BANK OF AMERICA, N.A.
MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED
One Bryant Park
New York, New York 10036

WELLS FARGO BANK,
NATIONAL ASSOCIATION
550 S. Tryon Street
Charlotte, North Carolina
28202

JPMORGAN CHASE BANK,
N.A
383 Madison Avenue
New York, New York 10179

U.S. BANK NATIONAL
ASSOCIATION
3 Bryant Park
New York, NY 10036

CONFIDENTIAL

August 8, 2018

United Natural Foods, Inc.
313 Iron Horse Way
Providence, RI 02908
Attn:  Michael Zechmeister
       Chief Financial Officer

Project Jedi
Second Amended and Restated Commitment Letter

Ladies and Gentlemen:

You have advised Goldman Sachs Bank USA ("GS Bank"), Bank of America, N.A. ("Bank of America"), Merrill Lynch, Pierce, Fenner & Smith Incorporated (acting together with any of its designated affiliates, "MLPFS" and, together with Bank of America and their respective affiliates, "BAML"), Wells Fargo Bank, National Association ("Wells Fargo Bank"), JPMorgan Chase Bank, N.A. ("JPMCB") and U.S. Bank National Association ("US Bank", and together with GS Bank, BAML, Wells Fargo Bank and JPMCB, collectively, the "Commitment Parties", "we" or "us"), that United Natural Foods, Inc., a Delaware corporation ("you" or the "Borrower"), intends, directly or indirectly, to acquire a company identified to us as "Spring", a Delaware corporation (the "Target"), and consummate the other transactions described in the transaction description attached hereto as Exhibit A (the "Transaction Description"). Capitalized terms used but not defined herein have the meanings assigned to them in the Transaction Description, the Summary of Terms and Conditions attached hereto as Exhibit B (the "Term Loan Facility Term Sheet") and Exhibit C (the "ABL Facility Term Sheet" and, collectively with the Term Loan Facility Term Sheet, the "Term Sheets" and each a "Term Sheet") and the Conditions Precedent to Funding attached hereto as Exhibit D (together with this second amended and restated letter agreement, the Transaction Description and the Term Sheets, collectively, the "Commitment Letter"). In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this letter agreement shall be determined by reference to the context in which it is used.

This Second Amended and Restated Commitment Letter automatically amends, restates and supersedes in its entirety the amended and restated commitment letter, dated August 7, 2018, by and

among GS Bank, Goldman Sachs Lending Partners LLC ("GSLP"), BAML and you (the "First A&R Commitment Letter"), and such First A&R Commitment Letter shall be of no further force and effect. Reference is also made to that certain commitment letter (the "Original Commitment Letter"), dated July 25, 2018 (the "Signing Date") by and among GS Bank, GSLP and you.

1.       Commitments.

         In connection with the Transactions, (a) Bank of America, GS Bank, Wells Fargo Bank, JPMCB and US Bank (collectively in such capacities, the "Initial ABL Lenders") hereby commit to provide, severally and not jointly, 27.50%, 22.50%, 20.00%, 15.00% and 15.00%, respectively, of the aggregate principal amount of the ABL Facility (as defined in Exhibit A) and (b) GS Bank, Bank of America and US Bank (collectively, in such capacities, the "Initial Term Loan Lenders", together with the Initial ABL Lenders, the "Initial Lenders") hereby commit to provide, severally and not jointly, 45.00%, 45.00% and 10.00%, respectively, of the aggregate principal amount of the Term Loan Facility (as defined in Exhibit A) (together with the ABL Facility, collectively, the "Facilities"), in each case, upon the terms set forth in this letter agreement and in the applicable Term Sheet and subject only to the satisfaction or waiver of the conditions expressly set forth in Section 5 of this Commitment Letter.

2.       Syndication.

         You hereby appoint (a) in respect of the ABL Facility, MLPFS, GS Bank, Wells Fargo Bank, JPMCB and US Bank (collectively, in such capacities, the "ABL Lead Arrangers") to act, and each ABL Lead Arranger hereby agrees to act, as a lead arranger and bookrunner, upon the terms set forth in this letter agreement and in the ABL Facility Term Sheet and (b) in respect of the Term Loan Facility, GS Bank, MLPFS and US Bank (collectively, in such capacities, the "Term Loan Lead Arrangers", and together with the ABL Lead Arrangers, the "Lead Arrangers") to act, and each Term Loan Lead Arranger hereby agrees to act, as a lead arranger and bookrunner, upon the terms set forth in this letter agreement and in the Term Loan Facility Term Sheet.  You agree that JPMCB may perform its responsibilities hereunder through its affiliate, J.P. Morgan Securities LLC.

         It is further agreed that, (a) MLPFS shall appear on the "left" of all marketing and other materials in connection with the ABL Facility and will have the rights and responsibilities customarily associated with such name placement and each of GS Bank, Wells Fargo Bank, JPMCB and US Bank shall appear on the "right" of all marketing and other materials in connection with the ABL Facility in such order and will have the rights and responsibilities customarily associated with such name placement and (b) GS Bank shall appear on the "left" of all marketing and other materials in connection with the Term Loan Facility and will have the rights and responsibilities customarily associated with such name placement and each of MLPFS and US Bank shall appear on the "right" of all marketing and other materials in connection with the Term Loan Facility in such order and will have the rights and responsibilities customarily associated with such name placement.  No other arrangers, bookrunners, managers, agents or co-agents will be appointed and no Lender (as defined below) will receive compensation with respect to any of the Facilities outside the terms contained herein and in the letters of even date herewith addressed to you providing, among other things, for certain fees relating to the Facilities (the "Fee Letter") in order to obtain its commitment to participate in the Facilities, in each case, unless you and we so agree.

         The Lead Arrangers reserve the right, prior to or after the Closing Date (as defined on Exhibit A), to syndicate all or a portion of the Initial Lenders' commitments hereunder to one or more banks, financial institutions or other institutional lenders and investors reasonably acceptable to you (such acceptance not to be unreasonably withheld or delayed) that will become parties to the Facilities Documentation (as defined on Exhibit C) pursuant to syndications to be managed by the Lead Arrangers

2

and reasonably satisfactory to you (the banks, financial institutions or other institutional lenders and investors becoming parties to the Facilities Documentation, together with the Initial Lenders, being collectively referred to as the "Lenders"); provided that, notwithstanding the Initial Lender's right to syndicate the Facilities and receive commitments with respect thereto, (a) the Initial Lenders and the Lead Arrangers will not syndicate (i) to those banks, financial institutions or other persons separately identified in writing by you to us prior to the Signing Date, or to any affiliates of such banks, financial institutions or other persons that are readily identifiable as affiliates by virtue of their names or that are identified to us in writing from time to time by you or (ii) to bona fide competitors (or affiliates thereof readily identifiable on the basis of such persons' names or that are identified to us in writing by you from time to time) of you, the Target or any of your or its subsidiaries identified to us in writing from time to time by you (other than bona fide fixed income investors or debt funds); provided that no such identification after the Signing Date pursuant to clause (i) or (ii) shall apply retroactively to disqualify any person that has previously acquired an assignment or participation of an interest in any of the Facilities with respect to amounts previously acquired (collectively, the "Disqualified Institutions"), and no Disqualified Institutions may become Lenders or otherwise participate in the Facilities, and (b) notwithstanding the Lead Arrangers' right to syndicate the Facilities and receive commitments with respect thereto, except as expressly set forth in Section 9 or otherwise agreed in writing by you, (i) the Initial Lenders shall not be relieved, released or novated from their respective obligations hereunder (including its obligation to fund the Facilities on the Closing Date) in connection with any syndication, assignment or participation of the Facilities, including their respective commitments hereunder in respect thereof, until after the Closing Date has occurred, (ii) no assignment or novation by any Initial Lender shall become effective as between you and such Initial Lender with respect to all or any portion of such Initial Lender's commitments in respect of the Facilities until after the initial funding of the Facilities and the occurrence of the Closing Date, and (iii) each Initial Lender shall retain exclusive control over all rights and obligations with respect to its commitments in respect of the Facilities, including all rights with respect to consents, modifications, supplements, waivers and amendments, until the Closing Date has occurred.

Without limiting your obligations to assist with syndication efforts as set forth herein, it is understood that the Initial Lenders' commitments hereunder are not conditioned upon the syndication of, or receipt of commitments or participations in respect of, the Facilities. In connection with the syndication of the Facilities, you agree to use your commercially reasonable efforts to assist the Lead Arrangers (and use your commercially reasonable efforts to cause the Target to assist) in completing syndications reasonably satisfactory to the Lead Arrangers and you until the date that is the earlier of (a) 45 days after the Closing Date and (b) the date on which a "Successful Syndication" (as defined in the Fee Letter), as applicable, is achieved (such earlier date, the "Syndication Date"). Such assistance shall include your using commercially reasonable efforts to (i) ensure that the syndication efforts benefit from your existing banking relationships (and, to the extent not in contravention of the Transaction Agreement, the Target's existing banking relationships), (ii) cause direct contact between your senior management, on the one hand, and the proposed Lenders, on the other hand (and, to the extent not in contravention of the Transaction Agreement, your using commercially reasonable efforts to ensure such contact between the senior management of the Target, on the one hand, and the proposed Lenders, on the other hand) at mutually agreed upon times and reasonable locations, (iii) assist (including, to the extent not in contravention of the Transaction Agreement, the use of commercially reasonable efforts to cause the Target to assist) in the preparation prior to the launch of general syndication of the Facilities of a customary confidential information memorandum for transactions of this type (the "Confidential Information Memorandum") for each of the Facilities and other customary marketing materials to be used in connection with the syndication of the Facilities, (iv) host, with the Lead Arrangers and at the request of the Lead Arrangers, one meeting of prospective Term Lenders and one meeting of prospective ABL Lenders, in each case at a time and at a location to be mutually agreed upon (and to the extent necessary, one or more conference calls with prospective Lenders in addition to any such meeting), (v) prepare and provide (and, to the extent not in contravention of the Transaction Agreement, to use commercially

#91120726v8
#91168007v6

reasonable efforts to cause the Target to prepare and provide) promptly to the Lead Arrangers all reasonably available customary information with respect to you, the Target and your and its respective subsidiaries and the Transactions, including all financial information and projections relating to the Target and its subsidiaries (including financial estimates, forecasts and budgets of the Target, the "Projections"), in each case, as the Lead Arrangers may reasonably request in connection with the syndication of the Facilities, (vi) obtain a public corporate credit rating (but no specific rating) and a public corporate family rating (but no specific rating) in respect of the Borrower from each of Standard and Poor's Rating Group ("S&P") and Moody's Investors Service, Inc. ("Moody's") and public ratings (but no specific ratings) for the Term Loan Facility from each of S&P and Moody's prior to the launch of general syndication of the Term Loan Facility, (vii) ensure that until the Syndication Date, there shall be no competing offering, placement or arrangement of any debt securities or syndicated credit facilities by you, your subsidiaries and, to the extent not in contravention of the Transaction Agreement, the Target and its subsidiaries (in each case, other than the Facilities, working capital and other indebtedness incurred in the ordinary course of business, indebtedness disclosed to the Commitment Parties on or prior to the Signing Date, other indebtedness permitted to be outstanding or issued under the Transaction Agreement (including any amendments or refinancing of such debt in connection with the Pre-Closing Reorganization (as defined in the Transaction Agreement) and indebtedness approved by the Lead Arrangers (such consent not to be unreasonably withheld, delayed or conditioned)) without the prior written consent of the Lead Arrangers if such offering, placement or arrangement would have a materially detrimental effect upon the primary syndication of the Facilities, (viii) in the case of the ABL Facility, use commercially reasonable efforts to provide the New ABL Agent (as defined in Exhibit C) and its advisors and consultants with sufficient access to the Target to complete a field examination and inventory appraisal of the Target and its subsidiaries prior to the Closing Date, in each case, to the extent not in contravention of the Transaction Agreement (and, if after such use of commercially reasonable efforts, such examination and appraisal is not completed by the Closing Date, such examination and appraisal shall be required to be completed thereafter by a time to be mutually agreed and, in any event, subsequent to the Closing Date and no later than a date that is 90 days following the Closing Date (subject to extensions by the New ABL Agent in its reasonable discretion)) and (ix) your using commercially reasonable efforts to provide the Lead Arrangers a period (the "Marketing Period") of 15 consecutive business days following the delivery of the financial statements necessary to satisfy the conditions set forth in Sections (c) and (d) of Exhibit D attached hereto to syndicate the Term Loan Facility and the ABL Facility; provided that (i) if the Marketing Period has not ended by August 17, 2018 then the Marketing Period shall not begin before September 4, 2018, (ii) November 21, 2018 and November 23, 2018 shall not be business days for purposes of calculating the Marketing Period and (iii) if the Marketing Period has not ended on or prior to December 21, 2018 then the Marketing Period shall not commence prior to January 2, 2019. You understand that the Lead Arrangers may decide to commence syndication efforts for each Facility promptly after the Signing Date. Notwithstanding anything to the contrary contained in this Commitment Letter, the Fee Letter, the Facilities Documentation or any other letter agreement or undertaking concerning the financing of the Transactions to the contrary, (i) the compliance with any of the provisions of this Commitment Letter (other than the conditions expressly set forth in Exhibit D attached hereto), (ii) the commencement and the completion of the syndication of any of the Facilities and (iii) the obtaining of the ratings referenced above shall not, in the case of any of the foregoing clauses (i) through (iii), constitute a condition precedent to any Initial Lender's commitments hereunder or to the funding and availability of the Facilities on the Closing Date or any time thereafter. For the avoidance of doubt, (x) you will not be required to provide any information to the extent that the provision thereof (i) could violate or waive any attorney-client privilege, (ii) violate or contravene any law, rule or regulation, or any obligation of confidentiality (not created in contemplation hereof) binding on you, the Target and your or its respective subsidiaries or affiliates or (iii) constitute attorney work product (provided that in the event that you do not provide information in reliance on the exclusions in this sentence relating to violation of any obligation of confidentiality, you shall use commercially reasonable efforts to provide notice to the Lead Arrangers promptly upon obtaining knowledge that such

4

information is being withheld (but solely if providing such notice would not violate such obligation of confidentiality); provided that in the event that you do not provide information pursuant to this clause (x) and such information would be required to ensure that any marketing materials would not contain any untrue statement of material fact or omit to state a material fact necessary in order to make the statements (taken as a whole) contained therein in light of the circumstances under which they would be made, not materially misleading, you shall provide notice to the Lead Arrangers and you shall communicate, to the extent feasible, the applicable information in a way that would not violate the applicable obligation) and (y) the only financial statements that shall be required to be provided to the Lead Arrangers or the Initial Lenders in connection with the syndication of the Facilities or otherwise shall be those required to be delivered pursuant to clauses (c) and (d) set forth in Exhibit D hereto.

The Lead Arrangers will manage, in consultation with you, all aspects of the syndication of the Facilities, including, without limitation, selection of Lenders (subject to your reasonable consent (such consent not to be unreasonably withheld or delayed), and excluding Disqualified Institutions), determination of when the Lead Arrangers will approach potential Lenders, the time of acceptance of the Lenders' commitments, the final allocations of the commitments among the Lenders (subject to your consent rights, as described above) and the amount and distribution of fees among the Lenders (subject to your consent rights, as described above).

You agree, at the reasonable request of the Lead Arrangers, to assist in the preparation of a version of the Confidential Information Memorandum to be used in connection with the syndication of each Facility, consisting exclusively of information and documentation that is either (a) publicly available (or could be derived from publicly available information) or (b) not material with respect to you, the Target or your or its respective subsidiaries or any of your or its respective securities for purposes of United States federal securities laws assuming such laws are applicable to you, the Target or your or its respective subsidiaries (all such information and documentation being "Public Lender Information" and with any information and documentation that is not Public Lender Information being referred to herein as "Private Lender Information").

You hereby acknowledge that the Lead Arrangers will make available, on a confidential basis, the information, Projections and other offering and marketing materials and presentations, including the Confidential Information Memorandum, to be used in connection with the syndication of each Facility (such information, Projections, other offering and marketing material and the Confidential Information Memorandum, collectively, with the Term Sheets, the "Information Materials"), to the proposed syndicate of Lenders by posting the Information Materials on Intralinks, SyndTrak Online or by similar electronic means.

It is understood that in connection with your assistance described above, (i) customary authorization letters will be included in the Confidential Information Memorandum that authorizes the distribution thereof to prospective Lenders, confirms (if applicable) that the additional version of the Confidential Information Memorandum does not include any Private Lender Information (other than information about the Transaction or the Facilities) and (ii) the Confidential Information Memorandum shall contain customary provisions exculpating the existing equity holders, you, the Target and the respective affiliates and subsidiaries of the foregoing and us and our affiliates with respect to any liability related to the use or misuse of the contents of the Information Materials or related offering and marketing materials by the recipients thereof. Before distribution of any Information Materials, you agree to identify and to use commercially reasonable efforts to cause the Target to identify that portion of the Information Materials that may be distributed to the public-side lenders. By marking Information Materials as "PUBLIC", you shall be deemed to have authorized the Lead Arrangers and the proposed Lenders to treat such Information Materials as not containing any Private Lender Information (it being understood that you shall not be under any obligation to mark the Information Materials "PUBLIC").

5

You agree that, unless expressly identified as "PUBLIC", each document to be disseminated by the Lead Arrangers (or any other agent) to any Lender in connection with the Facilities will be deemed to contain Private Lender Information.

You agree, subject to the confidentiality provisions of this Commitment Letter, that the Lead Arrangers on your behalf may distribute the following documents to all prospective Lenders, unless you advise the Lead Arrangers in writing (including by email) within a reasonable time prior to their intended distributions (after you have been given a reasonable opportunity to review such documents) that such material should only be distributed to prospective private Lenders: (a) administrative materials for prospective Lenders such as lender meeting invitations and funding and closing memoranda; (b) notifications of changes to the Facilities' terms; and (c) drafts and final versions of term sheets and definitive documents with respect to the Facilities. If you advise us in writing (including by email) within a reasonable time prior to their intended distributions (after you have been given a reasonable opportunity to review such documents) that any of the foregoing items should be distributed only to private Lenders, then the Lead Arrangers will not distribute such materials to public Lenders without your consent.

3.      Information.

You hereby represent and warrant that (a) to your knowledge, insofar as it applies to information concerning the Target, its subsidiaries and their respective businesses, all written information concerning you, the Target, your and its respective subsidiaries and your, its and their respective businesses (other than the Projections, other forward-looking information and information of a general economic or industry nature) that has been or will be made available by you (or on your behalf) to any Commitment Party in connection with the Transactions (the "Information") did not or will not when furnished, taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made, as supplemented and updated from time to time, and (b) the Projections contained in the Confidential Information Memorandum will be prepared in good faith based upon assumptions believed by you to be reasonable at the time of delivery thereof based on information provided by the Target or its representatives; it being understood that such Projections (i) are subject to significant uncertainties and contingencies, many of which are beyond your control, that no assurance can be given that any particular projections will be realized, that actual results may differ and that such differences may be material and (ii) are not a guarantee of performance. If at any time prior to the later of the Closing Date and the Syndication Date, you become aware that any of the representations and warranties in the preceding sentence are incorrect in any material respect (to your knowledge insofar as it applies to the Information and Projections concerning the Target, its subsidiaries and their respective businesses), you agree to (and to use your commercially reasonable efforts with respect to the Information and the Projections concerning the Target and its subsidiaries and their respective businesses) promptly supplement the Information and the Projections such that the representations and warranties in the preceding sentence remain true in all material respects (to your knowledge insofar as it applies to the Information and Projections concerning the Target, its subsidiaries and their respective businesses, it being understood in each case that such supplementation shall cure any breach of such representations and warranties). The accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the commitments and obligations of the Initial Lenders hereunder or the funding of the Facilities on the Closing Date. In arranging the Facilities, including the syndication of the Facilities, the Commitment Parties will be entitled to use and rely on the Information and the Projections without responsibility for independent verification thereof.

4.      Fees.

6

As consideration for the Initial Lenders' commitments hereunder and the Lead Arrangers' agreements to syndicate the Facilities, you agree to pay (or to cause to be paid) the nonrefundable (except as set forth in the Fee Letter) fees as set forth in the Fee Letter.

5.      Conditions.

The Initial Lenders' commitments hereunder to fund the Facilities on the Closing Date are subject solely to the conditions expressly set forth in Exhibit D hereto, and upon the satisfaction (or waiver by the applicable Lead Arrangers) of such conditions, the initial funding of the Facilities shall occur. There are no conditions (implied or otherwise) to the commitments hereunder, and there will be no conditions (implied or otherwise) under the Facilities Documentation to the funding of the Facilities on the Closing Date, including compliance with the terms of this Commitment Letter, the Fee Letter and the Facilities Documentation, other than those that are expressly set forth in Exhibit D.

Notwithstanding anything in this Commitment Letter, the Fee Letter, the Facilities Documentation or any other letter agreement or other undertaking concerning the financing of the Transactions to the contrary, (a) the only representations and warranties to the accuracy of which shall be a condition to the availability of the Facilities on the Closing Date shall be (i) such of the representations and warranties made by the Target with respect to the Target and its subsidiaries in the Transaction Agreement as are material to the interests of the Lenders, but only to the extent that you (or any of your affiliates) have the right (taking into account any applicable cure provisions) to terminate your (or its) obligations under the Transaction Agreement or decline to consummate the Acquisition (in each case, in accordance with the terms of the Transaction Agreement) as a result of a breach of such representations and warranties in the Transaction Agreement (the "Specified Transaction Agreement Representations") and (ii) the Specified Representations (as defined below) and (b) the terms of the Facilities Documentation shall be in a form such that they do not impair availability of the Facilities on the Closing Date if the applicable conditions set forth in Exhibit D as attached hereto are satisfied or waived by the Lead Arrangers (it being understood that to the extent any lien search or Collateral or any security interests therein (including the creation or perfection of any security interest) (other than to the extent that a lien on such Collateral may be perfected by the filing of a financing statement under the Uniform Commercial Code ("UCC") or, with respect to each material domestic wholly-owned subsidiary of the Borrower, by the delivery of stock or other certificates of each material domestic wholly-owned restricted subsidiary of the Borrower that is part of the Collateral and, with respect to the Target and material domestic wholly-owned restricted subsidiaries of the Target, by the delivery of stock or other certificates of the Target and material domestic wholly-owned restricted subsidiaries of the Target, only to the extent such stock or other certificates are received from the Target on or prior to the Closing Date after your use of commercially reasonable efforts to do so without undue burden or expense) is not or cannot be provided or perfected on the Closing Date after your use of commercially reasonable efforts to do so, or without undue burden or expense, the delivery of such lien search and/or Collateral (and creation or perfection of security interests therein), as applicable, shall not constitute a condition precedent to the availability of the Facilities on the Closing Date but shall instead be required to be delivered or provided within 90 days after the Closing Date (or such later date as may be reasonably agreed by the Borrower and the applicable Administrative Agent) pursuant to arrangements to be mutually agreed by the Borrower and the applicable Administrative Agent). For purposes hereof, "Specified Representations" means the representations and warranties made by the Loan Parties set forth in the applicable Facilities Documentation relating to: organizational existence of the Loan Parties; organizational power and authority of the Loan Parties, and due authorization, execution and delivery by the Loan Parties, in each case, as they relate to their entry into and performance of the applicable Facilities Documentation; enforceability of the applicable Facilities Documentation against the Loan Parties; no conflicts with charter documents of the Loan Parties as it relates to their entry into and performance of the applicable Facilities Documentation; solvency of the Borrower and its subsidiaries on a consolidated basis on the

7

Closing Date after giving effect to the Transactions (with solvency being determined in a manner consistent with Annex I to Exhibit D attached hereto); subject to the immediately preceding sentence and the limitations set forth in the Term Sheets, creation and perfection of security interests in the Collateral; Federal Reserve margin regulations; the use of proceeds of borrowings under the Facilities on the Closing Date not violating the PATRIOT Act, OFAC or FCPA; and the Investment Company Act. Notwithstanding anything to the contrary contained herein, to the extent any of the Specified Transaction Agreement Representations are qualified or subject to "material adverse effect," the definition thereof shall be "Material Adverse Effect" as defined in the Transaction Agreement ("Material Adverse Effect") for purposes of any representations and warranties made or to be made on, or as of, the Closing Date. The provisions of this paragraph are referred to as the "Certain Funds Provision".

6.      Indemnity; Costs and Expenses.

        You agree to indemnify and hold harmless each Commitment Party, its affiliates and their respective officers, directors, employees, members, agents, advisors, representatives and controlling persons involved in the Transactions (each, a "related party" it being understood that in no event will this indemnity apply to any Commitment Party or its affiliates in their capacity as financial advisors to you or the Target in connection with the Acquisition or any other potential acquisition, collectively, the "Indemnified Persons" and each individually an "Indemnified Person"), from and against any and all actual losses, claims, damages, liabilities and expenses, joint or several, to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the First A&R Commitment Letter, the Original Commitment Letter, the Fee Letter, the First A&R Fee Letter (as defined in the Fee Letter), the Original Fee Letter (as defined in the fee letter) or the Transactions or any claim, litigation, investigation or proceeding relating to any of the foregoing (any of the foregoing, a "Proceeding"), regardless of whether any such Indemnified Person is a party thereto or whether a Proceeding is brought by a third party or by you or any of your affiliates, and to reimburse each such Indemnified Person within 30 days after receipt of a written request (together with reasonably detailed backup documentation supporting such reimbursement request) for the reasonable fees and reasonable out-of-pocket expenses of one primary counsel for all Indemnified Persons (taken as a whole) (and, solely in the case of a conflict of interest, one additional counsel as necessary to the affected Indemnified Persons (taken as a whole) and to the extent reasonably necessary, one local counsel in each relevant jurisdiction for Indemnified Persons (taken as a whole), but no other third-party advisors without your prior consent, and other reasonable out-of-pocket expenses incurred in connection with investigating, or defending any of the foregoing (in each case, excluding allocated costs of in-house counsel); provided that, the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or expenses to the extent they resulted from (A) the willful misconduct, bad faith or gross negligence of such Indemnified Person or any of its affiliates or related parties (as determined in a final non-appealable judgment in a court of competent jurisdiction), (B) any material breach of the obligations of such Indemnified Person or any of its affiliates or related parties under this Commitment Letter, the First A&R Commitment Letter, the Original Commitment Letter, the Fee Letter, the First A&R Fee Letter or the Original Fee Letter (as determined in a final non-appealable judgment in a court of competent jurisdiction) or (C) any dispute among Indemnified Persons (or their respective affiliates or related parties) that does not involve an act or omission by you or any of your subsidiaries (other than any claims against an Administrative Agent or a Lead Arranger in their capacity as such but subject to clause (i)(A) above). Each Indemnified Person agrees (by accepting the benefits hereof), severally and not jointly, to refund and return any and all amounts paid by you (or on your behalf) under this Section 6 to such Indemnified Person to the extent such Indemnified Person is not entitled to payment of such amounts in accordance with the terms hereof.

        In addition, you hereby agree to reimburse the Lead Arrangers and Initial Lenders from time to time upon demand (to the extent you have been provided an invoice therefor at least three (3)

#91120726v8
#91168007v6

business days prior to such demand) for all reasonable documented out-of-pocket expenses (including, without limitation, reasonable documented out-of-pocket expenses of the Lead Arrangers' due diligence investigation, consultants' fees (to the extent any such consultant has been hired with your prior consent), syndication expenses (if applicable), travel expenses and reasonable fees, disbursements, field examinations and appraisal expenses and other charges of counsel, but in the case of legal fees and expenses, limited to the reasonable fees and reasonable documented out-of-pocket expenses of Davis Polk & Wardwell LLP as set forth in such Term Sheet and one local counsel in each relevant jurisdiction) incurred in connection with the preparation of this Commitment Letter, the First A&R Commitment Letter, the Original Commitment Letter, the Fee Letter, the First A&R Fee Letter, the Original Fee Letter and the Facilities Documentation, in each case, to the extent such advisors have been hired with your prior consent. You acknowledge that we may receive a benefit, including, without limitation, a discount, credit or other accommodation, from any of such counsel based on the fees such counsel may receive on account of their relationship with us, including, without limitation, fees paid pursuant hereto.

Notwithstanding any other provision of this Commitment Letter, no party hereto shall be liable for (i) any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent such damages have resulted from the willful misconduct, bad faith, gross negligence or material breach of such party or any of its affiliates or related parties of this Commitment Letter, as determined in a final, non-appealable judgment of a court of competent jurisdiction, or (ii) any special, indirect, consequential or punitive damages arising out of or in connection with this Commitment Letter, the First A&R Commitment Letter, the Original Commitment Letter, the Fee Letter, the First A&R Fee Letter or the Original Fee Letter, _provided_ that this clause (ii) shall not limit your indemnity or reimbursement obligations to the extent set forth in the second preceding paragraph in respect of any losses, claims, damages, liabilities and expenses incurred or paid by an Indemnified Person to a third party that are otherwise required to be indemnified in accordance with this Section 6. You shall not be liable for any settlement of any Proceedings (or any expenses related thereto) effected without your prior written consent (which consent shall not be unreasonably withheld, delayed or conditioned), but if settled with your prior written consent or if there is a final non-appealable judgment against an Indemnified Person in any such Proceedings, you agree to indemnify and hold harmless each Indemnified Person from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with the second preceding paragraph. You shall not, without the prior written consent of an Indemnified Person (which consent shall not be unreasonably withheld, delayed or conditioned), effect any settlement of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Indemnified Person unless (a) such settlement includes an unconditional release of such Indemnified Person in form and substance reasonably satisfactory to such Indemnified Person from all liability on claims that are the subject matter of such Proceedings and (b) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of such Indemnified Person.

Each Indemnified Person shall, in consultation with you, take all reasonable steps to mitigate any losses, claims, damages, liabilities and expenses and shall give (subject to confidentiality or legal restrictions) such information and assistance to you as you may reasonably request in connection with any Proceedings.

7.      Confidentiality.

You acknowledge that the Lead Arrangers, the Initial Lenders and their respective affiliates may be providing debt financing, equity capital or other services (including, without limitation, financial advisory services) to other companies in respect of which you or the Target may have conflicting interests. The Commitment Parties and their respective affiliates will not use information

#91120726v8
#91168007v6

obtained from you, the Target or any of your or their respective affiliates and subsidiaries by virtue of the transactions contemplated by this Commitment Letter or any of your or their other respective relationships with you, the Target and your or their respective affiliates and subsidiaries in connection with the performance by them and their respective affiliates of services for other persons or entities, and none of the Commitment Parties or their respective affiliates will furnish any such information to such other persons or entities. You also acknowledge that none of the Commitment Parties or their respective affiliates has any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, the Target or your or their respective subsidiaries, confidential information obtained by the Commitment Parties or their respective affiliates from other persons or entities. This Commitment Letter and the Fee Letter are not intended to create a fiduciary relationship among the parties hereto or thereto.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Commitment Parties is intended to be or has been created in respect of any of the debt transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Parties have advised or are advising you on other matters, and you will not claim that the Commitment Parties have rendered advisory services of any nature or respect with respect to the debt transactions contemplated hereby, (b) the Commitment Parties, on the one hand, and you, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of the Commitment Parties, (c) you are capable of and responsible for evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter and (d) you have been advised that the Commitment Parties and their respective affiliates are engaged in a broad range of transactions that may involve interests that differ from your interests and that the Commitment Parties and their respective affiliates have no obligation to disclose such interests and transactions to you by virtue of any fiduciary, advisory or agency relationship. You agree not to assert any claim you might allege based on any actual or potential conflicts of interest that might be asserted to arise or result from, on the one hand, the engagement of us or our affiliate as a financial advisor, and on the other hand, our and our affiliates' relationships with you as described and referred to herein.

You further acknowledge that each of the Lead Arrangers (or an affiliate thereof) may be a full service securities firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, each such person may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of you and other companies with which you may have commercial or other relationships. With respect to any securities and/or financial instruments so held by such person or any of its customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion. To the fullest extent permitted by law, you hereby waive (to the extent permitted by applicable law) and release any claims that you may have against each such Lead Arranger with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated by this Commitment Letter.

You agree that you will not disclose this Commitment Letter, the Fee Letter, the Original Fee Letter or the contents of any of the foregoing to any person without our prior written approval (which may include through electronic means) (not to be unreasonably withheld, conditioned, delayed or denied), except that you may disclose (a) this Commitment Letter, the Fee Letter, the Original Fee Letter and the contents hereof and thereof (i) to you and to your officers, directors, agents, employees, affiliates, members, partners, stockholders, equityholders, controlling persons, agents, attorneys, accountants and advisors on a confidential basis and (ii) as required by applicable law, compulsory legal process, pursuant

10

INDEX NO. 650594/2019

RECEIVED NYSCEF: 01/30/2019

to the order of any court or administrative agency in any pending legal, judicial or administrative proceeding or to the extent required by governmental and/or regulatory authorities (in which case you agree to use commercially reasonable efforts to inform us promptly thereof to the extent lawfully permitted to do so), (b) this Commitment Letter, the Fee Letter, the Original Fee Letter and the contents hereof and thereof to the Target, its direct or indirect parent companies and their respective officers, directors, agents, employees, affiliates, members, partners, stockholders, equityholders, controlling persons, agents, attorneys, accountants and advisors, in each case in connection with the Transactions and on a confidential basis (provided that, any such disclosure of the Fee Letter or the Original Fee Letter shall be subject to redaction of the fees, the economic "market flex" provisions contained therein in a manner reasonably acceptable to the applicable Lead Arrangers), (c) the existence and contents of the Term Sheets to any rating agency, (d) the existence and contents of this Commitment Letter to a potential Lender in connection with the Transactions, (e) the aggregate fee amounts contained in the Fee Letter as part of projections, *pro forma* information or a generic disclosure of aggregate sources and uses related to fee amounts related to the Transactions to the extent customary or required in offering and marketing materials or in any public filing relating to the Transactions, (f) the existence and contents of this Commitment Letter and the Term Sheets in any proxy, public filing, prospectus, offering memorandum, offering circular, syndication materials or other marketing materials in connection with the Acquisition or the financing thereof, (g) this Commitment Letter, the Fee Letter and the contents hereof and thereof in connection with any remedy or enforcement of any right under this Commitment Letter, or the Fee Letter and (h) after the Closing Date, the Fee Letter on a confidential basis to persons performing customary accounting functions, including accounting for deferred financing costs; provided that, the foregoing restrictions shall cease to apply after the Facilities Documentation shall have been executed and delivered by the parties thereto (other than in respect of the Fee Letter and the contents thereof).

Each Commitment Party agrees to keep confidential, and not to publish, disclose or otherwise divulge, information obtained from or on behalf of you, the Target or your respective affiliates in the course of the transactions contemplated hereby, except that such Commitment Party shall be permitted to disclose such confidential information (a) to their respective directors, officers, agents, employees, attorneys, accountants and advisors, and to their respective affiliates involved in the Transactions (other than Excluded Affiliates) on a "need to know" basis and who are made aware of the confidential nature of such information and have been advised of this obligation to keep information of this type confidential; provided, that such Commitment Party shall remain liable for the breach of the provisions of this paragraph by such directors, officers, agents, employees, attorneys, accountants and advisors, (b) on a confidential basis to any bona fide potential Lender, prospective participant or swap counterparty (in each case, other than a Disqualified Institution and other persons to whom you have affirmatively declined to consent to the syndication or assignment thereto prior to the disclosure of such confidential information to such person) that agrees to keep such information confidential in accordance with (x) the provisions of this paragraph (or language substantially similar to this paragraph that is reasonably acceptable to you) for the benefit of you or (y) other customary confidentiality language in a "click-through" arrangement, (c) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case we agree to use commercially reasonable efforts to inform you promptly thereof to the extent lawfully permitted to do so (except with respect to any audit or examination conducted by bank accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority)), (d) to the extent requested by any bank regulatory authority having jurisdiction over a Commitment Party (including in any audit or examination conducted by bank accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority), (e) to the extent such information: (i) becomes publicly available other than as a result of a breach of this Commitment Letter, the Fee Letter or other confidential or fiduciary obligation owed by such Commitment Party to you, the Target or your or their respective affiliates or (ii) becomes available to the Commitment Party on a non-confidential

basis from a source other than you or on your behalf that, to such Commitment Party's knowledge (after due inquiry), is not in violation of any confidentiality obligation owed to you, the Target or your or their respective affiliates, (f) to the extent you shall have consented to such disclosure in writing (which may include through electronic means), (g) in protecting and enforcing such Commitment Party's rights with respect to this Commitment Letter or the Fee Letter, (h) for purposes of establishing any defense available under securities laws, including, without limitation, establishing a "due diligence" defense or to defend any claim related to this Commitment Letter or the Fee Letter, (i) to the extent independently developed by such Commitment Party without reliance on confidential information or (j) with respect to the existence and contents of the Term Sheets, in consultation with you, to the rating agencies; provided that, no such disclosure shall be made to the members of such Commitment Party's or any of its affiliates' deal teams that are engaged as principals primarily in private equity, mezzanine financing or venture capital (a "Private Equity Affiliate") or are engaged in the sale of the Target and its subsidiaries, including through the provision of advisory services (a "Sell Side Affiliate" and, together with the Private Equity Affiliates, the "Excluded Affiliates") other than a limited number of senior employees who are required, in accordance with industry regulations or such Commitment Party's internal policies and procedures to act in a supervisory capacity and the Commitment Party's internal legal, compliance, risk management, credit or investment committee members. In addition, each Commitment Party may disclose the existence of the Facilities to market data collectors, similar services providers to the lending industry, and service providers to such Commitment Party in connection with the administration and management of the Facilities after the Closing Date. The Commitment Parties' and their respective affiliates', if any, obligations under this paragraph shall terminate automatically to the extent superseded by the confidentiality provisions in the Facilities Documentation upon the effectiveness thereof and, in any event, will terminate two years from the Signing Date.

8.    Patriot Act.

We hereby notify you that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "Patriot Act")), each of us and each of the Lenders may be required to obtain, verify and record information that identifies the Borrower and each Loan Party, which information may include its name and address and other information that will allow each of us and the Lenders to identify the Borrower and each Loan Party in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective for each of us and the Lenders.

9.    Governing Law, Etc.

This Commitment Letter and the commitments hereunder and the Fee Letter shall not be assignable by any party hereto (except between Goldman Sachs Bank USA and GSLP (which assignment shall reduce the commitment of the assignor to the extent of the assigned interest and the applicable assignee shall become bound by the terms and conditions and subject to all commitments and obligations of an "Initial Lender" and "Commitment Party" hereunder)) without the prior written consent of each of the other parties hereto, and any attempted assignment without such consent shall be void; provided that MLPFS may, without notice to you, assign its rights and obligations under this Commitment Letter to any other registered broker dealer wholly owned by Bank of America Corporation to which all or substantially all of Bank of America Corporation's or any of its subsidiaries' investment banking, commercial lending services or related businesses may be transferred following the date of this Commitment Letter. This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by the Commitment Parties and you. This Commitment Letter may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or electronic

transmission (e.g., "pdf" or "tiff") shall be effective as delivery of a manually executed counterpart of this Commitment Letter. This Commitment Letter and the Fee Letter are the only agreements that have been entered into among the parties hereto with respect to the Facilities and set forth the entire understanding of the parties hereto with respect thereto. This Commitment Letter is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto, the Indemnified Persons and, if any of this Commitment Letter or any commitment hereunder is assigned in accordance with the first sentence of this <u>Section 9</u> above, the applicable assignee or assignees. Subject to the limitations set forth in <u>Section 2</u> above, the Commitment Parties may perform the duties and activities described hereunder through any of their respective affiliates (other than an Excluded Affiliate or other Disqualified Institution) and the provisions of <u>Section 6</u> shall apply with equal force and effect to any of such affiliates so performing any such duties or activities. This Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York; <u>provided</u>, <u>however</u>, that (a) the interpretation of the definition of Material Adverse Effect and whether a Material Adverse Effect has occurred, (b) the accuracy of any Specified Transaction Agreement Representations and whether you (or any of your affiliates) have the right (taking into account any applicable cure provisions) to terminate your (or its) obligations under the Transaction Agreement or decline to consummate the Acquisition (in each case, in accordance with the terms of the Transaction Agreement) as a result of a breach of such Specified Transaction Agreement Representations and (c) whether the Acquisition has been consummated in accordance with the terms of the Transaction Agreement shall, in each case, be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

Each party hereto hereby irrevocably and unconditionally submits to the exclusive jurisdiction of any state or Federal court sitting in the Borough of Manhattan in the City of New York, and, in each case, any appellate court thereof, over any suit, action or proceeding arising out of or relating to this Commitment Letter or the Fee Letter or the performance of services hereunder or thereunder, whether in contract, tort or otherwise, and irrevocably and unconditionally agrees that it will not commence any such suit, action or proceeding against any of the other parties hereto arising out of or in any way relating to this Commitment Letter or the Fee Letter or the performance of services hereunder or thereunder in any forum other than such courts. Each party hereto agrees that service of any process, summons, notice or document by registered mail addressed to such party shall be effective service of process for any suit, action or proceeding brought in any such court. Each party hereto hereby irrevocably and unconditionally waives any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum and agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other matter provided by law. EACH PARTY HERETO HEREBY IRREVOCABLY AGREES TO WAIVE (TO THE EXTENT PERMITTED BY APPLICABLE LAW) TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS COMMITMENT LETTER OR THE FEE LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Each of the parties hereto agrees that, if accepted by you (a) this Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein, including an agreement to negotiate in good faith the Facilities Documentation by the parties hereto in a manner consistent with this Commitment Letter, it being acknowledged and agreed that the funding of the Facilities is subject to the conditions precedent set forth in <u>Section 5</u> hereof and (b) the Fee Letter is a binding and enforceable agreement with respect to the subject matter contained therein. Reasonably

13

promptly after the execution of this Commitment Letter, the parties hereto shall proceed with the negotiation in good faith of the Facilities Documentation for the purpose of executing and delivering the Facilities Documentation substantially simultaneously with the consummation of the Acquisition.

The syndication (if applicable), indemnification, expense reimbursement (if applicable), information (if applicable), compensation (if applicable), jurisdiction, waiver of jury trial, service of process, venue, governing law, absence of fiduciary duty and confidentiality provisions contained herein and in the Fee Letter shall remain in full force and effect regardless of whether the Facilities Documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the Initial Lenders' commitments hereunder; <u>provided</u> that your obligations under this Commitment Letter, other than your obligations relating to syndication assistance in respect of the Facilities (which shall terminate in accordance with Section 2) and confidentiality of the Fee Letter, shall automatically terminate and be superseded by the provisions of the Facilities Documentation upon the execution and delivery thereof, and you shall automatically be released from all liability in connection therewith at such time. You may terminate (on a *pro rata* basis among all Initial Lenders) all or any portion of the Initial Lenders' commitments hereunder at any time subject to the provisions of the preceding sentence; <u>provided</u> that the termination by you of the Initial Term Loan Lenders' commitments with respect to the Term Loan Facility in full will automatically, and without any further action on the part of you or the Initial Lenders, terminate all of the Initial ABL Lenders' commitments with respect to the ABL Facility.

Please indicate your acceptance of the terms hereof and of the Fee Letter by signing in the appropriate space below and in the Fee Letter and returning to us facsimiles or electronic copies of this Commitment Letter and the Fee Letter, in each case not later than 11:59 p.m., New York City time, on August 8, 2018, failing which the Initial Lenders' commitments hereunder will expire at such time. In the event that (a) the initial borrowing under the Facilities does not occur on or before the Original End Date (as defined in the Transaction Agreement as in effect on the Signing Date) (or to the extent extended pursuant to the proviso to Section 7.1(b) of the Transaction Agreement as in effect on the Signing Date, the Extended End Date (as defined in the Transaction Agreement as in effect on the Signing Date)), (b) the Acquisition closes without the use of the Facilities (in each case, as to such Facility) or (c) the Transaction Agreement is validly terminated by you prior to the closing of the Acquisition, then this Commitment Letter and the commitments hereunder shall automatically terminate unless we shall, in our sole discretion, agree to an extension. Notwithstanding anything to the contrary, (i) in the event the ABL Amendment is approved by the requisite lenders under the Existing ABL Facility on or prior to the Closing Date, immediately upon the Borrower's receipt of such approval, the commitments hereunder in respect of the Backstop ABL Facility shall be automatically terminated and thenceforth the commitments hereunder in respect of the Incremental ABL Facility shall constitute the entire commitments hereunder in respect of the ABL Facility and (ii) in the event the Specified Disposition (as defined in Exhibit B) is consummated on or prior to the Closing Date, to the extent the net proceeds thereof are not applied to reduce pension liabilities on a dollar-for-dollar basis on or prior to the Closing Date, the Term Loan Facility shall be reduced on a dollar-for-dollar basis with the amount of such net proceeds on the Closing Date. The termination of any commitment shall not prejudice your rights and remedies in respect of any breach of this Commitment Letter or the Fee Letter.

[SIGNATURE PAGES FOLLOW]

14

Please confirm that the foregoing is our mutual understanding by signing and returning to us an executed counterpart of this Fee Letter.

Very truly yours,

**GOLDMAN SACHS BANK USA**

By: _____
Name:   Robert Ehudin
Title:   Authorized Signatory

**GOLDMAN SACHS LENDING PARTNERS LLC**

By: _____
Name:   Robert Ehudin
Title:   Authorized Signatory

BANK OF AMERICA, N.A.

By:
Name:
Title:

**Jonathan Miscimarra**
**Director**

MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED

By:
Name:
Title:

**Jonathan Miscimarra**
**Director**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By: _Lynn Gosselin_
Name: LYNN GOSSELIN
Title: DIRECTOR

*[Signature Page to 2nd A&R Commitment Letter]*

JPMORGAN CHASE BANK, N.A.

By:

Name:

Title:      Alicia T. Schreibstein
            Executive Director

**U.S. BANK NATIONAL ASSOCIATION**

By: _____

Name: LISa freeman

Title: SVP

*[Signature Page to 2nd A&R Commitment Letter]*

Accepted and agreed to as of
the date first written above:

**UNITED NATURAL FOODS, INC.**

By: _____
Name: MICHAEL ZECHMEISTER
Title: CFO

*[Signature Page to 2nd A&R Commitment Letter]*

EXHIBIT A

Project Jedi
Senior Secured Term Loan Facility
Senior Secured ABL Facility

Transaction Description

Capitalized terms used but not defined in this Exhibit A shall have the respective meanings set forth in the letter agreement to which this Exhibit A is attached and in the other Exhibits attached thereto. In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this Exhibit A shall be determined by reference to the context in which it is used.

United Natural Foods, Inc., a Delaware corporation (the "Borrower") intends to acquire (the "Acquisition") a company identified to us as "Spring", a Delaware corporation (the "Target"), pursuant to the Agreement and Plan of Merger, dated as of the Signing Date, among, *inter alia*, the Target, the Borrower and a wholly-owned subsidiary of the Borrower incorporated under the laws of the State of Delaware ("Merger Sub") (together with the schedules and exhibits thereto, and as may be amended, modified, supplemented or waived from time to time in accordance with the terms herein and therein, the "Transaction Agreement").

In connection with the foregoing, it is intended that:

a)      The Borrower will obtain (i) either (x) an increase in the U.S. Revolver Commitments and/or the Canadian Commitments under and as defined in that certain Third Amended and Restated Loan and Security Agreement, dated as of April 29, 2016, by and among the Borrower, Bank of America, N.A., as administrative agent and the other borrowers, agents and lenders party thereto (the "Existing ABL Facility") in an aggregate principal amount of $1,100,000,000 (the "Incremental ABL Facility") and an amendment to the Existing ABL Facility (i) to the extent necessary to permit the incurrence of the Term Loan Facility and the Incremental ABL Facility and matters related thereto, including authorizing the ABL Administrative Agent to execute and deliver an intercreditor agreement on the terms described in the other Exhibits attached hereto described herein, (ii) that provides that the "Borrowing Base" shall be deemed to be no less than $1,500,000,000 on the Closing Date ("Minimum Available ABL Amount") and (iii) that provides that the borrowing under the Existing ABL Facility on the Closing Date of the Minimum Available ABL Amount is subject solely to conditions precedent that are analogous to and no more restrictive than those set forth in Exhibit D hereto (the "ABL Amendment") or (y) in the event the ABL Amendment is not approved by the requisite lenders under the Existing ABL Facility on or prior to the Closing Date, an asset-based revolving facility in an aggregate principal amount of $2,000,000,000 comprised of (A) an asset-based revolving facility in an aggregate principal amount of $1,950,000,000 available for U.S. Borrowers and (B) an asset-based revolving facility in an aggregate principal amount of $50,000,000 available for the Canadian Borrower (collectively, the "Backstop ABL Facility" and, together with the Incremental ABL Facility, the "ABL Facility") that will be used to replace the Existing ABL Facility and (ii) a senior secured term loan facility in an aggregate principal amount of $2,150,000,000 (the "Term Loan Facility" and, together with the ABL Facility, each a "Facility" and collectively, the "Facilities").

b)      The proceeds of (x) cash on hand and (y) the ABL Loans and the Term Loans made on the Closing Date will be used to fund (i) the payment of consideration pursuant to the terms and conditions of the Transaction Agreement (the "Purchase Consideration"), and the other payments contemplated by the Transaction Agreement, (ii) the repayment in full (or the termination, discharge

or defeasance (or arrangements reasonably satisfactory to the Initial Lenders for the termination, discharge or defeasance (or, in the case of the Existing Term Facility, irrevocable notice for the repayment or redemption thereof will be given))) of all outstanding indebtedness (and the release of guarantees and liens securing such indebtedness) of (A) the Borrower and its subsidiaries under (1) that certain Term Loan Agreement, dated as of August 14, 2014, by and among the Borrower, Bank of America, N.A., as administrative agent, the lenders party thereto and the other parties thereto, as amended on or prior to the Closing Date (the "Existing Term Facility") and (2) in the case the ABL Amendment is not approved by the requisite lenders under the Existing ABL Facility on or prior to the Closing Date, the Existing ABL Facility, as amended on or prior to the Closing Date (provided that, for the avoidance of doubt, any letters of credit outstanding under the Existing ABL Facility that are cash collateralized or otherwise backstopped or "rolled over" into the Backstop ABL Facility shall be permitted to remain outstanding) and (B) the Target and its subsidiaries under (1) the Second Amended and Restated Term Loan Credit Agreement, dated as of January 31, 2014, by and among the Target, Goldman Sachs Bank USA, as administrative agent, the lenders party thereto and the other parties thereto, as amended on or prior to the Closing Date, (2) that certain Amended and Restated Credit Agreement, dated as of March 21, 2013, by and among the Target, Wells Fargo Bank, National Association, as administrative agent, the lenders party thereto and the other parties thereto, as amended on or prior to the Closing Date (provided that, for the avoidance of doubt, any letters of credit outstanding thereunder that are cash collateralized or otherwise backstopped or "rolled over" into the Backstop ABL Facility shall be permitted to remain outstanding) (the "Target ABL Facility"), (3) the Target's 6.75% Senior Notes due June 1, 2021 and (4) the Target's 7.75% Senior Notes due November 15, 2022 (the repayment, termination, discharge, defeasance, arrangement and release of all such indebtedness in this clause (ii), the "Closing Date Refinancing"), (iii) fees and expenses incurred in connection with the foregoing and transactions related thereto (such fees and expenses, the "Transaction Costs") and (iv) with respect to the ABL Facility, working capital and general corporate purposes.

c)      On the Closing Date, the Acquisition will be effected via the merger (the "Merger") of Merger Sub with and into the Company, with the Company as the surviving entity of such Merger.

For purposes of the Commitment Letter and the Fee Letter, "Closing Date" shall mean the date that the loans under the Facilities are funded and, substantially concurrently therewith, the Transaction is consummated. The transactions described above, together with the transactions related thereto (including the payment of all Transaction Costs), are collectively referred to herein as the "Transactions".

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

#91120726v8
#91168007v6

EXHIBIT B

Project Jedi
$2,150,000,000 Senior Secured Term Loan Facility
Summary of Terms and Conditions

        Capitalized terms used but not defined in this Exhibit B shall have the meanings set forth in the Commitment Letter to which this Exhibit B is attached and in the other Exhibits attached thereto. In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this Exhibit B shall be determined by reference to the context in which it is used.

| | |
|---|---|
| Borrower: | United Natural Foods, Inc. |
| Term Loan Administrative Agent: | Goldman Sachs Bank USA ("GS Bank") will act as the sole administrative agent and sole collateral agent (in such capacities and together with its successors and permitted assigns, the "Term Loan Administrative Agent" and, collectively with the New ABL Agent (as defined in Exhibit C), the "Administrative Agent") for a syndicate of banks, financial institutions and other institutional lenders and investors (other than Disqualified Institutions) (together with the Initial Term Loan Lenders, the "Term Lenders" and, collectively with the ABL Lenders (as defined in Exhibit C), the "Lenders") reasonably acceptable to the Borrower (such acceptance not to be unreasonably withheld or delayed). |
| Term Loan Lead Arrangers and Bookrunners: | GS Bank, MLPFS and US Bank (collectively, in such capacities, the "Term Loan Lead Arrangers" and, together with the ABL Lead Arrangers (as defined in Exhibit C), the "Lead Arrangers"). |
| Term Loan Facility: | A term loan facility in an aggregate principal amount of $2,150 million (the "Term Loan Facility"; loans incurred under the Term Loan Facility shall be the "Term Loans"). The Term Loan Facility will be available to the Borrower in U.S. Dollars. |

    Use of Proceeds:  The proceeds of Term Loans will be applied on the Closing Date, together with cash on hand and any amount drawn under the ABL Facility, to (a) finance a portion of the Purchase Consideration and (b) pay Transaction Costs.

    Availability:  The full amount of Term Loans must be drawn in a single drawing on the Closing Date. Amounts repaid or prepaid under the Term Loan Facility may not be reborrowed.

    Interest Rates and Fees:  As set forth on Annex I to this Exhibit B.

<table>
<tr><td></td><td>Maturity and Amortization: The Term Loan Facility will mature on the day that is seven (7) years after the Closing Date (the "Maturity Date") and will amortize in equal quarterly installments in an aggregate annual amount equal to 1.0% of its original principal amount (subject to reduction in connection with debt prepayments and debt buy backs), commencing the second full fiscal quarter after the Closing Date, with the balance payable on the final maturity date.</td></tr>
<tr><td>Guarantees:</td><td>All obligations of the Borrower under the Term Loan Facility will be unconditionally guaranteed (the "Guarantees") by each existing and subsequently acquired or organized U.S. direct or indirect wholly-owned U.S. restricted subsidiary of the Borrower to the extent permitted by applicable law and subject to exceptions and limitations consistent with the Existing Term Facility and other customary exceptions to be mutually agreed upon between the Borrower and the Term Loan Administrative Agent (as defined below) (collectively, the "Term Loan Guarantors" and the Term Loan Guarantors, together with the Borrower, the "Term Loan Loan Parties"); and, the Term Loan Guarantors together with the ABL Guarantors, the "Guarantors"; and, the Term Loan Loan Parties together with the ABL Loan Parties, the "Loan Parties"); provided, that on the Closing Date, each ABL Guarantor will also be a Term Loan Guarantor; provided, further, that subsidiaries that are not "eligible contract participants" (after giving effect to any "keepwell" provisions) shall not guarantee swap obligations to the extent it is illegal or unlawful under the Commodity Exchange Act, or any regulation thereunder, by virtue of such subsidiary failing to constitute an "eligible contract participant". Notwithstanding the foregoing, it is understood and agreed that there shall be no guarantees governed under the laws of any non-U.S. jurisdiction.</td></tr>
<tr><td>Security:</td><td>Subject to the Certain Funds Provision and the provisions of the immediately following paragraph and consistent with the Existing Term Facility, the obligations of Borrower and the Term Loan Guarantors in respect of the Term Loan Facility will be secured by (a) a perfected first-priority (subject to exceptions consistent with the Existing ABL Facility and the Existing Term Facility) security interest in the Term Loan Priority Collateral (as defined in Exhibit C) and (b) a perfected second-priority (subject to permitted liens, including in respect of the applicable ABL Facility, and other exceptions consistent with the Existing ABL Facility and the Existing Term Facility) security interest in the ABL Priority Collateral (as defined in Exhibit C) (the foregoing, collectively, the "Collateral"), in each case, subject to permitted liens and to certain exceptions and limitations consistent with the Existing ABL Facility and the Existing Term Facility and other customary exceptions to be mutually agreed upon between the Borrower and the Term Loan Administrative Agent.</td></tr>
</table>

Notwithstanding anything to the contrary, the Borrower and the Term Loan Guarantors shall not be required, nor shall the Term Loan Administrative Agent be authorized, (i) to perfect the above described pledges, security, interests and mortgages by any means other than by (A) filings pursuant to the UCC in the office of the secretary of state (or similar central filing office) of the relevant State(s), (B) filings in United States government

#91120726v8
#91168007v6

offices with respect to intellectual property as expressly required in the Term Loan Facility Documentation, (C) delivery to the Term Loan Administrative Agent, for its possession, of all Collateral consisting of material intercompany notes and stock certificates of the Borrower and its material wholly-owned restricted subsidiaries and material instruments, issued to the Borrower or a Guarantor or (D) mortgages in respect of fee owned real property located in the U.S. with a fair market value in excess of an amount to be mutually agreed between the Borrower and the Term Loan Administrative Agent, in each case expressly required in the Term Loan Facility Documentation, (ii) to enter into any control agreement with respect to any deposit account, securities account or commodities account or contract, (iii) to take any action in any non-U.S. jurisdiction or pursuant to the requirements of the laws of any non-U.S. jurisdiction in order to create any security interests or to perfect any security interests, including with respect to any intellectual property registered outside of the U.S. (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdictions) or (iv) except as expressly set forth above, to take any other action with respect to any Collateral to perfection through control agreements or to otherwise perfect by "control".

All the above-described pledges and security interests shall be created on terms, and pursuant to documentation, consistent with the Term Loan Documentation Principles and subject to exceptions permitted under the Term Loan Facility Documentation. Notwithstanding anything to the contrary contained herein, the requirements of the preceding paragraphs in this "Security" section shall be subject to the Certain Funds Provision.

|                                          |                                                                                                                                                                                                                                                |
|------------------------------------------|---|

Intercreditor Matters:
The lien priority, relative rights and other creditors' rights issues in respect of the Term Loan Facility and the ABL Facility will be set forth in a customary intercreditor agreement consistent with the Term Loan Documentation Principles and the ABL Documentation Principles.

Uncommitted Incremental Facilities:
After the Closing Date, the Borrower will have the right to solicit the existing Term Lenders or prospective lenders determined by the Borrower to provide (x) incremental commitments consisting of one or more new tranches of revolving credit facilities available under the Facilities Documentation (each, an "Incremental Revolving Facility") and/or (y) incremental commitments consisting of one or more increases to the Term Loan Facility and/or one or more new tranches of term loans to be made available under the Term Loan Facility Documentation (each, a "Incremental Term Facility" and together with any Incremental Revolving Facility, the "Incremental Facilities") in an aggregate amount not to exceed the *pro forma* Consolidated EBITDA (to be defined in a manner consistent with the Term Loan Documentation Principles and including, without limitation, customary pro forma adjustments to include run-rate synergies management expects to be realized, subject to customary parameters to be agreed) on the Closing Date (the "Incremental Fixed Dollar Basket"), *plus* (2) all voluntary prepayments of the Term Loan Facility, any Incremental Term Facility and permanent commitment reductions of any Incremental Revolving Facility (except to the extent funded with the proceeds of the

#91120726v8
#91168007v6

incurrence of long-term indebtedness), *plus* (3) an unlimited amount so long as, in the case of this clause (3), after giving effect to the incurrence of such amount, any acquisition consummated in connection therewith and all other appropriate pro forma adjustments, (x) if such Incremental Facility is secured on a pari passu basis with the Term Loans, the Consolidated First Lien Net Leverage Ratio (as defined below) is equal to or less than the *pro forma* Consolidated First Lien Net Leverage Ratio on the Closing Date, (y) if such Incremental Facility is secured on a junior basis to the Term Loans, the Consolidated Secured Net Leverage Ratio (as defined below) is equal to or less than the *pro forma* Consolidated Secured Net Leverage Ratio on the Closing Date or (z) if such Incremental Facility is unsecured, the Consolidated Total Net Leverage Ratio (as defined below) is equal to or less than the *pro forma* Consolidated Total Net Leverage Ratio on the Closing Date, in each case, after giving effect to any acquisition consummated in connection therewith and all other appropriate *pro forma* adjustments, and assuming for purposes of this calculation that (i) the full committed amount of any Incremental Revolving Facility and any Incremental Equivalent Debt then being incurred at such time shall be treated as outstanding and (ii) cash proceeds of any such Incremental Facility and Incremental Equivalent Debt then being incurred shall not be netted from indebtedness (provided, however, that if amounts incurred under this clause (3) are incurred concurrently with the incurrence of Incremental Facilities in reliance on clause (1) and/or clause (2) above, the Consolidated First Lien Net Leverage Ratio, the Consolidated Secured Net Leverage Ratio or Consolidated Total Net Leverage Ratio, as applicable, shall be permitted to exceed the Consolidated First Lien Net Leverage Ratio, the Consolidated Secured Net Leverage Ratio or the Consolidated Total Net Leverage Ratio, as applicable, to the extent of such amounts incurred in reliance on clause (1) and/or clause (2)), on terms agreed by the Borrower and the lender(s) providing the respective Incremental Facility (it being understood that (A) if the Consolidated First Lien Net Leverage Ratio, Consolidated Secured Net Leverage Ratio or Consolidated Total Net Leverage Ratio, as applicable, incurrence test is met, then, at the election of the Borrower, any Incremental Facility may be incurred under clause (3) above regardless of whether there is capacity under clause (1) and/or clause (2) above and (B) any portion of any Incremental Facility incurred in reliance on clause (1) and/or clause (2) shall be reclassified, as the Borrower may elect from time to time, as incurred under clause (3) if the Borrower meets the applicable leverage ratio under clause (3) at such time on a pro forma basis); provided that:

(i) (a) no event of default (or, in the case of an Incremental Facility the proceeds of which will be used to finance a Permitted Acquisition or other similar permitted investment or repayment of indebtedness that requires an irrevocable prepayment or redemption notice, no payment or bankruptcy event of default) exists or would exist after giving effect thereto and (b) the representations and warranties in the Term Loan Facility Documentation shall be true and correct in all material respects (provided, in the case of an Incremental Facility used to finance a Permitted Acquisition or other similar permitted investment or repayment of indebtedness that requires an irrevocable prepayment or redemption notice, only the Specified

#91120726v8
#91168007v6

Representations (conformed as necessary for such Permitted Acquisition) shall be required to be true and correct in all material respects),

(ii) any Incremental Facility shall rank *pari passu* or junior in right of payment with the Facilities and will either be secured on a *pari passu* or junior basis with the Term Loan Facility by the same Collateral securing the Term Loan Facility or be unsecured, and shall not be secured by any lien on the assets of any Term Loan Loan Party that does not also secure the then outstanding Term Loan Facility, or be guaranteed by any subsidiary other than a Term Loan Loan Party under the then outstanding Term Loan Facility, and

(iii) loans to be made under any Incremental Facility (each, under any Incremental Term Facility, an "Incremental Term Loan" and, each, under any Incremental Revolving Facility, an "Incremental Revolving Loan" and, collectively with Incremental Term Loans, the "Incremental Loans") shall be subject to terms determined by the Borrower and the lenders providing such Incremental Facility, except that:

(1) in connection with any Incremental Term Loans, unless any Incremental Term Loans are made a part of the Term Loan Facility (in which case all terms thereof shall be identical to those of the Term Loan Facility), (a) if the "effective margin" applicable to any Incremental Term Loans that are *pari passu* in right of payment and security with the initial Term Loans (which (x) shall be deemed to include all upfront or similar fees or OID (amortized over the shorter of (1) the weighted average life to maturity of such loans and (2) four years) payable to all lenders providing such Incremental Term Loans, (y) if such Incremental Term Loans include an interest rate floor greater than the applicable interest rate floor under the initial Term Loans, such differential between interest rate floors shall be equated to the applicable interest rate margin for purposes of determining whether an increase to the interest rate margin under the initial Term Loans shall be required, but only to the extent an increase in the interest rate floor in the initial Term Loans would cause an increase in the interest rate then in effect thereunder, and in such case, the interest rate floor (but not the interest rate margin) applicable to the initial Term Loans shall be increased to the extent of such differential between interest rate floors and (z) shall exclude structuring, underwriting, ticking, arrangement, amendment, consent, commitment and other fees payable in connection therewith) determined as of the initial funding date for such Incremental Term Loans, exceeds the "effective margin" applicable to the initial Term Loans (determined on the same basis as provided above) by more than 0.50%, then the "effective margin" for the initial Term Loans shall be increased so that the "effective margin" thereof equals the "effective margin" of such Incremental Term Loans, *minus* 0.50% (all adjustments made pursuant to this clause (iii)(1)(a), the "MFN Adjustment"); provided that if any Incremental Term Loan is incurred more than 12 months after the Closing Date, the MFN Adjustments shall not apply, (b) the final stated maturity date for any

Incremental Term Loans may be the same as or later (but not sooner) than the final stated maturity date applicable to the then-existing Term Loans, (c) the average weighted life to maturity of such Incremental Term Loans shall be no shorter than the average weighted life to maturity applicable to the then-existing Term Loans (without giving effect to any amortization or prepayments on the outstanding Term Loans), (d) the Borrower may issue, in lieu of any Incremental Term Loans, first lien secured or junior lien secured or unsecured notes, first lien loans, junior lien loans, unsecured loans, or secured or unsecured "Mezzanine" debt ("Incremental Equivalent Debt") (in each case, (x) if in the form of junior lien or unsecured loans or notes, with a maturity at least 91 days after the maturity of the then existing Term Loans (or if in the form of first lien secured loans or notes, with a maturity no earlier than the maturity of the then existing Term Loans), (y) not guaranteed by any subsidiary other than a Term Loan Loan Party under the then outstanding Term Loan Facility and (z) to the extent secured, subject to customary intercreditor terms to be consistent with the Term Loan Documentation Principles and not secured by any lien on the assets of any Term Loan Loan Party that does not also secure the then outstanding Term Loan Facility) if the applicable conditions to effecting and borrowing under an Incremental Term Facility (as if such Incremental Equivalent Debt were an Incremental Term Loan) would have been satisfied, provided that, the provisions of the preceding clause (iii)(1)(a) shall not apply other than with respect to any loans that are *pari passu* with the Term Loans in security and right of payment, and clauses (iii)(1)(b) and (iii)(1)(c) shall not apply to any customary bridge facility so long as the long-term debt into which any such customary bridge facility is to be converted satisfies such clauses; provided further that (x) mandatory prepayments shall not be permitted to be applied to any Incremental Term Facility or Incremental Equivalent Debt on a greater than pro rata basis relative to the initial Term Loans (except with respect to mandatory prepayments with the proceeds of Refinancing Facilities or Refinancing Notes) and (y) the covenants, events of default and guarantees of such Incremental Term Loans or Incremental Equivalent Debt, if not consistent with the terms of the corresponding Term Loans, shall not be materially more restrictive to the Borrower, when taken as a whole, than the terms of the Term Loans unless (1) lenders under the Term Loan Facility also receive the benefit of such more restrictive terms or (2) such more restrictive terms apply after the maturity date of the initial Term Loan Facility; and

(2) in connection with any Incremental Revolving Loans, (a) the final stated maturity date for any Incremental Revolving Loans may be the same as or later (but not sooner) than the final stated maturity date applicable to the ABL Facility, (b) any Incremental Revolving Loans shall not be subject to (x) any mandatory prepayments other than those customary mandatory prepayments in connection with the Incremental Revolving Loans under any Incremental Revolving Facility exceeding the commitments thereunder or (y) any mandatory

B-6

commitment reductions or scheduled amortization payments and (c) the covenants, events of default and guarantees of any Incremental Revolving Loans shall not be materially more restrictive to the Borrower, when taken as a whole, than the terms of the Term Loans.

Existing lenders under the Facilities may, but shall not be obligated to without their prior written consent, provide a commitment and/or make any loans pursuant to any Incremental Facility, and nothing contained herein constitutes, or shall be deemed to constitute, a commitment with respect to any Incremental Facility. The use of proceeds, if any, of any Incremental Facility will be as agreed by the Borrower and the lenders providing such Incremental Facility.

"Consolidated First Lien Net Leverage Ratio" shall mean the ratio of (i) consolidated first lien net debt (consisting of indebtedness for borrowed money (including, for the avoidance of doubt, any amounts outstanding under the ABL Facility), capitalized lease obligations, purchase money debt and drawn and unreimbursed letters of credit as reflected on the balance sheet of the Borrower and its restricted subsidiaries, in each case secured, in whole or in part, by first priority liens on the assets of the Borrower or any restricted subsidiary), *minus* unrestricted cash and cash equivalents (excluding for purposes of any calculation of the Consolidated First Lien Net Leverage Ratio in connection with the incurrence of any indebtedness, the cash proceeds of such incurrence) to (ii) Consolidated EBITDA for the most recent four fiscal quarter period for which financial statements have been delivered (or were required to have been delivered) pursuant to the Term Loan Facility Documentation.

"Consolidated Secured Net Leverage Ratio" shall mean the ratio of (i) consolidated secured net debt (consisting of indebtedness for borrowed money (including, for the avoidance of doubt, any amounts outstanding under the ABL Facility), capitalized lease obligations, purchase money debt and drawn and unreimbursed letters of credit as reflected on the balance sheet of the Borrower and its restricted subsidiaries, in each case secured, in whole or in part, by liens on the assets of the Borrower or any restricted subsidiary), *minus* unrestricted cash and cash equivalents (excluding for purposes of any calculation of the Consolidated Secured Net Leverage Ratio in connection with the incurrence of any indebtedness, the cash proceeds of such incurrence) to (ii) Consolidated EBITDA for the most recent four fiscal quarter period for which financial statements have been delivered (or were required to have been delivered) pursuant to the Term Loan Facility Documentation.

"Consolidated Total Net Leverage Ratio" shall mean the ratio of (i) consolidated net debt (consisting of indebtedness for borrowed money, capitalized lease obligations, purchase money debt and drawn and unreimbursed letters of credit as reflected on the balance sheet of the Borrower and its restricted subsidiaries), *minus* unrestricted cash and cash equivalents (excluding for purposes of any calculation of the Consolidated Total Net Leverage Ratio in connection with the incurrence of any indebtedness, the cash proceeds of such incurrence) to (ii) Consolidated

#91120726v8
#91168007v6

EBITDA for the most recent four fiscal quarter period for which financial statements have been delivered (or were required to have been delivered) pursuant to the Term Loan Facility Documentation.

Refinancing Facilities:

The Term Loan Facility Documentation will permit the Borrower to refinance loans under the Term Loan Facility or any Incremental Term Facility or commitments under the Incremental Revolving Facility from time to time, in whole or part, with one or more new term facilities (each, a "Refinancing Term Facility") or new revolving credit facilities (each a "Refinancing Revolving Facility" and, together with any Refinancing Term Facility, collectively, the "Refinancing Facilities"), respectively, under the Term Loan Facility Documentation solely with the consent of the Borrower and the institutions providing such Refinancing Term Facility or Refinancing Revolving Facility and with one or more additional series of senior unsecured notes or loans or senior secured notes or loans that will be secured by the Collateral on a *pari passu* or junior basis with the Term Loan Facility (such notes or loans, "Refinancing Notes"); provided that (i) with respect to Refinancing Facilities or Refinancing Notes that are secured, customary intercreditor agreements are entered into which are reasonably acceptable to the Borrower and Term Loan Administrative Agent, (ii) any Refinancing Term Facility or Refinancing Notes do not mature prior to the maturity date of, or have a shorter weighted average life than, loans under the Term Loan Facility or Incremental Term Facility being refinanced (without giving effect to any amortization or prepayments on the outstanding Term Loans or Incremental Term Loans, as applicable) or, with respect to any Refinancing Notes, have mandatory prepayment provisions (other than related to customary asset sale (or similar event) and change of control offers or prepayments and customary acceleration rights after an event of default) that would result in mandatory prepayment of such Refinancing Notes prior to the loans under the Term Loan Facility being refinanced (it being understood the Borrower shall be permitted to prepay or offer to purchase any first lien secured Refinancing Notes pursuant to the second paragraph of the "Mandatory Prepayments" section below), (iii) any Refinancing Revolving Facility does not mature prior to the maturity date of the revolving commitments being refinanced, (iv) the aggregate principal amount of any Refinancing Facility or Refinancing Notes shall not be greater than the aggregate principal amount of the applicable class under the Facilities being refinanced or replaced, *plus* any fees, premiums, original issue discount and accrued interest associated therewith and costs and expenses related thereto and such Facilities being refinanced or replaced will be permanently reduced on a dollar-for-dollar basis concurrently with the issuance of such Refinancing Facility or Refinancing Notes, (v) the Term Loan Facility Documentation will contain provisions providing for the *pro rata* treatment of the payment, borrowing, participation and commitment reduction of any Incremental Revolving Facility and any Refinancing Revolving Facility, (vi) any Refinancing Facility or Refinancing Notes, to the extent secured, shall not be secured by any lien on any asset of any Term Loan Loan Party that does not also secure the then outstanding applicable Term Loans, or be guaranteed by any Subsidiary other than the Term Loan Guarantors under the then outstanding Term Loans, (vii) the other terms and conditions of such Refinancing Facilities or

#91120726v8
#91168007v6

Refinancing Notes (excluding pricing, fees and optional prepayment or redemption terms which shall be determined in good faith by the Borrower) shall either, at the option of the Borrower, (x) reflect market terms and conditions (taken as a whole) at the time of incurrence or issuance (as determined in good faith by the Borrower) or (y) if not consistent with the terms of the corresponding class under the Term Loan Facility, not be materially more restrictive to the Borrower, when taken as a whole, than the terms of the applicable class under the Term Loan Facility (or any revolving credit facility thereunder) being refinanced or replaced unless (1) the Term Lenders under the corresponding class under the Term Loan Facility also receive the benefit of such more restrictive terms or (2) any such provisions apply only after the maturity date of the Term Loan Facility. In connection with any Refinancing Facility or Refinancing Notes, the Term Loan Facility Documentation will provide the Borrower the right to require the applicable Term Lenders or lenders in respect of any Incremental Facility to assign their loans and commitments to the providers of any such Refinancing Facility or Refinancing Notes.

<u>Mandatory Prepayments</u>:    The Term Loans shall be prepaid with:

(a)    100% of the net cash proceeds from issuances of debt by the Borrower or any of its restricted subsidiaries (with appropriate exceptions for all permitted indebtedness (other than Refinancing Term Facilities and Refinancing Notes) and the Incremental Facilities);

(b)    for each fiscal year of the Borrower (beginning with the first full fiscal year following the Closing Date) 50% (with step-downs to 25% and 0% if the Consolidated First Lien Net Leverage Ratio is less than 0.50:1.00 and 1.00:1.00 inside the Consolidated First Lien Net Leverage Ratio as of the Closing Date) of the Borrower's annual excess cash flow (to be defined consistent with the Term Loan Documentation Principles (such definition to provide for a deduction from excess cash flow, without duplication among periods, of cash used (or to be used within a time period to be mutually agreed and consistent with the Term Loan Documentation Principles) to finance permitted acquisitions, other investments and capital expenditures (to the extent such amount are used or to be used within agreed upon time period for permitted acquisitions, other investments and capital expenditures, including any of the foregoing for which a binding agreement (or binding commitment) then exists and subject to reversal if such case is not so used within such agreed time period and to the extent not financed with long term debt proceeds) and for certain restricted payments, permitted tax distributions, scheduled payments of indebtedness and prepayments of other indebtedness, subject to limitation consistent with the Term Loan Documentation Principles, and to include a dollar-for-dollar credit for the following (to the extent not financed with long-term debt proceeds): (x) voluntary permanent prepayments of (i) the Term Loan Facility and any Incremental Term Facility, any Incremental Equivalent Debt, any Refinancing Notes and any Refinancing Term Facility, in each case that is secured on a *pari passu* basis with the Term Loan Facility (in each case, including any

B-9

debt buyback, but limited to the actual cash amount paid by Borrower in connection with such buyback) and (ii) the ABL Facility, any Incremental Revolving Facility, any Refinancing Revolving Facility and any revolving facility refinancing, replacing or extending any of the foregoing (to the extent accompanied by a permanent reduction of the relevant commitment) and (y) repayment of the ABL Loans made to account for any additional OID or upfront fees that are implemented pursuant to the "market flex" provisions of the Fee Letter; and

(c)     100% of the net cash proceeds of all non-ordinary course asset sales or other dispositions of property by the Borrower or any of its restricted subsidiaries (including casualty insurance and condemnation proceeds and to the extent not consummated prior to the Closing Date and the net proceeds thereof not applied to reduce pension liabilities on a dollar-for-dollar basis, dispositions in whole or in part of the retail business of the Target (collectively, the "Specified Disposition"), but with exceptions for ordinary course dispositions, dispositions of obsolete or worn-out property and property no longer used or useful in the business (other than the Specified Disposition) and other exceptions to be consistent with the Term Loan Facility Documentation) in excess of an individual and annual threshold amount to be agreed and (other than with respect to proceeds of the Specified Disposition) subject to a 100% reinvestment right if reinvested (or committed to be reinvested) within 18 months of such sale or disposition (or 24 months in the event a binding letter of intent is entered into within such 18-month period).

Mandatory prepayments shall be applied *pro rata* among classes of term loans, except that (i) the Borrower may direct that proceeds of Refinancing Term Facilities or Refinancing Notes shall be applied to the class or classes of term loans to be refinanced as selected by the Borrower and (ii) Incremental Term Facilities and Refinancing Term Facilities may participate in mandatory prepayments on a less than *pro rata* basis. Mandatory prepayments of the Term Loans shall be applied to scheduled installments thereof in direct order of maturity (without premium or penalty); provided, that the Term Loan Facility Documentation shall provide that in the case of mandatory prepayments pursuant to clauses (b) or (c) above, a ratable portion of such mandatory prepayment may be applied to redeem, prepay or offer to purchase any Refinancing Notes or Incremental Equivalent Debt (collectively, "Additional Debt"), in each case secured on a pari passu basis with the Term Loan Facility and if required under the terms of the applicable documents governing such Additional Debt.

All prepayments referred to in clauses (a) through (c) above are subject to there being no adverse tax consequences and to permissibility under (i) local law (*e.g.*, financial assistance, corporate benefit, restrictions on upstreaming of cash intra-group and the fiduciary and statutory duties of the directors of the relevant subsidiaries) and (ii) material constituent document restrictions (including as a result of minority ownership by third parties)

#91120726v8
#91168007v6

and other material agreements (so long as any prohibition is not created in contemplation of such prepayment). The non-application of any prepayment amounts as a consequence of the foregoing provisions will not, for the avoidance of doubt, constitute a default or an event of default, and such amounts shall be available for working capital purposes of the Borrower and its restricted subsidiaries as long as not required to be prepaid in accordance with the following provisions. Borrower and its restricted subsidiaries will undertake to use reasonable efforts to overcome or eliminate any such restrictions (subject to the considerations above and as determined in the Borrower's reasonable business judgment) to make the relevant prepayment. Notwithstanding the foregoing, any prepayments required after application of the above provision shall be net of any costs, expenses or taxes incurred by the Borrower or any of its affiliates and arising as a result of compliance with the preceding sentence.

Any Term Lender under the Term Loan Facility may elect not to accept its *pro rata* portion of any mandatory prepayment (other than with respect to Refinancing Notes and Refinancing Term Facilities) (each, a "Declining Term Loan Lender"). Any prepayment amount declined by a Declining Term Loan Lender may be retained by the Borrower ("Retained Declined Proceeds").

| | |
|---|---|
| Voluntary Prepayments: | Voluntary prepayments of borrowings under the Term Loan Facility will be permitted at any time, in minimum principal amounts to be mutually agreed upon between the Borrower and the Term Loan Administrative Agent consistent with the Term Loan Documentation Principles, without premium or penalty (except the Prepayment Premium referred to below), subject to reimbursement of the Term Lenders' redeployment costs (other than lost profits) in the case of a prepayment of Adjusted LIBOR Loans prior to the last day of the relevant interest period. Voluntary prepayments of the Term Loans shall be applied to installments thereof as directed by the Borrower (and absent such direction, in direct order of maturity). All voluntary prepayments shall be applied to the class or classes of Term Loans as selected by the Borrower. |
| Prepayment Premium: | Voluntary prepayments and mandatory prepayments (or repricing or refinancing through any waiver, consent or amendment, including any mandatory assignment in connection therewith) of initial Term Loans made pursuant to clause (a) of the "Mandatory Prepayments" section of this Term Sheet prior to the date that is six months after the Closing Date will be subject to a prepayment premium of 1.00% (the "Prepayment Premium") of the principal amount prepaid, refinanced or amended to the extent constituting a Repricing Transaction. "Repricing Transaction" shall mean (i) any prepayment or repayment of initial Term Loans with the proceeds of, or any conversion of initial Term Loans into, any new or replacement tranche of senior secured term loans under credit facilities the primary purpose of which is to reduce the all-in-yield applicable to the initial Term Loans and (ii) any amendment to the initial Term Loan Facility (or any exercise of any "yank-a-bank" rights in connection therewith) the primary purpose of which is to reduce the all-in-yield applicable to the initial Term Loans (with the all-in-yield, in each case, calculated in a manner consistent |

B-11

with the MFN Adjustment); provided that such Prepayment Premium shall not apply if such refinancing or amendment is in connection with a "change of control" transaction, initial public offering or any transformative acquisition.

| | |
|---|---|
| Term Loan Facility Documentation: | The definitive documentation with respect to the Term Loan Facility (the "Term Loan Facility Documentation") will be initially prepared by counsel to the Borrower based on a recent precedent to be agreed for a similarly-situated borrower in the syndicated term loan "B" market to be mutually agreed, will contain only those mandatory prepayments set forth above in this Term Sheet and representations, warranties, conditions to borrowing, affirmative, negative and financial covenants and events of default set forth below in this Term Sheet, in each case applicable to the Borrower and its restricted subsidiaries, with materiality thresholds, qualifications, exceptions, "baskets" and grace and cure periods to be mutually agreed, with changes and modifications that reflect the "market flex" provisions of the Fee Letter and shall be no less favorable (except as expressly set forth in this Exhibit B) to the Borrower and its subsidiaries than the Existing Term Facility (collectively, the "Term Loan Documentation Principles"). Notwithstanding the foregoing, all leases of the Borrower, the Guarantors and the respective restricted subsidiaries of the Borrower or Subsidiary Guarantors that are or would be treated as operating leases for purposes of GAAP as of the Signing Date shall be accounted for as operating leases for purposes of the defined financial terms, including "Capital Lease Obligations" under the Term Loan Facility Documentation regardless of any change to GAAP following such date which would otherwise require such leases to be treated as capital leases; provided that financial reporting shall not be affected thereby. The Term Loan Facility Documentation will contain customary European Union bail-in and Beneficial Ownership Regulation provisions and, to the extent applicable, Department of Labor lender regulatory representations. The Term Loan Facility Documentation shall be subject in all respects to the Certain Funds Provision. |
| Representations and Warranties: | Consistent with the Term Loan Documentation Principles and include (and limited to) the following (to be applicable to the Borrower and its restricted subsidiaries): pro forma financial statements; no Material Adverse Effect (as defined below) after the Closing Date; legal existence; compliance with laws (including, without limitation, anti-terrorism laws, FCPA and OFAC); organizational power and authority; due authorization, execution, delivery and enforceability of the Term Loan Facility Documentation; no violation of or conflict with law, organizational documents or material debt agreements; government approvals; material litigation; ownership of material property; intellectual property; taxes; the Patriot Act; Beneficial Ownership Certification; FCPA; Sanctions (including OFAC); Federal Reserve regulations; ERISA and Canadian pension regulations; Investment Company Act; environmental matters; labor matters; governmental consents; solvency on the Closing Date; accuracy of written disclosure; the Patriot Act; PACA and PSA, and creation, perfection and validity of security interests (subject to permitted liens and other exceptions to perfection to be mutually agreed and consistent with the Term Loan Documentation Principles). |

B-12

"Material Adverse Effect" means any event, circumstance or condition that has had a material and adverse effect on (a) the business, results of operations or financial condition of the Borrower and its restricted subsidiaries, taken as a whole, (b) the ability of the Borrower and its restricted subsidiaries, taken as a whole, to perform their material payment obligations under the Facilities Documentation or (c) material remedies (taken as a whole) of the Administrative Agent and the Lenders under the Facilities Documentation.

Conditions Precedent:

The availability of the Term Loan Facility on the Closing Date will be subject solely to the applicable conditions precedent set forth in Exhibit D to the Commitment Letter. For the avoidance of doubt, it is agreed that conditions set forth in Exhibit D are subject, in all respects, to the Certain Funds Provision.

Affirmative Covenants:

Consistent with the Term Loan Documentation Principles (to be applicable to the Borrower and its restricted subsidiaries) and limited to the following: delivery of consolidated annual audited financial statements within 120 days of the end of each fiscal year without any going concern qualification or exception (except to the extent such qualification or exception is a result of a current maturity of indebtedness or any actual or prospective default of any financial covenant) and, for each of the first three fiscal quarters of any fiscal year, quarterly unaudited financial statements within 45 days for each of the first three fiscal quarters of any fiscal year; together with the delivery of annual financials, customary management discussion and analysis; together with the delivery of quarterly financials, summary management discussion and analysis; quarterly lender calls at the Term Loan Administrative Agent's request; annual budgets and quarterly (for the first three fiscal quarters of each fiscal year) and annual compliance certificates; payment of material taxes; maintenance of existence; compliance with laws; maintenance of property (subject to casualty, condemnation and normal wear and tear) and adequate insurance; maintenance of books and records; right of the Term Loan Administrative Agent to inspect property and books and records (subject to frequency and cost reimbursement limitations consistent with the Term Loan Documentation Principles and other than information subject to confidentiality obligations or attorney-client privilege and other exceptions to be agreed); information (including, without limitation, the PATRIOT Act and the Beneficial Ownership Regulation); notices of events of default; changes in fiscal year; designation and re-designation of restricted and unrestricted subsidiaries; notices of litigation and ERISA events which, in either case, result in a Material Adverse Effect; use of proceeds; further assurances with respect to the Collateral and Guarantees; material changes in lines of business (other than lines of business complementary, ancillary, synergistic or incidentally related to then-existing lines of business); commercially reasonable efforts to maintain public ratings (but not to maintain a specific rating); in each case, all with customary materiality qualifiers, exceptions and limitations to be agreed upon and consistent with the Term Loan Documentation Principles.

#91120726v8
#91168007v6

Negative Covenants:

Consistent with the Term Loan Documentation Principles (to be applicable to the Borrower and its restricted subsidiaries) and limited to the following (which shall be subject to customary materiality qualifiers, exceptions and limitations to be mutually agreed upon and which shall be consistent with the Term Loan Documentation Principles):

1. Limitation on asset sales (with exceptions to include, without limitation, the Specified Disposition).

2. Limitation on mergers, liquidations, dissolutions and other fundamental changes.

3. Limitations on dividends, stock repurchases and redemptions of equity interests.

4. Limitation on incurrence of indebtedness (with exceptions to include, without limitation, the Facilities, any Incremental Facility, Refinancing Facility, Incremental Equivalent Debt or Refinancing Notes or and any permitted refinancings thereof).

5. Limitation on investments.

6. Limitation on liens (with exceptions to include liens securing the Facilities (including any Incremental Facility and any Refinancing Facility), Incremental Equivalent Debt and Refinancing Notes).

7. Limitations on restrictions on distributions from subsidiaries and granting of negative pledge clauses.

8. Limitations on prepayments, redemptions and repurchases of certain material debt that is subordinated in right of payment or security to the Facilities or is unsecured, excluding for the avoidance of doubt, the ABL Loans.

9. Limitations on amendments to organizational documents and material Junior Debt documents, in each case, solely to the extent such amendments are materially adverse to the Term Lenders.

10. Limitations on transactions with affiliates.

Unless an event of default has occurred and is continuing or would result therefrom (at the time of execution of a binding agreement in respect thereof), the Borrower and its restricted subsidiaries may make acquisitions (each, a "Permitted Acquisition"), subject solely to the following terms and conditions: (i) after giving effect thereto, the Borrower is in compliance with the permitted lines of business covenant and (ii) if the Borrower or any of its restricted subsidiaries acquires the majority of the equity interests of any person in connection with such acquisition such person will, subject to the right of the Borrower to designate an unrestricted subsidiary and (subject to a cap on amounts invested by Term Loan Loan Parties in entities that do not become (or assets that do not become owned by) Term Loan

B-14

Loan Parties) become a restricted subsidiary and, solely to the extent required by and subject to the limitations set forth in, "Guarantee"" and "Security" and the immediately preceding parenthetical above, the acquired company and its subsidies will become Term Loan Guarantors and pledge their Collateral to the Term Loan Administrative Agent.

The Borrower will be also permitted to utilize an "Available Additional Basket" in an amount equal to (a) a fixed amount to be agreed, *plus* (b) 50% of cumulative consolidated net income (to be defined consistent with the Term Loan Documentation Principled), *plus* (c) the proceeds of new public or private qualified equity issuances by, and capital contributions to, the Borrower after the Closing Date, *plus* (d) debt and disqualified stock which have been exchanged or converted into qualified equity of the Borrower (and any direct or indirect parent thereof) after the Closing Date, *plus* (e) the proceeds of sales of investments made under the Available Additional Basket, *plus* (f) without duplication of amounts under clause (e) above, returns, profits, distributions and similar amounts received on investments made under the Available Additional Basket (up to the amount of the original investment), *plus* (g) the investments of the Borrower and its restricted subsidiaries in any unrestricted subsidiary that have been transferred to the Borrower or any of its restricted subsidiaries, in each case up to the amount of the original investment made in such unrestricted subsidiary under the Available Additional Basket, *plus* (h) the amount of Retained Declined Proceeds, *plus* (i) the sale of equity interests or assets of an unrestricted subsidiary, joint venture or minority investment that has been re-designated as a restricted subsidiary or that has been merged or consolidated into a Term Loan Party or any of its restricted subsidiaries or the fair market value of the assets of any unrestricted subsidiary, joint venture or minority investment that have been transferred to a Term Loan Loan Party or any of its restricted subsidiaries, in each case up to the amount of the original investment made in such unrestricted subsidiary, joint venture or minority investment under the Available Additional Basket, *plus* (k) certain other items to be mutually agreed and consistent with the Term Loan Documentation Principles, in the case of each of the foregoing clauses (a) through (k), to the extent not otherwise applied to make investments to other restricted payments (including subordinated debt prepayments, redemptions or repurchases); provided that, to the extent such amounts are to be utilized for dividends, stock repurchases and redemptions of equity interests or for prepayments, redemption and repurchases of Junior Debt, the unused amounts under the Available Additional Basket shall only be available so long as (x) no event of default has occurred and is continuing and (y) the Borrower shall be in compliance, on a *pro forma* basis, with a Consolidated Total Net Leverage Ratio to be agreed (the "Available Additional Basket Conditions").

| | |
|---|---|
| Limited Condition Transactions: | Consistent with the Term Loan Documentation Principles. |
| Financial Covenant: | None. |
| Unrestricted Subsidiaries: | The Term Loan Facility Documentation will contain provisions pursuant to |

B-15

which, so long as no event of default is continuing, the Borrower will be permitted to designate any existing or subsequently acquired or organized subsidiary as an "unrestricted subsidiary" and subsequently re-designate any such unrestricted subsidiary as a restricted subsidiary, if, on a pro forma basis, the Borrower would be in compliance with a maximum Consolidated Total Net Leverage Ratio equal to the Consolidated Total Net Leverage Ratio on the Closing Date, provided, (x) such designation of a restricted subsidiary as an unrestricted shall be deemed to constitute the incurrence of indebtedness and liens of such subsidiary (and reduction in an outstanding investment). Unrestricted subsidiaries will not be subject to the mandatory prepayments, representations and warranties, covenants, events of default or other provisions of the Term Loan Facility Documentation, and the results of operations and indebtedness of unrestricted subsidiaries will not be taken into account for purposes of calculating any financial ratios or baskets contained in the Term Loan Facility Documentation.

<u>Events of Default</u>:    Consistent with the Term Loan Documentation Principles (to be applicable to the Borrower and its restricted subsidiaries) and limited to the following (with grace periods, baskets and materiality thresholds to be mutually agreed upon and consistent with the Term Loan Documentation Principles): nonpayment of principal; nonpayment of interest with a grace period of 5 business days; nonpayment of fees or other amounts with a grace period of 10 business days; any representation or warranty in the Term Loan Facility Documentation proving to have been materially incorrect when made or deemed made; failure to perform or observe covenants set forth in the Term Loan Facility Documentation within a specified period of time where appropriate (subject, in the case of affirmative covenants, to a grace period of 30 days following written notice from the Term Loan Administrative Agent (other than in respect of maintenance of the Borrower's existence and notices of default); cross-default (other than with respect to the ABL Facility) and cross-acceleration to debt in excess of a materiality threshold; cross-acceleration to the ABL Facility; bankruptcy and insolvency defaults (with a 60 day grace period for involuntary proceedings); final monetary judgment defaults to the extent not covered by indemnities or insurance above a materiality threshold (with a 60 day grace period); customary ERISA events that would result in a Material Adverse Effect; invalidity of material guarantees or impairment of security of a material portion of the Collateral; and change of control (to be defined in a manner consistent with the Term Loan Documentation Principles)).

<u>Voting</u>:    Amendments and waivers of the Term Loan Facility Documentation will require the approval of Term Lenders holding more than 50% of the aggregate amount of loans and commitments under the Facilities (the "<u>Required Term Lenders</u>"), except that (a) only the consent of each directly and adversely affected Lender (and not the Required Term Lenders) shall be required with respect to (i) increases in commitments of such Term Lender (it being understood that a waiver of any condition precedent or the waiver of any default, event of default or mandatory prepayment shall not constitute an increase of any commitment of any Term Lender), (ii) reductions of principal, interest or fees payable to such Term Lender

#91120726v8
#91168007v6

(other than waivers of default interest, a default or event of default or mandatory prepayment), <u>provided</u> that any change in the definitions of any ratio used in the calculation of any rate of interest or fees (or the component definitions) shall not constitute a reduction in any rate of interest or fees, (iii) extensions of final scheduled maturity or scheduled times for payment of principal, interest or fees owing to such Term Lender (it being understood and agreed that the waiver of any mandatory prepayment, default interest, default or event of default shall only require the consent of the Required Term Lenders) and (iv) alterations of such Lender's pro rata sharing of payments, (b) the consent of all Term Lenders shall be required with respect to (i) releases of all or substantially all of the Term Loan Guarantors or all or substantially all of the Collateral (other than in connection with permitted asset sales, dispositions, mergers, liquidations or dissolutions or as otherwise permitted) and (ii) reductions to any of the voting percentages, and (c) the consent of the Term Loan Administrative Agent shall be required with respect to amendments and waivers directly adversely affecting its rights or duties; it being understood that (i) additional extensions of credit permitted under the Term Loan Facility Documentation shall not require the consent of all Term Lenders but instead shall only require the consent of each Term Lender extending such credit, (ii) any applicable intercreditor agreement may be amended solely with the consent of the Term Loan Administrative Agent to give effect thereto or to carry out the purposes thereof and (iii) there shall be no "class" voting requirement for amendments, modifications or supplements to the Term Loan Facility Documentation.

The Term Loan Facility Documentation shall contain a mechanism to permit the Borrower (a) with the consent of each directly and adversely affected Term Lender under the Term Loan Facility, but without the consent of any other Term Lender or the Required Term Lenders, to extend the maturity date and to provide for different interest rates and fees and prepayments for the Term Lender providing such extended maturity date, so long as an offer to extend the final expiration or maturity date of the applicable Facility is made to all Term Lenders of the applicable class on a *pro rata* basis pursuant to procedures established by the Term Loan Administrative Agent and (b) with the consent of each directly and adversely affected Term Lender under the applicable Facility (but no other Term Lender) to provide for a "re-pricing" amendment which reduces the interest rate accruing in respect of the Term Loans and/or Revolving Loans held by such Term Lender.

In connection with any proposed amendment, modification, waiver or termination (a "<u>Proposed Change</u>") requiring the consent of all Term Lenders or all directly and adversely affected Term Lenders, if the consent to such Proposed Change of other Term Lenders whose consent is required is not obtained (but the consent of the Required Term Lenders or more than 50% (in principal amount) of the directly and adversely affected Term Lenders, as applicable, is obtained) (any such Term Lender whose consent is not obtained being referred to as a "<u>Non-Consenting Lender</u>"), then the Borrower may, at its option and at its sole expense and effort, upon notice to such Non-Consenting Lender and the Term Loan Administrative Agent,

B-17

(x) require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to customary restrictions on assignment), all its interests, rights and obligations under the Term Loan Facility Documentation with respect to the applicable class or classes of loans to an assignee that shall assume such obligations (which assignee may be another Term Lender, if a Term Lender accepts such assignment) and/or (y) terminate the commitment of such Non-Consenting Lender and prepay such Term Lender on a non-*pro rata* basis; provided that, such Non-Consenting Lender shall have received payment of an amount equal to the outstanding principal of its loans, accrued interest thereon, accrued fees and all other amounts then due and owing to it under the Term Loan Facility Documentation with respect to such class or classes from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts).

The Term Loan Facility Documentation shall contain customary provisions consistent with the Term Loan Documentation Principles for replacing or terminating the commitments of (i) an insolvent Term Lender, (ii) a Lender failing to fund its commitment (a "Defaulting Lender"), (iii) a Lender seeking indemnity for increased costs or grossed-up tax payments and (iv) a Lender refusing to extend its commitment, in each case consistent with the Term Loan Documentation Principles.

In addition, the Term Loan Facility Documentation shall provide for the amendment (or amendment and restatement) of the Term Loan Facility Documentation to (a) add one or more additional or replacement credit facilities thereto and changes related thereto and (b) to provide for term loans replacing all or a portion of the Term Loans, subject to customary limitations, with only the consent of the Borrower and the lenders providing such replacement term loans and, in connection with any of the foregoing, the right of the Borrower to require the applicable Term Lenders to assign their Term Loans to the providers of any replacement credit facility or loans or to prepay their outstanding loans and terminate their commitments.

The Term Loan Facility Documentation will permit guarantees, collateral security documents and related documents to be amended and waived with the consent of the Term Loan Administrative Agent at the request of Borrower without the need for consent by any other Term Lender if such amendment or waiver is delivered in order to (i) comply with local law or advice of local counsel or (ii) cause such guarantee, collateral security document or other document to be consistent with or effectuate the credit agreement and the other Term Loan Facility Documentation. The Term Loan Administrative Agent shall be entitled (in its discretion) to extend any deadline for taking actions required to perfect security interests in collateral.

In addition, if the Term Loan Administrative Agent and the Borrower shall have jointly identified an obvious error, defect or any error or omission of a technical nature in the Term Loan Facility Documentation, then the Term Loan Administrative Agent and the Borrower shall be permitted to amend such provision without further action or consent of any other party if such amendment is posted to the Lenders and Required Lenders (to be defined)

#91120726v8
#91168007v6

do not oppose such amendment within five business days of such posting.

| | |
|---|---|
| Cost and Yield Protection: | Usual for facilities and transactions of this type (including mitigation provisions and to include Dodd-Frank and Basel III as changes in law) and consistent with the Term Loan Documentation Principles; provided that requests for such additional payments shall be limited to circumstances in which the applicable Lender is imposing such charges on other similarly situated borrowers under comparable syndicated credit facilities. The Term Loan Facility Documentation will contain customary tax gross-up provisions. |
| Assignments and Participations: | The Term Lenders will be permitted to assign loans and commitments with the consent (not to be unreasonably withheld or delayed) of the Borrower (unless a payment or bankruptcy (with respect to the Borrower) event of default has occurred and is continuing or such assignment is to a Term Lender, an affiliate of a Term Lender or an approved fund of a Term Lender); provided that, with respect to the Term Loan Facility, the Borrower's consent shall be deemed given if it fails to respond within fifteen business days; provided further that, no loans or commitments shall be assigned to Disqualified Institutions. Each assignment (except to other Term Lenders or their affiliates) will be in a minimum amount of $1,000,000 or will be the assignment of the entire remaining amount of an assigning Term Lender's Term Loans. |
| | The Term Loan Administrative Agent shall have no duties or responsibilities for monitoring or enforcing prohibitions on assignment to Disqualified Institutions. |
| | The Term Lenders will be permitted to participate loans and commitments without restriction (except as provided below). Voting rights of participants shall be limited to matters in respect of (a) reductions of principal, interest or fees owing to such participant, (b) extensions of final scheduled maturity or scheduled times for payment of interest or fees owing to such participant and (c) releases of Collateral or Guarantees requiring the approval of all Term Lenders. In no event shall any portion of the Facilities be participated to any Disqualified Institution (so long as the identity of any such Disqualified Institution to whom no portion of the Facilities shall be participated is available to all Term Lenders). |
| Expenses and Indemnification: | The Borrower shall pay within thirty (30) days after written demand (including documentation reasonably supporting such request) (a) all reasonable documented out-of-pocket expenses of the Term Loan Administrative Agent and the Term Loan Lead Arrangers associated with the syndication, preparation, execution, delivery, negotiation and administration of the Term Loan Facility Documentation and any amendment or waiver with respect thereto (in the case of (i) legal fees and expenses, limited to the reasonable documented fees, disbursements and other charges of one counsel identified herein and, to the extent reasonably necessary, one local counsel in each relevant jurisdiction, which, in each case, shall exclude allocated costs of in-house counsel and (ii) fees or |

B-19

expenses with respect to any other advisor or consultant, solely to the extent the Borrower has consented to the retention of such person) and (b) all reasonable documented out-of-pocket expenses of the Term Loan Administrative Agent and the Term Lenders (in the case of legal fees and expenses, limited to the reasonable documented fees, disbursements and other charges of one counsel for the Term Loan Administrative Agent and the Term Lenders (taken as a whole) and to the extent reasonably necessary, one local counsel in each relevant jurisdiction and, in the event of a conflict of interest, one additional conflicts counsel for the affected Indemnified Persons (as defined below) taken as a whole, which, in each case, shall exclude allocated costs of in-house counsel), in connection with the enforcement of the Term Loan Facility Documentation.

The Borrower will, within thirty (30) days after written demand, indemnify the Term Loan Administrative Agent, the Term Loan Lead Arrangers, the Term Lenders, their respective affiliates, and their respective officers, directors, employees, members, agents, advisors, representatives and controlling persons (each an "Indemnified Person"), and hold them harmless from and against all losses, claims, damages, liabilities and expenses (in the case of (i) legal fees and expenses, limited to reasonable fees, disbursements and other charges of one primary counsel for all such Indemnified Persons (taken as a whole) and to the extent reasonably necessary, one local counsel in each relevant jurisdiction and, in the event of a conflict of interest, one additional counsel for the affected Indemnified Persons taken as a whole, which, in each case, shall exclude allocated costs of in-house counsel and (ii) any other advisor or consultant, solely to the extent the Borrower has consented to the retention of such person) and liabilities of any such Indemnified Person arising out of or relating to any claim or any action, suit or other proceedings (regardless of whether any such Indemnified Person is a party thereto or whether such claim, litigation, or other proceeding is brought by a third party or by the Borrower or any of its affiliates) that relate to the Term Loan Facility Documentation or the use of proceeds therefrom; provided that, no Indemnified Person will be indemnified (a) for its (or any of its affiliates' or any of its or their respective officers', directors', employees', members', agents', advisors', representatives' and controlling persons') willful misconduct, bad faith or gross negligence (to the extent determined in a final non-appealable order of a court of competent jurisdiction), (b) for its (or any of its affiliates' or any of its officers', directors', employees', members', agents', advisors', representatives' and controlling persons') material breach of its obligations under the Term Loan Facility Documentation (to the extent determined in a final non-appealable order of a court of competent jurisdiction), (c) for any dispute among Indemnified Persons (or any of their respective affiliates or any of their respective officers, directors, members, employees, agents, advisors, representatives and controlling persons) that does not involve an act or omission by the Borrower or any of its subsidiaries (other than any claims against the Term Loan Administrative Agent or the Term Loan Lead Arrangers in their capacity as such but subject to clause (a) and (b) above) or (d) for any settlement effected without the Borrower's prior written consent (not to be unreasonably withheld or delayed), but if settled with Borrower's prior written consent or if there is a final non-appealable

#91120726v8
#91168007v6

judgment against an Indemnified Person in any such proceeding, the Borrower will indemnify and hold harmless such Indemnified Person from and against any and all actual losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with this section. Each such Indemnified Person agrees to refund and return any and all amounts paid by the Borrower to such Indemnified Person to the extent any of the foregoing items described in clauses (a) through (d) occurs (to the extent determined in a final non-appealable order of a court of competent jurisdiction). None of the Indemnified Persons or the Borrower shall be liable for any special, indirect, consequential or punitive damages in connection with the Facilities (except to the extent of its indemnity or reimbursement obligations hereunder in respect of any losses, claims, damages, liabilities and expenses incurred or paid by an Indemnified Person to a third party).

| | |
|---|---|
| Governing Law and Forum: | New York. |
| Counsel to Term Loan Administrative Agent and Term Loan Lead Arrangers: | Davis Polk & Wardwell LLP |

#91120726v8
#91168007v6

ANNEX I TO EXHIBIT B

Interest Rates:                    The interest rates under the Term Loan Facility will be, at the option of the
                                   Borrower, Adjusted LIBOR, *plus* 2.75% or ABR, *plus* 1.75%; <u>provided</u>
                                   that, such interest rates will be subject to a step-down of 25 bps if the
                                   Consolidated First Lien Net Leverage Ratio is equal to or less than a level
                                   to be agreed.
                                   As used herein:

                                   "<u>Adjusted LIBOR</u>" means the London interbank offered rate, adjusted for
                                   statutory reserve requirements (and each Term Loan designated as such, an
                                   "<u>Adjusted LIBOR Loan</u>"); <u>provided</u> that Adjusted LIBOR shall be deemed
                                   to be no less than 0.00% per annum.

                                   "<u>ABR</u>" means the highest of (i) the rate the Term Loan Administrative
                                   Agent announces from time to time as its prime rate, (ii) the Federal Funds
                                   Effective Rate, *plus* 1/2 of 1% and (iii) Adjusted LIBOR *plus* 1% (and each
                                   Term Loan designated as such, an "<u>ABR Loan</u>").

                                   Adjusted LIBOR borrowings may be made for interest periods of 1, 2, 3 or
                                   6 months and, if available to all relevant Term Lenders, a period shorter
                                   than one month or a period of 12 months, as selected by the Borrower.

                                   Interest on Adjusted LIBOR Loans and all fees will be payable in arrears on
                                   the basis of a 360-day year, calculated on the basis of the actual number of
                                   days elapsed. Interest on ABR Loans will be payable in arrears on the basis
                                   of a 365-day year (or a 366-day year in a leap year) calculated on the basis
                                   of the actual number of days elapsed.  Interest will be payable on Adjusted
                                   LIBOR Loans on the last day of the applicable interest period (or at the end
                                   of each three months, in the case of interest periods longer than three
                                   months) and upon prepayment, and on ABR Loans quarterly and upon
                                   prepayment.

                                   If either (i) the Term Loan Administrative Agent determines that adequate
                                   and reasonable means do not exist for ascertaining Adjusted LIBOR and
                                   such circumstances are unlikely to be temporary and/or (ii) the supervisor
                                   for the administrator of the London interbank offered rate or a governmental
                                   authority having jurisdiction over the Term Loan Administrative Agent has
                                   made a public statement identifying a specific date after which the London
                                   interbank offered rate shall no longer be used for determining interest rates
                                   for loans, then the Term Loan Administrative Agent and the Borrower shall
                                   endeavor to establish an alternate rate of interest to "LIBOR" and that gives
                                   due consideration to the then prevailing market convention for determining
                                   a rate of interest for syndicated loans in the United States at such time and
                                   shall enter into an amendment to reflect such alternate rate of interest and
                                   such other related changes to the Term Loan Facility Documentation as
                                   may be applicable, which amendment shall not require the consent of any
                                   Lender unless the Term Loan Administrative Agent shall have received,
                                   within five business days of the date notice of such successor or alternative
                                   index rate is provided to the Lenders, a written notice from the Required
                                   Lenders stating that such Required Lenders object to such amendment.

<u>Default Rate</u>:  Upon any payment or bankruptcy event of default, the interest rate will be, with respect to overdue principal, the applicable interest rate, *plus* 2.00% *per annum* and, with respect to any other overdue amount, the interest rate applicable to ABR Loans, *plus* 2.00% *per annum* (other than to Defaulting Lenders).  Interest on such overdue amounts will be payable upon written demand.

#91120726v8
#91168007v6

EXHIBIT C

Project Jedi
ABL Facility
Summary of Terms and Conditions

Capitalized terms used but not defined in this Exhibit C shall have the respective meanings set forth in the letter agreement to which this Exhibit C is attached and in the other Exhibits attached thereto. In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this Exhibit C shall be determined by reference to the context in which it is used.

| | |
|---|---|
| Borrowers: | With respect to the U.S. Facility (as defined below), the Borrower (as defined in Exhibit B) (the "Borrower") and other domestic co-borrowers consistent with the Existing ABL Facility (collectively, the "U.S. Borrowers"). |
| | With respect to the Canadian Facility (as defined below), UNFI Canada, Inc. (the "Canadian Borrower"). |
| ABL Administrative Agent and ABL Collateral Agent: | In the case of the Incremental ABL Facility, the administrative agent and collateral agent under the Existing Facility will continue to act as the administrative agent and collateral agent (the "Existing ABL Agent"; the Existing ABL Agent or the New ABL Agent (as defined below), as the case may be, the "ABL Administrative Agent"). |
| | In the case of the Backstop ABL Facility, Bank of America, N.A. ("Bank of America") will act as the sole administrative agent and sole collateral agent (in such capacities and together with its permitted successors, the "New ABL Agent" and, collectively with the Term Loan Administrative Agent (as defined in Exhibit B), the "Administrative Agents") for a syndicate of banks, financial institutions and other institutional lenders and investors (other than Disqualified Institutions) (together with the Initial ABL Lenders, the "ABL Lenders" and, collectively with the Term Lenders (as defined in Exhibit B), the "Lenders") reasonably acceptable to the Borrower (such acceptance not to be unreasonably withheld or delayed). |
| ABL Lead Arrangers and Bookrunners: | MLPFS, GS Bank, Wells Fargo Bank, JPMCB and US Bank (collectively, in such capacities, the "ABL Lead Arrangers" and, together with the Term Loan Lead Arrangers (as defined in Exhibit B), the "Lead Arrangers"). |
| ABL Facility: | Either (x) an increase in the U.S. Revolver Commitments and/or the Canadian Commitments under and as defined in the Third Amended and Restated Loan and Security Agreement dated as of April 29, 2016 among the Borrower, Bank of America, N.A. and the other borrowers, agents and lenders party thereto (the "Existing ABL Facility") in an aggregate principal amount of $1,100,000,000 (the "Incremental ABL Facility") pursuant to the ABL Amendment or (y) in the event the ABL Amendment is not approved by the requisite lenders under the Existing ABL Facility on or prior to the Closing Date, an asset-based revolving facility in an aggregate principal amount of $2,000,000,000 comprised of (i) an asset-based revolving credit facility in an aggregate principal amount of $1,950,000,000 available for |

U.S. Borrowers (the "U.S. Facility") and (ii) an asset-based revolving facility in an aggregate principal amount of $50,000,000 available for the Canadian Borrower (the "Canadian Facility") (collectively, the "Backstop ABL Facility" and, together with the Incremental ABL Facility, the "ABL Facility"; loans incurred under the ABL Facility shall be the "ABL Loans"). The ABL Loans will be subject to availability as described under the heading "Availability" below.

Use of Proceeds:

Subject to Availability (as defined below), the proceeds of loans under the ABL Facility will be used (a) on the Closing Date, to issue or cash collateralize any letters of credit or to fund any upfront fees or OID due to the exercise of the "market flex" provisions of the Fee Letter with respect to the Term Loan Facility, (b) on or after the Closing Date, to finance working capital and general corporate purposes from time to time for the Borrower and its subsidiaries, (c) on the Closing Date, to fund a portion of the purchase price in connection with the Acquisition, and (d) on the Closing Date, to pay transaction fees, costs and expenses; provided that the aggregate amount of ABL Loans made on the Closing Date for purposes set forth in clauses (b) through (d) above shall not exceed $1,200 million in the aggregate *plus*, at the Borrower's election, an amount sufficient to fund any original issue discount ("OID") or upfront fees required to be funded in connection with the "market flex" provisions of the Fee Letter.

Availability:

In the case of the Incremental ABL Facility: pursuant to the Existing ABL Facility.

In the case of the Backstop ABL Facility:

Availability under the U.S. Facility will be equal to the lesser of (a) the then available unutilized commitments under the U.S. Facility and (b) the then available unutilized U.S. Borrowing Base (as defined below).

"U.S. Borrowing Base" shall mean (a) 90% of Eligible Accounts (to be defined in a manner consistent with the ABL Documentation Principles), *plus* (b) 90% of NOLV Percentage of the Value of Eligible Inventory (each to be defined in a manner consistent with the ABL Documentation Principles), *plus* (c) Qualified Cash (to be defined in a manner consistent with the ABL Documentation Principles), *plus* (d) Eligible Pharmacy Receivables (to be defined in a manner consistent with the Target ABL Facility with certain exceptions to be agreed), subject to advance rates to be agreed, *plus* (e) Pharmacy Scripts Availability (to be defined in a manner consistent with the Target ABL Facility with certain exceptions to be agreed), in each case of the U.S. Borrowers, *minus* (f) applicable reserves (such reserves shall be established from time to time by the ABL Administrative Agent in its permitted discretion on the same terms and conditions of and consistent with the ABL Documentation Principles).

Availability under the Canadian Facility will be equal to the lesser of (a) the then available unutilized commitments under the Canadian Facility and (b) the then available unutilized Canadian Borrowing Base (as defined below).

#91120726v8
#91168007v6

"Canadian Borrowing Base" shall mean (a) 90% of Eligible Accounts (to be defined in a manner consistent with the ABL Documentation Principles), *plus* (b) 90% of NOLV Percentage of the Value of Eligible Inventory (each to be defined in a manner consistent with the ABL Documentation Principles), *plus* (c) Qualified Cash (to be defined in a manner consistent with the ABL Documentation Principles), in each case of the Canadian Borrower, *minus* (d) applicable reserves (such reserves shall be established from time to time by the ABL Administrative Agent in its permitted discretion on the same terms and conditions of and consistent with the ABL Documentation Principles).

The U.S. Borrowing Base and the Canadian Borrowing Base (collectively, the "Borrowing Base") shall be computed pursuant to a Borrowing Base certificate to be delivered by the Borrower in such manner and at such frequency as is consistent with the ABL Documentation Principles.

The Borrower will use commercially reasonable efforts to deliver a field examination and inventory appraisal prior to the Closing Date. In the event the New ABL Agent has not received its field examinations and inventory appraisals with respect to the Target and its subsidiaries (the "Target Group") prior to the Closing Date, the Borrower shall provide the New ABL Agent and its advisors and consultants with sufficient access and relevant information relating to the Target Group and its assets to complete such field examinations and inventory appraisals on or before the 90th day after the Closing Date. In the case of the Backstop ABL Facility, during the period from the Closing Date and until the New ABL Agent's receipt and reasonable opportunity to review such field examinations and inventory appraisals, Availability with respect to the Target Group (to the extent any member is an ABL Loan Party) shall be based on the Target's existing asset-based revolving credit facility; and if the New ABL Agent does not receive such field examinations and inventory appraisals on or prior to the 90th day after the Closing Date, Availability with respect to the Target Group shall be zero on and after such 90th day until the New ABL Agent's receipt and reasonable opportunity to review such field examinations and inventory appraisals.

Notwithstanding the foregoing, it is agreed that regardless of the Borrowing Base calculations on the Closing Date, availability under the ABL Facility (whether the Existing ABL Facility, as amended by the Incremental ABL Facility, or the Backstop ABL Facility) shall be no less than $1,500 million on the Closing Date until the 90th day after the Closing Date; provided if the ABL Administrative Agent receives field examinations and inventory appraisals prior to the Closing Date and Availability is less than or equal to $1,500 million, then Availability shall be deemed to be the greater of (x) such Availability and (y) $1,300 million until the 90th day after the Closing Date.

Interest Rates and Fees:     As set forth on Annex I to this Exhibit C.

#91120726v8
#91168007v6

| | |
|---|---|
| Maturity: | The Incremental ABL Facility will mature, and the lending commitments thereunder will terminate, on April 29, 2021 and the Backstop ABL Facility will mature, and the lending commitments thereunder will terminate, on the date that is five (5) years from the Closing Date. |
| Cash Management/Cash Dominion: | In the case of the Incremental ABL Facility, pursuant to the Existing ABL Facility. |
| | In the case of the Backstop ABL Facility, the Borrower shall deliver account control agreements on the Borrower's concentration accounts and other accounts to be mutually agreed within 90 days after the Closing Date, subject to extensions agreed to by the ABL Administrative Agent. After a Trigger Event (as defined in the Existing ABL Facility), amounts in controlled accounts will be swept into a core concentration account maintained with the ABL Administrative Agent, subject to customary exceptions and thresholds and consistent with the ABL Documentation Principles. |
| Letters of Credit: | In the case of the Incremental ABL Facility, pursuant to the Existing ABL Facility. |
| | In the case of the Backstop ABL Facility: |
| | Up to an amount to be agreed of the ABL Facility will be available to the Borrower in the form of standby and trade letters of credit, which will reduce availability under the ABL facility on a dollar-for-dollar basis. Letters of credit will be issued by GS Bank and other ABL Lenders (in such capacity, the "Issuing Banks"); provided that neither GS Bank nor any of its affiliates shall be required to issue trade letters of credit; provided, further, that each Initial ABL Lender that holds commitments under the ABL Facility shall have a letter of credit commitment that is proportionate with its commitment under the ABL Facility.  Each letter of credit shall expire not later than the earlier of (a) 12 months after its date of issuance or such longer period of time as may be agreed by the applicable Issuing Bank and (b) the fifth business day prior to the final maturity of the ABL Facility; provided that any standby letter of credit may provide for renewal thereof for additional periods of up to 12 months or such longer period of time as may be agreed by the applicable Issuing Bank (which in no event shall extend beyond the date referred to in clause (b) above, except to the extent cash collateralized or backstopped pursuant to arrangements reasonably acceptable to the relevant Issuing Banks). |
| | Drawings under any letter of credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of borrowings under the ABL Facility) within one (1) business day.  Each ABL Lender under the ABL Facility shall be irrevocably obligated to reimburse such Issuing Bank pro rata based upon their respective ABL Facility commitments. |
| Swingline Loans: | Consistent with the ABL Documentation Principles. |

#91120726v8
#91168007v6

Guarantees:

In the case of the Incremental ABL Facility, pursuant to the Existing ABL Facility.

In the case of the Backstop ABL Facility, all obligations of the Borrower under the ABL Facility and, at the option of the Borrower, the obligations of the Borrower or any of its subsidiaries under interest rate protection, currency exchange or other hedging arrangements with the ABL Administrative Agent, an ABL Lead Arranger, an ABL Lender or an affiliate of the ABL Administrative Agent, an ABL Lead Arranger or an ABL Lender (at the time such agreement was entered into or, in the case of any such arrangements existing on the Closing Date, on the Closing Date) specifically designated by the Borrower as "ABL Pari Passu Secured Hedging Arrangements" (collectively, the "ABL Pari Passu Secured Hedging Arrangements") and, at the option of the Borrower, the cash management obligations of the Borrower or any of its subsidiaries owing to the ABL Administrative Agent, any ABL Lender or an affiliate of the ABL Administrative Agent or any ABL Lender (at the time such arrangement was entered into or, in the case of any such arrangements existing on the Closing Date, on the Closing Date) and specifically identified by the Borrower as "ABL Secured Cash Management Obligations" (collectively, "ABL Secured Cash Management Obligations") will be unconditionally guaranteed (the "ABL Guarantees") by each Guarantor under the Term Loan Facility and as provided in the following proviso, each wholly-owned subsidiary of the Borrower organized in Canada subject to limitations consistent with the Existing ABL Facility (the "ABL Guarantors" and, collectively with the Borrower, the "ABL Loan Parties"); provided, that (a)(i) no ABL Loan Party organized in Canada shall be required to guarantee or shall otherwise be liable for the obligations of any domestic Loan Party, but the domestic Loan Parties shall be required to guarantee the obligations of the Loan Parties organized in Canada and (ii) each Loan Party organized in Canada shall guarantee the obligations of the Canadian Borrower and (b) on the Closing Date, each Term Loan Guarantor will also be an ABL Guarantor; provided, further, that subsidiaries that are not "eligible contract participants" (after giving effect to any "keepwell" provisions) shall not guarantee any swap obligations to the extent it is illegal or unlawful under the Commodity Exchange Act, or any regulation thereunder, by virtue of such subsidiary failing to constitute an "eligible contract participant".

Security:

In the case of the Incremental ABL Facility, pursuant to the Existing ABL Facility.

In the case of the Backstop ABL Facility:

The ABL Facility, the ABL Guarantees, the ABL Pari Passu Secured Hedging Arrangements (at the option of the Borrower, subject to customary procedures to be agreed, which shall include that pari passu treatment in the waterfall will require reserves) and the ABL Secured Cash Management Obligations (at the option of the Borrower, subject to customary procedures to be agreed) will be secured by the following: (a) a perfected first-priority (subject to exceptions consistent with the Existing ABL Facility and the

Existing Term Facility) security interest in the following: (i) all personal property of the Borrower and each ABL Guarantor consisting of accounts receivable, cash, deposit accounts and security accounts (the "<u>Current Asset Collateral</u>"), (ii) all owned and after acquired inventory of the Borrower and the ABL Guarantors (the "<u>Inventory Collateral</u>"), (iii) the right to use trademarks, tradenames and other intellectual property in connection with the processing or sale of inventory or the sale or collection on accounts receivable under a royalty fee license agreement or to the extent necessary to sell such Current Asset Collateral or Inventory Collateral, and (iv) all letter of credit rights, commercial tort claims, chattel paper, supporting obligations, general intangibles (including contract rights, customer lists and Pharmacy Scripts (to be defined in a manner consistent with the Target ABL Facility)), documents, books, records and instruments relating to such Current Asset Collateral or Inventory Collateral and, in the case of each of clause (i) through (iv), the proceeds thereof (including insurance, indemnity, guaranty and condemnation proceeds), in each case subject to exceptions consistent with the ABL Documentation Principles (the foregoing, collectively, the "<u>ABL Priority Collateral</u>") and (b) a perfected second-priority security interest in substantially all other present and after-acquired assets of the Loan Parties other than real property (subject to customary exceptions consistent the Term Facility Documentation Principles) and proceeds of the foregoing (such collateral, excluding ABL Priority Collateral, the "<u>Term Loan Priority Collateral</u>" and together with the ABL Priority Collateral, the "<u>Collateral</u>"), in each case subject to exceptions consistent with the Documentation Principles.

All the above-described pledges and security interests shall be created on terms, and pursuant to documentation, consistent with the Documentation Principles and subject to exceptions permitted under the Documentation Principles. Notwithstanding anything to the contrary contained herein, the requirements of the preceding paragraphs in this "Security" section shall be subject to the Certain Funds Provision.

| | |
|---|---|
| <u>Intercreditor Matters</u>: | The lien priority, relative rights and other creditors' rights issues in respect of the ABL Facility and the Term Loan Facility will be set forth in a customary intercreditor agreement consistent with the ABL Documentation Principles and the Term Loan Documentation Principles. |
| <u>Uncommitted Incremental Facilities</u>: | Consistent with the ABL Documentation Principles; <u>provided</u> that in the case of the Backstop ABL Facility, the aggregate amount of any increase in commitments under the Backstop ABL Facility after the Closing Date shall not exceed $600 million. |
| <u>Mandatory Prepayments</u>: | Consistent with the ABL Documentation Principles. |
| <u>Voluntary Prepayments</u>: | Consistent with the ABL Documentation Principles |
| <u>ABL Documentation</u>: | The definitive documentation with respect to the ABL Facility (the "<u>ABL Facility Documentation</u>" and, collectively with the Term Loan Facility Documentation (as defined in <u>Exhibit B</u>), the "<u>Facilities Documentation</u>") will be drafted based on the Existing ABL Facility as in effect on the date hereof, as modified by the ABL Amendment if approved by the requisite |

#91120726v8
#91168007v6

lenders under the Existing ABL Facility (in the case of the Backstop ABL Facility, with (i) reasonable modifications to the mechanical, operational, administrative and agency provisions to reflect the administrative guidelines and practices of the New ABL Agent reasonably agreed to by the Borrower and, in each case, to the extent not inconsistent with the terms of this Exhibit C, including additions of provisions regarding European Union bail-in and Beneficial Ownership Regulation and (ii) conforming changes to the representations and warranties, affirmative and negative covenants and events of default set forth in the Term Loan Facility, where appropriate) (collectively, the "ABL Documentation Principles"). The Term Loan Documentation Principles (as defined in Exhibit B) and the ABL Documentation Principles are referred to collectively herein as the "Documentation Principles".

| | |
|---|---|
| Representations and Warranties: | Consistent with the ABL Documentation Principles. |
| Conditions Precedent to Initial Borrowing: | The availability of the ABL Facility on the Closing Date will be subject solely to the applicable conditions precedent set forth in Exhibit D to the Commitment Letter. For the avoidance of doubt, it is agreed that conditions set forth in Exhibit D are subject, in all respects, to the Certain Funds Provision. |
| Conditions Precedent to each Borrowing (other than on the Closing Date): | Consistent with the ABL Documentation Principles. |
| Affirmative Covenants: | Consistent with the ABL Documentation Principles. |
| Negative Covenants: | Consistent with the ABL Documentation Principles; provided that incurrence of the Facilities and the Incremental Facilities (as defined in Exhibit B) and the Specified Disposition shall, in each case, be permitted. |
| Financial Covenant: | Consistent with the ABL Documentation Principles; provided that "Trigger Event" as defined in the Existing ABL Facility shall be amended to increase the dollar prong of each threshold from $60,000,000 to $235,000,000. |
| Events of Default: | Consistent with the ABL Documentation Principles; provided that the threshold for monetary judgments will be set at any amount to be mutually agreed. |
| Voting: | Consistent with the ABL Documentation Principles. |
| Cost and Yield Protection: | Consistent with the ABL Documentation Principles. |
| Assignments and Participations: | Consistent with the ABL Documentation Principles. |
| Expenses and Indemnification: | Consistent with the ABL Documentation Principles. |

#91120726v8
#91168007v6

<u>Governing Law</u>
<u>and Forum</u>:                    New York.

<u>Counsel to ABL</u>
<u>Administrative Agent and</u>
<u>ABL Lead Arrangers</u>:          Davis Polk & Wardwell LLP

C-8

Interest Rates:

In the case of the Incremental ABL Facility, pursuant to the Existing ABL Facility.

In the case of the Backstop ABL Facility:

Initially, from and after the Closing Date until the last day of the first full fiscal quarter ending after the Closing Date, the interest rates under (i) the U.S. Facility will be Adjusted LIBOR plus 1.25% for Adjusted LIBOR Loans or ABR plus 0.25% for ABR Loans and (ii) the Canadian Facility will be BA Equivalent Rate plus 1.25% for BA Equivalent Rate Loans or Canadian Prime Rate plus 0.25% for Canadian Prime Rate Loans, and then on the first day of each fiscal quarter thereafter (the "Adjustment Date"), the applicable margin under the ABL Facility will be determined from the pricing grid below based on the average daily Aggregate Availability (as defined in the Existing ABL Facility) for the fiscal quarter ending immediately prior to such Adjustment Date.

| Average Daily Aggregate Availability | Applicable Margin for Adjusted LIBOR Loans/BA Equivalent Rate Loans | Applicable Margin for ABR Loans/Canadian Prime Rate Loans |
|---|---|---|
| Greater than or equal to 66.67% of the Line Cap | 1.00% | 0.00% |
| Greater than or equal to 33.33% of the Line Cap but less than 66.67% of the Line Cap | 1.25% | 0.25% |
| Less than 33.33% of the Line Cap | 1.50% | 0.50% |

As used herein:

"Adjusted LIBOR" means the London interbank offered rate, adjusted for statutory reserve requirements provided that Adjusted LIBOR shall be deemed to be no less than 0.00% per annum.

"Adjusted LIBOR Loans" means ABL Loans, the rate of interest on which is based on Adjusted LIBOR.

"ABR" means the highest of (i) the U.S. prime rate published in The Wall Street Journal from time to time, (ii) the one month Adjusted LIBOR *plus* 1.0% and (iii) the Federal Funds Effective Rate, *plus* 1/2 of 1%.

"ABR Loans" means ABL Loans, the rate of interest on which is based on ABR.

"BA Equivalent Rate" will be defined in a manner consistent with the ABL Documentation Principles.

"BA Equivalent Rate Loans" means ABL Loans, the rate of interest on which is based on BA Equivalent Rate.

"Canadian Prime Rate" will be defined in a manner consistent with the ABL Documentation Principles.

"Canadian Prime Rate Loans" means ABL Loans, the rate of interest on which is based on the Canadian Prime Rate.

In no event shall the Adjusted LIBOR, ABR, BA Equivalent Rate or Canadian Prime Rate be less than zero.

If either (i) the ABL Administrative Agent determines that adequate and reasonable means do not exist for ascertaining Adjusted LIBOR and such circumstances are unlikely to be temporary and/or (ii) the supervisor for the administrator of the London interbank offered rate or a governmental authority having jurisdiction over the ABL Administrative Agent has made a public statement identifying a specific date after which the London interbank offered rate shall no longer be used for determining interest rates for loans, then the ABL Administrative Agent and the Borrower shall endeavor to establish an alternate rate of interest to "Adjusted LIBOR" and that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time and shall enter into an amendment to reflect such alternate rate of interest and such other related changes to the ABL Facility Documentation as may be applicable, which amendment shall not require the consent of any Lender unless the ABL Administrative Agent shall have received, within five business days of the date notice of such successor or alternative index rate is provided to the Lenders, a written notice from the Required Lenders (to be defined) stating that such Required Lenders object to such amendment.

| | |
|---|---|
| Interest Periods and Computation of Interest and Fees: | Consistent with the ABL Documentation Principles. |
| Default Rate: | Consistent with the ABL Documentation Principles. |
| Letter of Credit Fees: | In the case of the Incremental ABL Facility, pursuant to the Existing ABL Facility. |

In the case of the Backstop ABL Facility:

A per annum fee equal to the applicable spread over Adjusted LIBOR under the ABL Facility in effect from time to time will accrue on the aggregate face amount of outstanding letters of credit under the ABL Facility, payable in arrears at the end of each quarter after the Closing Date and upon termination of the ABL Facility. Such fees shall be distributed to the ABL Lenders (other than to Defaulting Lenders) pro rata in accordance with their commitments under the ABL Facility. In addition, the Borrower shall pay to each Issuing Bank, for its own account, (a) a fronting fee of 0.125% on the aggregate face amount of outstanding letters of credit, payable in arrears

at the end of each quarter after the Closing Date and upon termination of the ABL Facility and (b) the Issuing Bank's customary issuance and administration fees.

Commitment Fees:

In the case of the Incremental ABL Facility, pursuant to the Existing ABL Facility.

In the case of the Backstop ABL Facility:

Initially, 0.375% per annum on the undrawn portion (for this purpose, disregarding Swingline Loans as a utilization of the ABL Facility) of the commitments in respect of the ABL Facility and from and after the date that is three months after the Closing Date, (a) if average daily usage is greater than or equal to 25% of the total commitments, 0.25% per annum on the undrawn portion (for this purpose, disregarding Swingline Loans as a utilization of the ABL Facility) of the commitments in respect of the ABL Facility and (b) if average daily usage is less than 25% of the total commitments, 0.375% per annum on the undrawn portion (for this purpose, disregarding Swingline Loans as a utilization of the ABL Facility) of the commitments in respect of the ABL Facility.

#91120726v8
#91168007v6

EXHIBIT D

Project Jedi
Conditions Precedent to Funding

Capitalized terms used but not defined in this <u>Exhibit D</u> shall have the meanings set forth in the Commitment Letter and the other Exhibits attached to the Commitment Letter to which this <u>Exhibit D</u> is attached. In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this <u>Exhibit D</u> shall be determined by reference to the context in which it is used.

Subject, in each case, to the Certain Funds Provision, the initial availability of, and initial funding under, the Facilities on the Closing Date shall be subject solely to the satisfaction or waiver by the Lead Arrangers, as applicable, of the following conditions precedent:

(a)     The Acquisition shall have been, or substantially concurrently with the initial borrowing under the Facilities shall be, consummated in all material respects in accordance with the Transaction Agreement. No provision of the Transaction Agreement shall have been amended or otherwise modified, no provisions thereof shall have been waived by you and no consent shall be granted by you thereunder, in each case, in a manner material and adverse to the Initial Lenders (in its capacity as such) without the consent of the Lead Arrangers (not to be unreasonably withheld, delayed, denied or conditioned); <u>provided</u> that (i) any reduction in the purchase price for the Acquisition set forth in the Transaction Agreement of greater than 10% shall be deemed to be material and adverse to the interests of the Initial Lenders, and any reduction in the purchase price of 10% or less shall be deemed to be material and adverse to the interests of the Initial Lenders unless applied to reduce the Term Loan Facility on a dollar-for-dollar basis, (ii) any increase in the purchase price set forth in the Transaction Agreement shall be deemed to be not material and adverse to the interests of the Lenders so long as such purchase price increase is not funded with additional indebtedness and (iii) any change to the definition of Material Adverse Effect (as defined in the Transaction Agreement as in effect on the Signing Date) shall be deemed materially adverse to the Initial Lenders and shall require the consent of the Lead Arrangers (not to be unreasonably withheld, delayed, denied or conditioned).

(b)     The Closing Date Refinancing shall have been consummated prior to, or shall be made or consummated substantially concurrently with the initial borrowing under the Facilities.

(c)     The Lead Arrangers shall have received copies of (A)(i) the audited consolidated balance sheet and related consolidated statements of operations, comprehensive income, change in stockholders' equity and cash flows for the fiscal years of the Borrower ended August 1, 2015, July 30, 2016 and July 29, 2017 (it being understood that the Lead Arrangers acknowledges receipt of such audited financial statements) and for each subsequent fiscal year of the Borrower ended at least 60 days before the Closing Date and (ii) the unaudited consolidated balance sheet and related consolidated statements of operations, comprehensive income, change in stockholders' equity and cash flows for each subsequent fiscal quarter (other than the fourth fiscal quarter of the Borrower's fiscal year) ended at least 40 days before the Closing Date (it being understood that the Lead Arrangers acknowledge receipt of the unaudited consolidated financial statements in respect of the fiscal quarters ended October 28, 2017, January 27, 2018 and April 28, 2018) and (B)(i) the audited consolidated balance sheet and related consolidated statements of operations, comprehensive income, change in stockholders' equity and cash flows for the fiscal years of the Target ended February 27, 2016, February 25, 2017 and February 24, 2018 (it being understood that the Lead Arrangers acknowledges receipt of such audited financial statements) and for each subsequent fiscal year of the Target ended at least 60 days before the Closing Date and (ii) the unaudited consolidated balance sheet and related consolidated statements of operations,

comprehensive income, change in stockholders' equity and cash flows for each subsequent fiscal quarter (other than the fourth fiscal quarter of the Target's fiscal year) ended at least 40 days before the Closing Date.

(d)     The Lead Arrangers shall have received an unaudited *pro forma* consolidated balance sheet and related unaudited *pro forma* consolidated statement of income of the Borrower and its subsidiaries as of and for the twelve-month period ending on the last day of the most recently completed four-fiscal quarter period ended at least 40 days (or 60 days if such four-fiscal quarter period is the end of the Borrower's fiscal year) prior to the Closing Date, prepared after giving effect to the Transactions as if the Transactions had occurred on such date (in the case of such *pro forma* balance sheet) or on the first day of such period (in the case of such *pro forma* statement of income), as applicable (which need not be prepared in compliance with Regulation S-X of the Securities Act of 1933, as amended, or include adjustments for purchase accounting (including adjustments of the type contemplated by Financial Accounting Standards Board Accounting Standards Codification 805, Business Combinations (formerly SFAS 141R))).

(e)     Subject to the Certain Funds Provision, all documents and instruments required to grant and perfect the Administrative Agent's security interests in the Collateral shall have been executed and delivered by the Loan Parties and, if applicable, be in proper form for filing.

(f)     The Administrative Agent shall have received (at least three (3) business days prior to the Closing Date) all documentation and other information about the Borrower and each Guarantor as has been reasonably requested in writing at least ten (10) business days prior to the Closing Date by the Administrative Agent or the Lead Arrangers that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act and the Beneficial Ownership Certification.

(g)     (i) (x) With respect to the ABL Facility, the execution and delivery by the Borrower and the other Loan Parties of the ABL Facility Documentation consistent with the Commitment Letter and the ABL Facility Term Sheet shall have occurred and (y) with respect to the Term Loan Facility, the execution and delivery by the Borrower and the other Loan Parties of the Term Loan Facility Documentation consistent with the Commitment Letter and the Term Loan Facility Term Sheet shall have occurred, (ii) with respect to each such Facility, the delivery of customary legal opinion(s) from counsel to the Loan Parties, customary evidence of organizational authorization, customary officer's and secretary's certificates, customary organizational good standing certificates (to the extent such concept exists), customary borrowing requests and a solvency certificate of the Borrower's chief financial officer, chief operating officer or other officer with similar responsibilities substantially in the form attached as Annex I hereto shall have each occurred and (iii) with respect to the ABL Facility, the delivery by the Borrower of a Borrowing Base Certificate if a borrowing under the ABL Facility is requested to be made on the Closing Date.

(h)     All fees required to be paid on the Closing Date pursuant to the Fee Letter and reasonable out-of-pocket expenses required to be paid on the Closing Date pursuant to the Commitment Letter, in each case to the extent invoiced at least three (3) business days prior to the Closing Date, shall have been paid, or shall be paid substantially concurrently with, the initial borrowing under the Facilities (which amounts may be offset against the proceeds of the Facilities).

(i)     Except (a) as disclosed in any form, document or report publicly filed with or publicly furnished to the SEC by the Target or any of its Subsidiaries (for purposes of this section, as defined in the Transaction Agreement as in effect on the Signing Date) on or after February 27, 2016 and prior to the Signing Date (excluding any disclosures set forth in any "risk factors", "forward-looking

#91120726v8
#91168007v6

statements" or "market risk" sections or in any other section to the extent they are cautionary, predictive or forward-looking in nature) or (b) as disclosed in the Company Disclosure Schedule (as defined in the Transaction Agreement as in effect on the Signing Date) delivered to the Commitment Parties prior to or concurrently with the execution and delivery of this Commitment Letter (provided that disclosure of any item in any section or subsection of the Company Disclosure Schedule shall be deemed disclosed with respect to any other section or subsection to the extent that the relevance of any disclosed event, item or occurrence in such section or subsection to such other section or subsection is reasonably apparent on its face), since February 24, 2018, there has not been any change, occurrence or development that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(j)      The Specified Representations shall be true and correct in all material respects as of the Closing Date.

(k)      The Specified Transaction Agreement Representations shall be true and correct in all material respects, but only to the extent that the Borrower (or any of its affiliates) has the right (taking into account any applicable cure provisions) to terminate its obligations under the Transaction Agreement or decline to consummate the Acquisition (in each case, in accordance with the terms of the Transaction Agreement) as a result of a breach of such Specified Transaction Agreement Representation.

(l)      The Closing Date shall not occur prior to 45 days after the Signing Date.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

#91120726v8
#91168007v6

ANNEX I to EXHIBIT D

FORM OF SOLVENCY CERTIFICATE

SOLVENCY CERTIFICATE of

THE COMPANY AND ITS SUBSIDIARIES

[DATE]

Pursuant to (i) Section [___] of that certain [___] (the "Term Loan Credit Agreement") and (ii) Section [___] of that certain [___] (the "ABL Credit Agreement" and, collectively with the Term Loan Credit Agreement, the "Credit Agreement"), the undersigned hereby certifies to the Administrative Agent and the Lenders, solely in such undersigned's capacity as [chief financial officer] [chief operating officer] [specify other officer with similar responsibilities] of the Borrower, and not individually (and without personal liability), as follows:

As of the date hereof, on a *pro forma* basis after giving effect to the consummation of the Transactions, including the making of the Loans under the Credit Agreement on the date hereof, and after giving effect to the application of the proceeds of such Loans:

(a)     the fair value of the assets (on a going concern basis) of the Borrower and its Subsidiaries, on a consolidated basis, exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise;

(b)     the present fair saleable value of the property (on a going concern basis) of the Borrower and its Subsidiaries, on a consolidated basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course of business;

(c)     the Borrower and its Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured in the ordinary course of business; and

(d)     the Borrower and its Subsidiaries, on a consolidated basis, are not engaged in, and are not about to engage in, business contemplated as of the date hereof for which they have unreasonably small capital.

For purposes of this Solvency Certificate, the amount of any contingent liability at any time shall be computed as the amount that would reasonably be expected to become an actual and matured liability in the ordinary course of business. Capitalized terms used but not otherwise defined herein shall have the respective meanings assigned to them in the applicable Credit Agreement.

The undersigned is familiar with the business and financial position of the Borrower and its Subsidiaries (taken as a whole). In reaching the conclusions set forth in this Solvency Certificate, the undersigned has made such other investigations and inquiries as the undersigned has deemed appropriate, having taken into account the nature of the particular business anticipated to be conducted by the Borrower and its Subsidiaries (taken as a whole) after consummation of the transactions contemplated by the Credit Agreement.

*[Signature Page Follows.]*

#91120726v8
#91168007v6

     IN WITNESS WHEREOF, the undersigned has executed this Solvency Certificate in such undersigned's capacity as [chief financial officer][chief operating officer][specify other officer with similar responsibilities] of the Borrower, on behalf of the Borrower, and not individually, as of the date first stated above.

 

_____

Name:

Title:

#91120726v8
#91168007v6

# EXHIBIT 2

Execution Version

GOLDMAN SACHS BANK USA
GOLDMAN SACHS LENDING PARTNERS LLC
200 West Street
New York, New York 10282-2198

BANK OF AMERICA, N.A.
MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED
One Bryant Park
New York, New York 10036

WELLS FARGO BANK,
NATIONAL ASSOCIATION,
LLC
550 S. Tryon Street
Charlotte, North Carolina 28202

JPMORGAN CHASE BANK,
N.A
383 Madison Avenue
New York, New York 10179

U.S. BANK NATIONAL
ASSOCIATION
3 Bryant Park
New York, NY 10036

CONFIDENTIAL

August 8, 2018

United Natural Foods, Inc.
313 Iron Horse Way
Providence, RI 02908
Attn:    Michael Zechmeister
         Chief Financial Officer

Project Jedi
Second Amended and Restated Fee Letter

Ladies and Gentlemen:

Reference is made to the amended and restated commitment letter, dated the date hereof (including the exhibits and other attachments thereto, the "Commitment Letter"), by and between us (as defined in the Commitment Letter) and you (as defined in the Commitment Letter) regarding the Transactions described therein.  Capitalized terms used but not defined in this letter agreement (this "Fee Letter") are used with the meanings assigned to them in the Commitment Letter.  This amended and restated letter agreement is a "Fee Letter" referred to in the Commitment Letter.

This Second Amended and Restated Fee Letter amends, restates and supersedes in its entirety the amended and restated fee letter, dated August 7, 2018, by and among GS Bank, GSLP, BAML and you (the "First A&R Fee Letter"), and such First A&R Fee Letter shall be of no further force and effect.  Reference is also made to the fee letter, dated July 25, 2018, by and among GS Bank, GSLP and you (the "Original Fee Letter").

As consideration for the Lead Arrangers' agreements to arrange the Facilities and the Initial Lenders' commitments to provide the Facilities under the Commitment Letter, you agree to pay (or cause to be paid) the following fees:

(a)    An underwriting fee equal to 1.00% of the aggregate commitments in respect of the Backstop ABL Facility on the date hereof (the "ABL Underwriting Fee"), payable to the Initial ABL Lenders, each for its own account, such fee to be earned, due and payable on, and subject to the occurrence of, the Closing Date; provided that if the commitments of GS Bank (and its affiliates) in

respect of the ABL Facility shall have been reduced to $100,000,000 (as a result of the ABL Amendment or otherwise) and the commitments of Bank of America (and its affiliates) in respect of the ABL Facility shall have been reduced to $400,000,000 (as a result of the ABL Amendment or otherwise) on or prior to August 31, 2018, the ABL Underwriting Fee payable to the Initial ABL Lenders shall be reduced to 0.25% of the aggregate commitments in respect of the Backstop ABL Facility on the date hereof.

(b)     An underwriting fee equal to 1.50% of the aggregate commitments in respect of the Term Loan Facility on the date hereof (in each case, without giving effect to any increase in such commitments to fund original issue discount ("OID") or upfront fees) (the "Term Loan Underwriting Fee" and, collectively with the ABL Underwriting Fee, the "Underwriting Fees"), payable to the Initial Term Loan Lenders, each for its own account, such fee to be earned, due and payable on, and subject to the occurrence of, the Closing Date.

(c)     An agency fee payable to the ABL Administrative Agent in respect of the ABL Facility equal to $100,000 per annum (the "ABL Agency Fee"), earned, due and payable in quarterly installments in cash in advance on the Closing Date (if the Closing Date occurs) with respect to the first fiscal quarter and each successive quarterly payment date thereof until the ABL Facility has been terminated, with the Borrower being entitled to a refund of a pro-rated portion of such ABL Agency Fee that has been paid in advance to the extent the ABL Facility is terminated prior to the next quarterly payment date; provided that, unless the Closing Date occurs on the last day of a fiscal quarter, the payment with respect to the first fiscal quarter shall be prorated for the number of days from the Closing Date until the end of such fiscal quarter.

(d)     An agency fee payable to the Term Loan Administrative Agent in respect of the Term Loan Facility equal to $100,000 per annum (the "Term Loan Agency Fee" and, collectively with the ABL Agency Fee, the "Agency Fee"), earned, due and payable in quarterly installments in cash in advance on the Closing Date (if the Closing Date occurs) with respect to the first fiscal quarter and each successive quarterly payment date thereof until the Term Loan Facility has been terminated, with the Borrower being entitled to a refund of a pro-rated portion of such Term Loan Agency Fee that has been paid in advance to the extent the Term Loan Facility is terminated prior to the next quarterly payment date; provided that, unless the Closing Date occurs on the last day of a fiscal quarter, the payment with respect to the first fiscal quarter shall be prorated for the number of days from the Closing Date until the end of such fiscal quarter.

(e)     A funding fee equal to 0.25% of the aggregate amount of the loans made under the Term Loan Facility on the Closing Date (the "Term Loan Funding Fee"), which Term Loan Funding Fee will be fully earned and payable on the Closing Date if the Closing Date occurs prior to the completion of the Marketing Period and a Successful Syndication has not occurred.

(f)     A funding fee equal to 0.25% of the aggregate amount of the loans made under the ABL Facility on the Closing Date (the "ABL Funding Fee"), which ABL Funding Fee will be fully earned and payable on the Closing Date if the Closing Date occurs prior to the completion of the Marketing Period and a Successful Syndication has not occurred.

The Borrower also agrees to pay (or cause to be paid) for the benefit of each Term Lender under the Term Loan Facility as of the Closing Date, an upfront fee of up to 0.50% of the aggregate principal amount of the Term Loans held by such Term Lender as of the Closing Date (the "Term Loan Upfront Fee") to the extent necessary to place such Term Loans at market pricing in syndication (or, if a Successful Syndication has not occurred on or prior to the Closing Date). In the case of the amount described in the preceding sentence, if Successful Syndication occurs on or prior to the Closing Date, any excess above what is required

to be paid in syndication shall be retained by the Borrower. Notwithstanding the foregoing, (a) all calculations of interest and fees in respect of the Term Loan Facility will be calculated on the basis of its full stated principal amount and (b) at the option of the Term Loan Lead Arrangers, any or all of the Term Loan Upfront Fee may instead be effected in the form of OID with respect to the Term Loan Facility.

The Borrower also agrees to pay (or cause to be paid) for the benefit of each ABL Lender under the ABL Facility as of the Closing Date, an upfront fee of up to 0.375% of the aggregate of commitments in respect of the ABL Facility held by such ABL Lender as of the Closing Date (the "ABL Upfront Fee") to the extent necessary to place the ABL Facility at market pricing in syndication (or if a Successful Syndication has not occurred on or prior to the Closing Date); provided that the ABL Upfront Fee payable to each Initial ABL Lender shall not be less than the ABL Upfront Fee received by any other ABL Lender. In the case of the amount described in the preceding sentence, if Successful Syndication occurs on or prior to the Closing Date, any excess above what is required to be paid in syndication shall be retained by the Borrower.

You agree to pay (or cause to be paid) to each of the Initial Term Loan Lenders, for its own account, a nonrefundable ticking fee on the earlier of (a) the expiration or termination of the commitments under the Commitment Letter with respect to the Term Loan Facility and (b) the Closing Date (such earlier date, the "*Ticking Fee Payment Date*") on the amount of such Initial Term Loan Lender's commitment in respect of the Term Loan Facility on the Allocation Date (as defined below) (i) for a period from the date that is 31 days after the date (which date shall be reasonably acceptable to the Borrower) on which the Term Loan Facility is allocated and free to trade (the "*Allocation Date*") to but excluding the earlier of (x) the Ticking Fee Payment Date and (y) the date that is 60 days after the Allocation Date, 50% of the rate set forth under "Interest Rates" on Annex I to Exhibit B of the Commitment Letter for the margin on the Term Loan Facility above Adjusted LIBOR (after giving effect to any changes to such margin pursuant to the "market flex" provisions) and (ii) for the period from the date that is 61 days after the Allocation Date until the Ticking Fee Payment Date, at a rate per annum, of 100% of the rate set forth under "Interest Rates" on Annex I to Exhibit B of the Commitment Letter for the margin on the Term Loan Facility above Adjusted LIBOR (after giving effect to any changes to such margin pursuant to the "market flex" provisions). The Ticking Fee shall be due and payable on the Ticking Fee Payment Date.

In the event that, during the twelve-month period commencing on the Signing Date, you or any of your affiliates consummate the Acquisition or any similar transaction that results in the acquisition of all or substantially all of the equity securities or assets of the Target and its subsidiaries (any such transaction, an "Alternate Transaction") and any Commitment Party does not act in the capacities contemplated for it by the Commitment Letter with respect to any senior secured credit facility or other debt financing incurred in lieu of the Facilities to finance the Acquisition or any such Alternate Transaction (collectively, the "Alternate Transaction Facilities"), unless (i) such Commitment Party has breached its obligation to provide, on the terms and conditions contemplated hereby and by the Commitment Letter, the portion of the Facilities committed to by it under the Commitment Letter or otherwise failed to reaffirm such obligation following a written request, (ii) such Commitment Party has terminated the Commitment Letter prior to its stated termination date with respect to the portion of the Facilities committed by it under the Commitment Letter, (iii) such Commitment Party is, or is an affiliate of, any agent, arranger or lender of any Alternate Transaction Facility, or (iv) except in the case of an Alternate Transaction Facility in connection with the Acquisition, such Commitment Party has been offered the opportunity to provide, place, arrange or underwrite such Alternate Transaction Facilities on the same terms and conditions as other lenders acting in such roles and with not less than the percentage of compensatory economics applicable to such Commitment Party in connection with the Facilities, as specified in the Commitment Letter and this Fee Letter, as applicable, you will pay (or cause to be paid) to such Commitment Party a fee in an amount equal to 50% of the Underwriting Fees that would have been payable to such non-declining, non-breaching and non-terminating Commitment Party as provided above as if the Closing Date and full funding under the Facilities occurred immediately upon

3

consummation of the Acquisition or such Alternate Transaction, as applicable. Payment of the fees set forth in this paragraph will be in lieu of and will discharge you from any obligation in respect of any fee provided for herein with respect to the Facilities.

The agreements in the immediately preceding paragraph shall remain in effect notwithstanding the termination of the Commitment Letter or the Initial Lender's commitments thereunder.

You agree that, once paid, the fees or any part thereof earned, due and payable hereunder and under the Commitment Letter shall not be refundable under any circumstances (except as expressly provided herein or otherwise agreed). All fees earned, due and payable hereunder and under the Commitment Letter shall be paid in U.S. Dollars in immediately available funds and shall be in addition to any reimbursement of the Initial Lenders' reasonable documented out-of-pocket expenses to the extent reimbursable pursuant to the Commitment Letter. At the discretion of the Initial Lenders, the Initial Lenders may share all or any portion of any fees with any of their affiliates or any other Lender.

The Requisite Term Loan Lead Arrangers (as defined below) shall be entitled at any time prior to the earlier of (a) the Closing Date and (b) the date of a Successful Syndication (as defined below), without your consent (but after consultation with you) to make the following changes (and only the following changes) (such changes, the "Flex Provisions") to the Term Loan Facility, in each case so long as the Requisite Term Loan Lead Arrangers reasonably determine that (i) such changes are necessary to ensure a Successful Syndication or (ii) such Successful Syndication has not or cannot be achieved by the Closing Date:

(a)     increase the applicable margin on the Term Loan Facility set forth in the Term Loan Facility Term Sheet by not more than 125 basis points (increasing by (i) 25 basis points on the date that is 4 months after the Signing Date, (ii) another 25 basis points on the date that is 7 months after the Signing Date, (iii) another 25 basis points if the public corporate credit ratings of the Borrower after giving effect to the Transactions from S&P are not at least BB- or from Moody's are not at least Ba3, in each case with at least a stable outlook and (iv) another 50 basis points on the Closing Date if a Successful Syndication has not occurred by such date and the Marketing Period has not concluded by such date) (which amounts may be implemented as OID or taken as upfront fees (based on four year life to maturity and no present value discount)); provided, that the aggregate amount of such OID and upfront fees (including any OID and upfront fees otherwise described herein or in the Commitment Letter) shall not exceed 2.50% of the Term Loan Facility; provided further that in the event that (x) the increase in applicable margin is implemented in the form of OID or upfront fees as provided for in such "pricing flex", then notwithstanding anything to the contrary contained in the Commitment Letter, the Borrower will be permitted to incur additional ABL Loans on the Closing Date to account for such OID or pay such additional upfront fees; provided further that, there shall be no increase in the commitments in respect of the ABL Facility provided by the Initial Lender in the Commitment Letter in connection therewith to account for such OID or pay such additional upfront fees and (y) any "pricing flex" rights are exercised, the Financial Covenant and any incurrence-based tests in the Term Loan Facility and the Backstop ABL Facility shall be adjusted as mutually agreed to account for any additional indebtedness, the additional interest expense resulting from the change in applicable margin and the effects of any OID or upfront fees and to maintain the agreed cushion taking into account such additional indebtedness, additional interest expense and the effects of any OID or upfront fees; and/or

(b)     with respect to the Incremental Facilities: (i) reduce the Incremental Fixed Dollar basket from the *pro forma* Consolidated EBITDA (to be defined) on the Closing Date to 75% of

4

the *pro forma* Consolidated EBITDA (to be defined) on the Closing Date and/or (ii) remove clause (B) of the "Uncommitted Incremental Facilities" section of the Term Sheet providing for the ability to reclassify the basket under which an Incremental Facility was incurred, and/or (iii) reduce the Consolidated First Lien Net Leverage Ratio test, the Consolidated Secured Net Leverage Ratio test and the Consolidated Total Net Leverage Ratio test under clause (3) thereof in each case by 0.25:1.00; and/or

(c)     extend the call protection period applicable to the Term Loan Facility from six months to no longer than twelve months after the Closing Date; and/or

(d)     extend or eliminate the 12 month MFN sunset with respect to the MFN provision under the Term Loan Facility; and/or

(e)     eliminate the stepdown in interest rate margins for the Term Loan Facility; and/or

(f)     with respect to the asset sale mandatory prepayment provision, shorten the reinvestment period to 12 months (or 18 months in the event a binding letter of intent is entered into within such 12-month period); and/or

(g)     set the highest excess cash flow sweep percentages on the Term Loan Facility at up to 75% with step-downs to 50%, 25% and 0% based on Consolidated First Lien Net Leverage Ratios of 0.5:1.00, 1.00:1.00 and 1.50:1.00 inside the Closing Date Consolidated First Lien Net Leverage Ratio; and/or

(h)     with respect to the definition of "Consolidated EBITDA", add a cap on "run-rate synergies" of no less than 25% of Consolidated EBITDA for the applicable period (calculated before giving effect to such adjustments).

The Requisite ABL Lead Arrangers (as defined below) shall be entitled at any time prior to the earlier of (a) the Closing Date and (b) the date of a Successful Syndication (as defined below), without your consent (but after consultation with you) to make the following changes (and only the following changes) to the ABL Facility, in each case so long as the Requisite ABL Lead Arrangers reasonably determine that (i) such changes are necessary to ensure a Successful Syndication or (ii) such Successful Syndication has not or cannot be achieved by the Closing Date:

(a)     increase the applicable margin on the ABL Facility set forth in the ABL Facility Term Sheet by not more than 25 basis points (increasing by 12.5 basis points on the Closing Date if a Successful Syndication has not occurred by such date and the Marketing Period has not concluded by such date); and/or

(b)     for purposes of the U.S. Borrowing Base and the Canadian Borrowing Base, reduce the advance rate in respect of NOLV Percentage of the Value of Eligible Inventory from 90% to a percentage not lower than 85%.

For purposes of the preceding paragraphs, "Successful Syndication" means (i) with respect to the Term Loan Facility, the Initial Term Loan Lenders hold commitments and loans in respect of the Term Loan Facility of not greater than $0 of the aggregate principal amount of the Term Loan Facility and (ii) with respect to the ABL Facility, (x) Bank of America holds commitments and loans in respect of the ABL Facility of not greater than $400,000,000 of the aggregate principal amount of the ABL Facility and (y) GS Bank holds commitments and loans in respect of the ABL Facility of not greater than $100,000,000 of the aggregate principal amount of the ABL Facility. "Requisite Term Loan Lead Arrangers" shall mean the

5

Term Loan Lead Arrangers holding, or affiliated with the Initial Term Loan Lenders representing, at least a majority of the commitments in respect of the Term Loan Facility as of the date hereof. "Requisite ABL Lead Arrangers" shall mean the ABL Lead Arrangers holding, or affiliated with the Initial ABL Lenders representing, at least a majority of the commitments in respect of the ABL Facility as of the date hereof.

It is understood and agreed that this Fee Letter shall not constitute or give rise to any obligation to provide any financing; such an obligation will arise only to the extent provided in the Commitment Letter if accepted in accordance with its terms. This Fee Letter may not be assigned by either party hereto except as permitted pursuant to the Commitment Letter. This Fee Letter may not be amended or waived except by an instrument in writing signed by the Commitment Party and you. This Fee Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York. This Fee Letter is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and, if the Fee Letter is assigned in accordance with the first sentence of Section 9 of the Commitment Letter, the applicable assignee or assignees. This Fee Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Fee Letter by facsimile transmission or other electronic transmission (e.g., "pdf" or "tiff") shall be effective as delivery of a manually executed counterpart hereof.

The applicable provisions of this Fee Letter shall survive the expiration or termination of the Commitment Letter (including any extension thereof) and the funding of the Facilities in accordance with the terms of the Commitment Letter. You agree that this Fee Letter and its contents are subject to the indemnification, jurisdiction, waiver of jury trial and confidentiality provisions of the Commitment Letter. The parties hereto hereby acknowledge and agree that, upon payment of the fees to be paid under this Fee Letter, this Fee Letter shall automatically terminate (other than with respect to the payment of the Agency Fee) without any action by any party hereto or thereto and all fees payable hereunder (other than any applicable Agency Fee) shall be deemed paid in full.

[SIGNATURE PAGES FOLLOW]

#91120727v7
#91168015v5

Please confirm that the foregoing is our mutual understanding by signing and returning to us an executed counterpart of this Fee Letter.

Very truly yours,

**GOLDMAN SACHS BANK USA**

By: _____
Name:  Robert Ehudin
Title:   Authorized Signatory

**GOLDMAN SACHS LENDING PARTNERS LLC**

By: _____
Name:  Robert Ehudin
Title:   Authorized Signatory

BANK OF AMERICA, N.A.

By:

Name:

Title: Jonathan Miscimarra

Director

MERRILL LYNCH, PIERCE, FENNER &
SMITH IN CORPORATED

By:

Name:

Title: Jonathan Miscimarra

Director

*[Signature Page to 2nd A&R Fee Letter]*

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By: _____

Name: LYNN GOSSELIN
Title: DIRECTOR

*[Signature Page to 2nd A&R Fee Letter]*

JPMORGAN CHASE BANK, N.A.

By:

Name:

Title:

**Alicia T. Schreibstein**
**Executive Director**

*[Signature Page to 2ⁿᵈ A&R Fee Letter]*

U.S. BANK NATIONAL ASSOCIATION

By: _____

Name: LISA Freeman
Title: SVP

*[Signature Page to 2nd A&R Fee Letter]*

Accepted and agreed to as of
the date first written above:

**UNITED NATURAL FOODS, INC.**

By: _____
Name: MICHAEL ZECHMEISTER
Title: CFO

# EXHIBIT 3

Execution Version

GOLDMAN SACHS BANK USA
GOLDMAN SACHS LENDING PARTNERS LLC
200 West Street
New York, New York 10282-2198

CONFIDENTIAL

August 8, 2018

United Natural Foods, Inc.
313 Iron Horse Way
Providence, RI 02908
Attn:    Michael Zechmeister
         Chief Financial Officer

Project Jedi
Second Amended and Restated Structuring Fee Letter

Ladies and Gentlemen:

Reference is made to the second amended and restated commitment letter, dated the date hereof (including the exhibits and other attachments thereto, the "Commitment Letter"), by and among GS Bank, GSLP, Bank of America, MLPFS, Wells Fargo Bank, JPMCB, US Bank and you regarding the Transactions described therein. Capitalized terms used but not defined in this letter agreement (this "Structuring Fee Letter") are used with the meanings assigned to them in the Commitment Letter. This amended and restated letter agreement is a "Fee Letter" referred to in the Commitment Letter.

This Second Amended and Restated Structuring Fee Letter amends, restates and supersedes in its entirety the amended and restated structuring fee letter, dated August 7, 2018, by and among GS Bank, GSLP and you (the "First A&R Structuring Fee Letter") ,and such First A&R Structuring Fee Letter shall be of no further force and effect.

As consideration for GS Bank's agreement to structure the Term Loan Facility you agree to pay (or cause to be paid), to GS Bank a non-refundable structuring fee equal to 0.25% of the aggregate commitments in respect of the Term Loan Facility as set forth in the Commitment Letter on the date hereof, which will be fully earned and due and payable on the Closing Date.

It is understood and agreed that this Structuring Fee Letter shall not constitute or give rise to any obligation to provide any financing; such an obligation will arise only to the extent provided in the Commitment Letter if accepted in accordance with its terms. This Structuring Fee Letter may not be assigned by either party hereto except as permitted pursuant to the Commitment Letter. This Structuring Fee Letter may not be amended or waived except by an instrument in writing signed by GS Bank and you. This Structuring Fee Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York. This Structuring Fee Letter is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and, if the Structuring Fee Letter is assigned in accordance with the first sentence of Section 9 of the Commitment Letter, the applicable assignee or assignees. This Structuring Fee Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Structuring Fee Letter by facsimile

INDEX NO. 650594/2019

RECEIVED NYSCEF: 01/30/2019

transmission or other electronic transmission (e.g., "pdf" or "tiff") shall be effective as delivery of a manually executed counterpart hereof.

The applicable provisions of this Structuring Fee Letter shall survive the expiration or termination of the Commitment Letter (including any extension thereof) and the funding of the Facilities in accordance with the terms of the Commitment Letter. You agree that this Structuring Fee Letter and its contents are subject to the indemnification, jurisdiction, waiver of jury trial and confidentiality provisions of the Commitment Letter. The parties hereto hereby acknowledge and agree that, upon payment of the fees to be paid under this Structuring Fee Letter, this Fee Letter shall automatically terminate without any action by any party hereto or thereto and all fees payable hereunder shall be deemed paid in full.

[SIGNATURE PAGES FOLLOW]

#91143640v1

Please confirm that the foregoing is our mutual understanding by signing and returning to us an executed counterpart of this Structuring Fee Letter.

Very truly yours,

**GOLDMAN SACHS BANK USA**

By: _____
Name:  Robert Ehudin
Title:   Authorized Signatory

**GOLDMAN SACHS LENDING PARTNERS LLC**

By: _____
Name:  Robert Ehudin
Title:   Authorized Signatory

*[Signature Page to 2nd A&R Structuring Fee Letter]*

Accepted and agreed to as of
the date first written above:

**UNITED NATURAL FOODS, INC.**

By: _____

Name: MICHAEL ZELHMEISTER

Title: CFO

*[Signature Page to Structuring Fee Letter]*

# AFFIDAVIT OF SERVICE

### SUPREME COURT OF THE STATE OF NEW YORK / COUNTY OF NEW YORK

*Index No. 650594/2019*

**UNITED NATURAL FOODS, INC.,**
**Plaintiff,**

-against-

**GOLDMAN SACHS GROUP, INC., ET AL,**
**Defendants**

**State Of New York, County of New York SS:**
**DOMINIK PRZYBYLO**
Being duly sworn, deposes and says that he is over eighteen years of age, is not a party to this action, and resides in the State of New York.

That on the **1st** day of **FEBRUARY, 2019** at: **2:01 PM**

At: **C/O CT CORPORATION SYSTEM, 28 LIBERTY STREET, 42nd FLOOR, NEW YORK, NY 10005**

Deponent served the: **SUMMONS, COMPLAINT WITH EXHIBITS, NOTICE OF ELECTRONIC FILING**

Upon: **GOLDMAN SACHS GROUP, INC.**

**PERSONAL SERVICE ON A CORPORATION**
A corporation, by delivering thereat a true copy to **ELENA BOUTAKOVA (SENIOR INTAKE SPECIALIST)** personally; who stated, that she is the said individual *Authorized to Accept Service* on behalf of **GOLDMAN SACHS GROUP, INC.**

**DESCRIPTION** – Deponent describes the individual served as follows:
Sex: **FEMALE** Color: **WHITE** Hair: **BLONDE** App. Age: **40** App. Ht. **5'7"** App. Wt. **135 lbs.**
Other identifying features:

Subscribed and sworn to before
me this **4th** day of **FEBRUARY, 2019**

JOLANTYNA CAGNEY
NOTARY PUBLIC, State of New York
No. 01CA6111489
Qualified in New York County  2020
Commission Expires June 14, 2016.

**DOMINIK PRZYBYLO #206-9153**

**CLASSIC LEGAL SUPPORT # 2022186-DCA**
475 PARK AVE SOUTH, 23rd FLOOR
NEW YORK, NEW YORK 10016
TEL. (212) 889-3200

1 of 1

# AFFIDAVIT OF SERVICE

### SUPREME COURT OF THE STATE OF NEW YORK / COUNTY OF NEW YORK
_Index No. 650594/2019_

**UNITED NATURAL FOODS, INC.,**
   **Plaintiff,**

 -against-

**GOLDMAN SACHS GROUP, INC., ET AL,**
   **Defendants**

_State Of New York, County of New York SS:_
**DOMINIK PRZYBYLO**
Being duly sworn, deposes and says that he is over eighteen years of age, is not a party to this action, and resides in the State of New York.

That on the 1st day of **FEBRUARY, 2019** at: **2:01 PM**

At: **C/O CT CORPORATION SYSTEM, 28 LIBERTY STREET, 42nd FLOOR, NEW YORK, NY 10005**

Deponent served the: **SUMMONS, COMPLAINT WITH EXHIBITS, NOTICE OF ELECTRONIC FILING**

Upon:  **MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED**

  **PERSONAL SERVICE ON A CORPORATION**
  A corporation, by delivering thereat a true copy to **ELENA BOUTAKOVA (SENIOR INTAKE SPECIALIST)** personally; who stated, that she is the said individual _Authorized to Accept Service_ on behalf of **MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED**

  **DESCRIPTION** – Deponent describes the individual served as follows:
  Sex: **FEMALE** Color: **WHITE** Hair: **BLONDE** App. Age: **40** App. Ht. **5'7"** App. Wt. **135 lbs.**
  Other identifying features:

Subscribed and sworn to before
me this 4th day of **FEBRUARY, 2019**

JOLANTYNA CAGNEY
NOTARY PUBLIC, State of New York
No. 01CA6111489
Qualified in New York County 2020
Commission Expires June 14, 2018

**DOMINIK PRZYBYLO #206-9153**

CLASSIC LEGAL SUPPORT # 2022186-DCA
475 PARK AVE SOUTH, 23rd FLOOR
NEW YORK, NEW YORK 10016
TEL. (212) 889-3200

# AFFIDAVIT OF SERVICE

### SUPREME COURT OF THE STATE OF NEW YORK / COUNTY OF NEW YORK

_____ *Index No. 650594/2019*

**UNITED NATURAL FOODS, INC.,**
    *Plaintiff,*

 *-against-*

**GOLDMAN SACHS GROUP, INC., ET AL,**
    *Defendants*

_____

**State Of New York, County of New York SS:**
**DOMINIK PRZYBYLO**
Being duly sworn, deposes and says that he is over eighteen years of age, is not a party to this action, and resides in the State of New York.

That on the **1**[st] day of **FEBRUARY, 2019** at: **2:01 PM**

At: **C/O CT CORPORATION SYSTEM, 28 LIBERTY STREET, 42**[nd] **FLOOR, NEW YORK, NY 10005**

Deponent served the: **SUMMONS, COMPLAINT WITH EXHIBITS, NOTICE OF ELECTRONIC FILING**

Upon: **GOLDMAN SACHS LENDING PARTNERS LLC**

   **PERSONAL SERVICE ON A LIMITED LIABILITY COMPANY**
   A limited liability company, by delivering thereat a true copy to **ELENA BOUTAKOVA (SENIOR INTAKE SPECIALIST)** personally; who stated, that she is the said individual *Authorized to Accept Service* on behalf of **GOLDMAN SACHS LENDING PARTNERS LLC**

   **DESCRIPTION** – Deponent describes the individual served as follows:
   Sex: **FEMALE** Color: **WHITE** Hair: **BLONDE** App. Age: **40** App. Ht. **5'7"** App. Wt. **135 lbs.**
   Other identifying features:

Subscribed and sworn to before
me this **4**[th] day of **FEBRUARY, 2019**

JOLANTYNA CAGNEY
NOTARY PUBLIC, State of New York
No. 01CA6111489
Qualified in New York County
Commission Expires June 14, 2020

**DOMINIK PRZYBYLO #206-9153**

**CLASSIC LEGAL SUPPORT # 2022186-DCA**
475 PARK AVE SOUTH, 23rd FLOOR
NEW YORK, NEW YORK 10016
TEL. (212) 889-3200

# AFFIDAVIT OF SERVICE

### SUPREME COURT OF THE STATE OF NEW YORK / COUNTY OF NEW YORK
### Index No. 650594/2019

**UNITED NATURAL FOODS, INC.,**
Plaintiff,

-against-

**GOLDMAN SACHS GROUP, INC., ET AL,**
Defendants

---

*State Of New York, County of New York SS:*
**DOMINIK PRZYBYLO**
Being duly sworn, deposes and says that he is over eighteen years of age, is not a party to this action, and resides in the State of New York.

That on the **1**st day of **FEBRUARY, 2019** at: **4:16 PM**

At: **ONE BRYANT PARK, NEW YORK, NEW YORK 10036**

Deponent served the: **SUMMONS, COMPLAINT WITH EXHIBITS, NOTICE OF ELECTRONIC FILING**

Upon: **BANK OF AMERICA, N.A.**

**PERSONAL SERVICE ON A CORPORATION**
A corporation, by delivering thereat a true copy to **AUDRA BERNARD (SENIOR LEGAL ADMINISTRATOR)** personally, who stated, that she is the said individual *Authorized to Accept Service* on behalf of **BANK OF AMERICA, N.A.**

**DESCRIPTION** – Deponent describes the individual served as follows:
Sex: **FEMALE** Color: **BLACK** Hair: **AUBURN** App. Age: **50** App. Ht. **5'7"** App. Wt. **200 lbs.**
Other identifying features:

Subscribed and sworn to before
me this **4**th day of **FEBRUARY, 2019**

JOLANTYNA CAGNEY
NOTARY PUBLIC, State of New York
No. 01CA6111489
Qualified in New York County
Commission Expires June 14, 2020

**DOMINIK PRZYBYLO #206-9153**

CLASSIC LEGAL SUPPORT # 2022186-DCA
475 PARK AVE SOUTH, 23rd FLOOR
NEW YORK, NEW YORK 10016
TEL. (212) 889-3200

# AFFIDAVIT OF SERVICE

### *SUPREME COURT OF THE STATE OF NEW YORK / COUNTY OF NEW YORK*

*Index No. 650594/2019*

*UNITED NATURAL FOODS, INC.,*
          *Plaintiff,*

     -against-

*GOLDMAN SACHS GROUP, INC., ET AL,*
          *Defendants*

*State Of New York, County of New York SS:*
**DOMINIK PRZYBYLO**
Being duly sworn, deposes and says that he is over eighteen years of age, is not a party to this action, and resides in the State of New York.

That on the **1ˢᵗ** day of **FEBRUARY, 2019** at: **3:41 PM**

At: **C/O CRAVATH SWAINE & MOORE, 825 8 AVENUE, 38ᵗʰ FLOOR, NEW YORK, NY 10019**

Deponent served the: **SUMMONS, COMPLAINT WITH EXHIBITS, NOTICE OF ELECTRONIC FILING**

Upon:   **STEPHAN J. FELDGOISE**

**PERSONAL SERVICE ON AN INDIVIDUAL**
An individual, by delivering thereat a true copy to **JERRY RIEDL (LAW CLERK)** personally; who stated, that he is the said individual *Authorized to Accept Service* on behalf of **STEPHAN J. FELDGOISE**

**DESCRIPTION** – Deponent describes the individual served as follows:
Sex: **MALE** Color: **WHITE** Hair: **BROWN** App. Age: **35** App. Ht. **6'2"** App. Wt. **170 lbs.**
Other identifying features:

Subscribed and sworn to before
me this **4ᵗʰ** day of **FEBRUARY, 2019**

JOLANTYNA CAGNEY
NOTARY PUBLIC, State of New York
No. 01CA611141
Qualified in New York County
Commission Expires June 14, 2020

**DOMINIK PRZYBYLO #206-9153**

**CLASSIC LEGAL SUPPORT # 2022186-DCA**
475 PARK AVE SOUTH, 23ᴿᴰ FLOOR
NEW YORK, NEW YORK 10016
TEL. (212) 889-3200

# AFFIDAVIT OF SERVICE

## SUPREME COURT OF THE STATE OF NEW YORK / COUNTY OF NEW YORK

_____ *Index No. 650594/2019*

**UNITED NATURAL FOODS, INC.,**
                    *Plaintiff,*

     *-against-*

**GOLDMAN SACHS GROUP, INC., ET AL,**
                    *Defendants*

_____

**State Of New York, County of New York SS:**
**DOMINIK PRZYBYLO**
Being duly sworn, deposes and says that he is over eighteen years of age, is not a party to this action, and resides in the State of New York.

That on the 1st day of **FEBRUARY, 2019** at: **2:38 PM**

At: **200 WEST STREET, NEW YORK, NEW YORK 10282**

Deponent served the: **SUMMONS, COMPLAINT WITH EXHIBITS, NOTICE OF ELECTRONIC FILING**

Upon:    **GOLDMAN SACHS BANK USA**

**PERSONAL SERVICE ON A CORPORATION**
A corporation, by delivering thereat a true copy to **DEBORAH A. RIVERA (VICE-PRESIDENT, LEGAL DEPARTMENT)** personally; who stated, that she is the said individual *Authorized to Accept Service* on behalf of **GOLDMAN SACHS BANK USA**

**DESCRIPTION** – Deponent describes the individual served as follows:
Sex: **FEMALE** Color: **WHITE** Hair: **BROWN** App. Age: **65** App. Ht. **5'6"** App. Wt. **200 lbs.**
Other identifying features: **GLASSES**

Subscribed and sworn to before
me this 4th day of **FEBRUARY, 2019**

JOLANTYNA CAGNEY
NOTARY PUBLIC, State of New York
No. 01CA6111489
Qualified in New York County 2020
Commission Expires June 14, 2016

**DOMINIK PRZYBYLO #206-9453**

**CLASSIC LEGAL SUPPORT # 2022186-DCA**
475 PARK AVE SOUTH, 23rd FLOOR
NEW YORK, NEW YORK 10016
TEL. (212) 889-3200